Edwards Wildman Palmer LLP
Ronie M. Schmelz, Bar No. 130798
1901 Avenue of the Stars, Suite 1700
Los Angeles, CA 90067
rschmelz@edwardswildman.com
Telephone: 310.860.8700
Facsimile: 310.860.3800

FILED
CLERK, U.S. DISTRICT COURT

NOV 27 2013

CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

Attorneys for Plaintiffs
Shuxin Li, Yongpu Cheng,
Miaozhou Zhu and Zhanyuan Tong

United States District Court

Central District of California

| | |
|---|---|
| SHUXIN LI, YONGPU CHENG, MIAOZHOU ZHU, and ZHANYUAN TONG, on Behalf of Themselves and All Others Similarly Situated, | Case No. |
| | **CV13-8832** DSF-CWx |
| Plaintiffs, | **CLASS ACTION COMPLAINT** |
| | **AND DEMAND FOR JURY** |
| v. | **TRIAL** |
| JACK J. QIN, individually and as President, Chief Executive Officer and Chairman of the Board of Directors of EFT Holdings, Inc., EFT HOLDINGS INC., VISMAN CHOW, NORMAN KO, WILLIAM SLUSS, PYNG SOON, | |
| Defendants, | |

Plaintiffs Shuxin Li, Youngpu Cheng, Miaozhou Zhu, and Zhanyuan Tong (collectively "Plaintiffs"), by and through their undersigned attorneys, make the following allegations pursuant to the investigation of their counsel and based upon information and belief, except as to allegations specifically pertaining to themselves and their counsel, which are based upon personal knowledge.

Edwards Wildman
Palmer LLP
Attorneys At Law
Los Angeles

AM 25898826.1

## **NATURE OF THE ACTION**

1.     This is a class action against Jack J. Qin (hereinafter "Qin") individually and as President, Chief Executive Officer, and Chairman of the Board of Directors of EFT  Holdings, Inc. ("EFT"), EFT, and officers and members of the EFT Board of Directors (collectively, "Defendants").

2.     Defendants have orchestrated a fraudulent pyramid scheme pursuant to which Plaintiffs and tens of thousands of other Chinese and American consumers paid Defendants tens of millions of dollars in United States' currency in exchange for the right to purchase nutritional supplements and other products and obtain an ownership interest in EFT.  Qin promised Plaintiffs that the value of their ownership interests in EFT would increase substantially over time as company sales increased.  A key, but unspoken part, of  Defendants' scheme was that in order for Plaintiffs to realize the promised lucrative rewards from their EFT investments, they had to recruit others to purchase EFT's products and ownership interests in the company.

3.     Defendants' entire business model was based on the recruitment of unsuspecting consumers who were promised the highest quality products and an ownership interest in a vibrant, growing, and legitimate company if they purchased EFT products, rather than on actual sales of EFT products to consumers. Defendants then were further able to prey upon Plaintiffs and other Class members by engaging in a series of transactions designed to loot the company for the benefit of Qin and his affiliates.

4.     EFT advertises its products as providing a variety of health, anti-aging, and nutritional benefits.  The U.S. Food and Drug Administration ("FDA") previously determined that a number of EFT products are drugs because they are intended for use in the cure, mitigation, treatment, and/or prevention of disease.  In

1   2009, the FDA sent EFT a Warning Letter advising the company that certain of its

2   dietary supplements, including those purchased by Plaintiffs and other Class

3   members, were misbranded and illegal drugs, and demanding that the company

4   immediately cease selling the products.  EFT ignored the FDA's Warning Letter

5   and continues to market and sell those dietary supplements today.

6

7          5.     Defendants, over the course of the last several years, have abdicated their

8   fiduciary obligations to Plaintiffs and other Class members, all of whom are

9   shareholders of EFT.  As a result of Defendants' breaches of their fiduciary duties,

10  Defendants and others have been unjustly enriched at the expense of EFT

11  shareholders.

12

13         6.     Beginning in at least 2007, EFT and Qin began using a pyramid scheme to

14  solicit investors in China and the United States for an upcoming private placement

15  of EFT stock by promising that the value of the stock in the private placement

16  would increase multiple times once the stock began trading publically.  In fact, the

17  private placement was a mechanism to provide funds for Qin to engage in certain

18  transactions that allowed him to manipulate the price of EFT stock and loot the

19  company, all with the assistance of EFT's officers and members of its Board of

20  Directors, including Defendants.  The result of Defendants' manipulation of EFT's

21  stock price and breaches of fiduciary duties resulted in a substantial payday for Qin

22  and others, while leaving EFT shareholders with stock worth virtually nothing.

23         7.     Plaintiffs seek relief in this action for themselves individually and on

24  behalf of all other shareholders of EFT stock for Defendants' breaches of their

25  fiduciary duties, unjust enrichment, aiding and abetting, constructive fraud,

26  corporate waste and gift, and gross mismanagement.

27

28

EDWARDS WILDMAN
PALMER LLP
ATTORNEYS AT LAW
LOS ANGELES

AM 25898826.1

## THE PARTIES

8.     Plaintiff Shuxin Li is a resident of the City of Dalian located in the People's Republic of China.  During the relevant time period, at the time the injurious acts complained of herein occurred, Li held and continues to hold shares of EFT stock.

9.     Plaintiff Yongpu Cheng is a resident of the City of Luoyang, Henan Province located in the People's Republic of China.  During the relevant time period, at the time the injurious acts complained of herein occurred, Cheng held and continues to hold shares of EFT stock.

10.     Plaintiff Miaozhou Zhu is a resident of the City of Hefei, Anhui Province located in the People's Republic of China.  During the relevant time period, at the time the injurious acts complained of herein occurred, Zhu held and continues to hold shares of EFT stock.

11.     Plaintiff Zhanyuan Tong is a resident of the City of Shijiazhuang, Hebei Province located in the People's Republic of China.  During the relevant time period, at the time the injurious acts complained of herein occurred, Tong held and continues to hold shares of EFT stock.

12.     Defendant EFT is a publicly-traded Nevada Corporation with its principal place of business at 17800 Castleton Street, Suite 300, City of Industry, California 91748.  According to its website, www.eftb.us, EFT, through its subsidiaries, engages in the merchandising and sale of EFT-brand products over the Internet. EFT operates through over one million registered "affiliate members" located throughout Hong Kong, the People's Republic of China, Asia, Europe, and the U.S. All EFT products, which include bio-available nutritional and nutritional spray products, are manufactured in the United States and sold to consumers around the world, including in the U.S. and China.

13.    Defendant Qin is a California resident who founded EFT in 1998 and, since its inception, has served as the Company's Chief Executive Officer, President, and Chairman of the Board.

14.    Defendant Chow is a resident of California and has been a member of EFT's Board of Directors since July 2009.

15.    Defendant Ko is a resident of California and has been a member of EFT's Board of Directors since July 2009.

16.    Defendant Sluss is a resident of California and EFT's principal financial and accounting officer.

17.    Defendant Soon is a resident of California and EFT's General Counsel Defendants Chow, Ko, Sluss, and Soon are hereinafter referred to collectively as the "Officer and Director Defendants").

## JURISDICTION AND VENUE

18.    Defendants are subject to the jurisdiction of this Court.  They have engaged in continuous and systematic business in California.  Defendants have designated agents for service of process in this State, have their principal place of business here, and have committed tortious acts in this State.

19.    This Court has original subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(2) because the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of a State and citizens or subjects of a foreign state.

20.    This Court also has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 (d)(2)(B) because there are more than 100 Class members, the aggregate amount in controversy exceeds $5,000,000.00, exclusive of interest and

EDWARDS WILDMAN
PALMER LLP
ATTORNEYS AT LAW
LOS ANGELES

AM 25898826.1

1  costs, and is a class action in which at least one Class member is a citizen or subject

2  of a foreign state.

3

4      21.    Venue is proper in this District pursuant to 28 U.S.C. §1391 as EFT's

5  principal place of business is located within this District and a substantial part of

6  the events, omissions, and acts giving rise to the claims herein occurred in this

7  District.

8  ## DUTIES OF DEFENDANTS

9      22.    By virtue of their positions as officers and members of the Board of

10  Directors of EFT, Defendants owe EFT and Plaintiffs and other members of the

11  Class, all of whom are EFT shareholders, the duty to exercise a high degree of care,

12  good faith, loyalty, and diligence: (1) to manage and administer EFT in the best

13  interests of the company and its shareholders; (2) to preserve the company's

14  property and assets; (3) to fairly and accurately report to shareholders on the

15  company's operations; and (4) not to seek to personally profit at the expense of

16  EFT and its shareholders.  The conduct of Qin and the other individual Defendants,

17  as complained of herein, involves knowing, intentional, and culpable violations of

18  their fiduciary duties to EFT, the Plaintiffs and other Class members.

19

20      23.    Qin, by virtue of his position of control and authority as President, Chief

21  Executive Officer, and Chairman of the Board of Directors of EFT was able to and

22  did exercise control over the company's corporate officers and Board of Directors

23  in order to engage in the wrongful acts complained of herein.

24      24.    In discharging their duties, Defendants were required to exercise

25  reasonable and prudent supervision over management, policies, practices, and

26  controls of EFT.  By virtue of such duties, Defendants were required to, among

27  other things:

28

Edwards Wildman
Palmer LLP
Attorneys At Law
Los Angeles

AM 25898826.1

(A)    Exercise good faith in ensuring that the affairs of EFT were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business;

(B)    Exercise good faith in ensuring that EFT was operated in a diligent, honest and prudent manner and complied with all applicable international, federal and state laws, rules, regulations, and requirements;

(C)    Exercise diligence and care in overseeing the business activities of EFT and educating themselves on the transactions being entered into by management; and

(D)    Take steps to prevent Defendant Qin from using the assets of EFT to unduly benefit himself and his affiliates.

25.    Qin breached his fiduciary duties to Plaintiffs and Class members by, among other things, knowingly conducting improper transactions with affiliated third parties to benefit himself and to the detriment of EFT shareholders.

26.    The Officer and Director Defendants breached their fiduciary duties to Plaintiffs and Class members by not exercising care and diligence in overseeing the activities of Qin and company management and/or knowingly approving of Qin's improper activities.

## FACTS COMMON TO ALL CLAIMS

### A. Background

27.    EFT was originally incorporated under a different name in the State of Nevada on March 19, 1992. It is a public company trading in the U.S. on the OTC Pink Sheets.

28.    EFT is an American-based e-Commerce publicly traded company that operates through over one-million registered affiliate members, or consumers, who

purchase EFT products, including nutritional supplements, anti-aging skin care, and natural cosmetics via the Internet. To purchase products, affiliates are directed to fax a form to a U.S. fax number and remit the purchase price for products ordered in U.S. Dollars ("USD"), the only currency Defendants accept. Orders are processed by EFT's offices in the City of Industry, California, and shipped from there to affiliates around the world, including in the U.S. and China.

29.    As a direct-sales company, EFT operates a multi-level distribution system which relies on its affiliates to market, promote, and sell its products. Anyone can become an affiliate by purchasing EFT products. The company represents "a no risk philosophy in joining the EFT team, [which] ensures the continuation of EFT's success."

30.    To join the "no-risk EFT team," Plaintiffs and other Class members are promised "rewards" based on the amount of EFT products they order. There are four levels of affiliates, or consumers, which are determined by the amount of product ordered. Today, those levels are as follows: (1) Beginning Consumers, who make one purchase order of $450.00 USD (which includes $400 worth of products + $50 shipping and handling ("S&H"); (2) Standard Consumers, who make one purchase order of $660.00 USD ($600 worth of products + $60 S&H); (3) Advisory Consumers, who make one purchase order of $990.00 USD ($900 worth of products + $90 S&H); and (4) Franchised Consumers, who make one purchase order of $3,300.00 USD (which includes $3,000 worth of products + $300 S&H).

31.    EFT affiliates earn "Instant Bonuses" when they "sponsor," or bring in, other consumers who purchase EFT products. For example, based on the structure currently in place, an affiliate that becomes a "Standard Consumer" (by purchasing $660 worth of EFT products), and sponsors, or brings in, another "Standard

Consumer" receives a $150 USD instant bonus.  An affiliate that achieves Advisory status (by purchasing $990 worth of products) and sponsors another "Advisory Consumer" receives a $350 USD instant bonus.  And a Franchised Consumer (who purchases $3,300 worth of products) who sponsors another Franchised Consumer receives a $1,350 USD instant bonus.

32.    In addition to Instant Bonuses, affiliates earn "Weekly Binary Commissions" based on the number of product orders they submit to EFT.   These commissions are based on the number of orders submitted, without regard to the number of EFT products actually purchased or sold by each consumer.  Thus, as with other classic pyramid schemes, the rewards that affiliates receive are based on recruiting other consumers to participate in the program, not on the basis of product sales.

33.    All of the monetary rewards earned by Plaintiffs and Class members were issued in the form of EFT credit points, which were held on account at EFT and could only be used to purchase more EFT products.  For a brief period of time during the first half of 2007, certain credit points were allowed to be withdrawn on EFT debit cards, subject to costly transaction and maintenance fees.  This arrangement was later suspended.  Defendants repeatedly dissuaded Plaintiffs and Class members from withdrawing cash from their accounts by telling them that withdrawal of the funds would reduce the value of EFT and their investments in the company.

**B. Qin Lures Plaintiffs and Others to Join EFT**

34.    Beginning in 2003, Defendant Qin held a series of public meetings during which he gave speeches to induce Plaintiffs and other Class members to purchase EFT products and become company "affiliates."  Some of Qin's speeches were recorded and discs of the speeches were handed out during subsequent meetings in

China and circulated among Plaintiffs and Class members. The discs were used as marketing tools to educate Class members who did not attend Qin's meetings in person about EFT, its products, the company's bonus and reward system, how to become an "affiliate" and invest in the company.

35.     During these meetings, Qin espoused the benefits of EFT products. He also represented that consumers who purchased the company's products would not only receive the products ordered, they would also reap financial rewards and the right to purchase ownership interests in EFT, in the form of stock certificates which Qin represented as "negotiable securities" that could be sold for money. The number and value of shares issued depended on the Consumer level of products purchased. Defendants recommend that consumers purchase products at the Franchised Consumer level so they can "compete at all levels, [] help support your duplication, and bring you great residual income."

36.     During his speeches, Qin represented to Plaintiffs and other Class members that the value of their ownership interests in EFT would increase as more consumers purchased products. In true pyramid fashion, however, Qin had to insure that, in addition to bringing money into the pyramid through the sale of EFT products, Plaintiffs and other Class members did not try to take money out of the company by selling their shares or otherwise liquidating the rewards they earned through sponsoring new product purchases. Thus, during his speeches, Qin told Plaintiffs and other Class members not to redeem their rewards or sell their shares in EFT until the company went public in an initial public offering (the promised "IPO"). By holding onto their shares until after the IPO, Qin assured Plaintiffs and other Class members that the value of their shares in the company would increase substantially.

37.   Qin continued giving speeches into at least 2010, during which, in addition to touting EFT products and extolling their benefits, he solicited investments in EFT through the sale of company shares which he promised would at least double in value as long as investors held onto their shares until the company was able to go through with its expected IPO.  As of the date this complaint is filed, Defendants continue to sell and extoll the virtue of EFT products and solicit affiliates to invest in the company.

**C. The Transfer of Shares to Dragon Win**

38.   Having succeeded in luring unsuspecting consumers into the EFT pyramid scheme, Defendant Qin embarked on a scheme to defraud Plaintiffs and other Class members by engaging in a series of transactions designed to transfer over Fifty Two Million (52,000,000) shares of EFT stock to his then-mistress and, later, after manipulating the share price of EFT stock, sell those shares to third parties at a substantial profit to Qin and/or his mistress.  Later, Qin continued the deception by engaging in a series of transactions designed to deceive shareholders into holding EFT's stock, thereby allowing him to continue to loot revenue from the company and further enrich himself and his associates.

39.   On November 18, 2007, EFT completed a reverse merger with EFT BioTech, Inc., a Nevada corporation formed on September 18, 2007 ("EFT BioTech"), pursuant to which EFT acquired 100% of issued and outstanding shares of EFT BioTech in exchange for Fifty Three Million Three Hundred Thousand (53,300,000) EFT shares, which represented 70.15% of EFT capital stock on a fully-diluted basis.

40.   Subsequently, later in November 2007, EFT transferred Fifty Two Million Ninety Nine Thousand (52,099,000) issued shares of EFT common stock to a British Virgin Islands Company called Dragon Win Management Limited ("Dragon

Edwards Wildman
Palmer LLP
Attorneys At Law
Los Angeles

AM 25898826.1

Win") in exchange for little or no value.  At the time of the transfer to Dragon Win, EFT's stock was trading at between Two Dollars and Sixty Five Cents ($2.65) and Three Dollars and Ten Cents ($3.10) per share, which meant that the transfer of EFT stock to Dragon Win should have increased the value to EFT from somewhere between One Hundred Thirty Eight Million Dollars ($138,000,000) and One Hundred Sixty One Million Dollars ($161,000,000).  EFT's financial statements, however, reflect little or no value to EFT as a result of this transaction.

41.  EFT's subsequent filings with the U.S. Securities and Exchange Commission ("SEC") indicate that the owner of Dragon Win was Jun Qin Liu ("Jun").  Jun is or was Qin's mistress and also a member of EFT's Board of Directors at the time of the Dragon Win transaction.

42.  Insofar as is relevant to this dispute, unbeknownst to Plaintiffs, other Class members and likely prospective shareholders, Jun was acting at Qin's direction and in collaboration with him.  There was no way, at the time, that Plaintiffs could have learned, and they did not learn, that Qin and Jun were acting in collaboration with one another.

43.  Also in November 2007, EFT sold an aggregate of Seven Million Five Hundred Thousand (7,500,000) shares to a few accredited U.S. investors, who were preferred affiliates of Qin or operating at his direction and control, for $0.0018 per share or a total of Thirteen Thousand Five Hundred Ninety Dollars ($13,590), which was well below the then stated market value of EFT shares.

44.  At the time of these transactions, there were approximately Seventy Five Million (75,000,000) EFT shares outstanding with a market capitalization of between One Hundred Ninety Eight Million Seven Hundred Fifty Thousand Dollars ($198,750,000) and Two Hundred Thirty Two Million Five Hundred Thousand Dollars ($232,500,000).  As a result of these transactions, Qin caused nearly 80%

1     of EFT issued shares to be transferred to his preferred affiliates for virtually

2     nothing.

3

4     45.     Upon information and belief, these actions were either undertaken by Qin

5     without approval of EFT's management and Board of Directors or, if they were

6     taken with the approval of management and the Board, they were so controlled by

7     Qin that they were unable to, and did not, function independently in approving such

8     transactions.

9     **D. EFT's Private Placement to Affiliates**

10

11     46.     Only two months after the Dragon Win transaction, in January 2008, EFT

12     commenced a purported "Regulation S" offering of its shares and warrants at a

13     purchase price of Three Dollars Eighty Cents ($3.80) per unit.  Each unit consisted

14     of one share of common stock and one redeemable common stock warrant to

15     purchase one share of common stock at Three Dollars Eighty Cents ($3.80) per

16     share.  The offering commenced in January 2008 and closed in late October 2008.

17     The offering was only available to EFT "affiliates."

18     47.     Beginning in 2007, Qin began to publicly tout the upcoming private

19     placement of EFT units through a series of speeches given to EFT affiliates

20     throughout Asia.  Qin repeatedly told audiences that EFT's stock price would soar

21     and that EFT would be listed on the New York Stock Exchange, as a result of

22     which its stock price would at least quadruple, and perhaps go up even more.  Such

23     statements were made at conferences in New Zealand in January 2007; Hong Kong

24     on April 21 and June 25, 2007; and Tianjin, China on August 8, 2008.

25     48.     Videotapes of Qin's speeches were routinely used to stimulate interest in

26     EFT's stock during the private placement, as well as more generally both before

27     and after the private placement.  Investors also relied on written materials and

28

AM 25898826.1

information which was available on EFT's website.  Sometimes Qin would use so-called "advisors" to further promote Qin's message that EFT's stock price would rise dramatically and that the company's shares would be listed on the New York Stock Exchange.

49.     The purported Regulations S offering was, in reality, nothing of the sort. EFT affiliates were not provided with a Private Placement Memorandum or other documents that describe the private placement as required by Regulation S.  The offering also included nearly Thirty Thousand (30,000) foreign nationals and U.S. citizens which violated both U.S. and Chinese securities laws.  In addition, many of those purchasing EFT shares under the private placement were not "accredited investors" as required by Regulation S.  Instead of receiving from Qin and EFT basic company information necessary to evaluate their investments in EFT, in order to make a decision of whether to invest in the company, Plaintiffs and other Class members were forced to rely on representations made on EFT's website, Qin's speeches and promotional activities, and vague written information provided by Qin.

50.     As a result of Qin's promotional efforts, EFT sold nearly Fifteen Million (15,000,000) units in the private placement for net proceeds in excess of Fifty One Million Dollars ($51,000,000).  These sales exceeded the original amount of units to be offered by nearly fifty percent.  Overall, nearly Thirty Thousand (30,000) affiliates participated in the offering.

51.     Before the offering began, EFT's stock price was just over Three Dollars ($3.00) a share.  That price increased slightly, to just over Four Dollars ($4.00) a share at the time of the offering.

52.     As a result of having purchased EFT products, Plaintiff Li earned the opportunity to, and did, purchase over Thirty Eight Thousand (38,000) shares in the

EDWARDS WILDMAN
PALMER LLP
ATTORNEYS AT LAW
LOS ANGELES
AM 25898826.1

company under his own and his wife's name.  Li would not have purchased EFT shares if he had known the Defendants operated EFT as a pyramid scheme and were acting and would continue to act in violation of their fiduciary duties.

53.     As a result of having purchased EFT products, Plaintiff Cheng earned the opportunity to, and did, purchase over Five Thousand Five Hundred (5,500) shares in the company.  Cheng would not have purchased EFT shares if he had known the Defendants operated EFT as a pyramid scheme and were acting and would continue to act in violation of their fiduciary duties.

54.     As a result of having purchased EFT products, Plaintiff Zhu earned the opportunity to, and did, purchase Eight Hundred (800) shares in the company.  Zhu would not have purchased EFT shares if he had known the Defendants operated EFT as a pyramid scheme and were acting and would continue to act in violation of their fiduciary duties.

55.     As a result of having purchased EFT products, Plaintiff Tong earned the opportunity to, and did, purchase over One Thousand Nine Hundred (1,900) shares in the company.  Tong would not have purchased EFT shares if he had known the Defendants operated EFT as a pyramid scheme and were acting and would continue to act in violation of their fiduciary duties.

**E. Qin and Jun Sell the Dragon Win Shares**

56.     Both before and after the offering, Qin reported that he owned only One Thousand (1,000) shares of EFT stock.  Although EFT reported that Jun was the owner of record or beneficial owner of about Fifty Two Million (52,000,000) shares of EFT stock, the relationship between Jun and Qin was not disclosed and the fact that they were acting in concert with one another was not disclosed to Plaintiffs or company shareholders.

57.     To reap the benefit of the shares transferred to Dragon Win, Qin devised a scheme to dispose of Dragon Win's EFT stock at the highest price possible, but in order to do so, Qin first had to prop up the stock's price and keep it high until a purchaser could be found and a transaction closed on favorable terms.

58.     To carry out his scheme, throughout 2009, Qin urged investors to hold on to their EFT shares, assuring them that if they did so, the price per share would multiply substantially over time.  Qin's speeches were persuasive and had their intended effect - nearly all of the Thirty Thousand (30,000) shareholders who purchased shares in EFT continued to hold them, some even purchased additional shares on the OTC market, and the price of EFT's shares soared.

59.     As a result of Qin's scheme, in or about early April 2009, Jun (acting for Qin) was able to sell Dragon Win and, with it, Dragon Win's only real asset – Fifty Two Million (52,000,000) shares in EFT.  At the time of the sale, EFT's stock price was at its all-time high of about Seven Dollars ($7.00) per share.

60.     Although the details of the sale of Dragon Win have not been disclosed to Plaintiffs and the other members of the Class, if the shares of Dragon Win were sold for the then-market value of EFT shares it owned, Jun (acting for Qin) would have pocketed about Three Hundred Fifty Million Dollars ($350,000,000) as a result of the sale of Dragon Win.

61.     Upon information and belief, the individuals who purchased the Dragon Win shares were or are affiliated with or controlled by Qin.  Despite having lost nearly Three Hundred Fifty Million Dollars ($350,000,000), when the value of the shares owned by Dragon Win declined, and having a controlling majority of voting shares in the company, the new owners of Dragon Win have taken no action to remove Qin from EFT's management or the Board of Directors and have instead condoned Qin's continuing breaches of fiduciary duties as described herein.

62.     Although Qin had already profited handsomely from his scheme to manipulate the market in EFT stock, he saw yet another opportunity to profit at the expense of Plaintiffs and other Class members.

63.     Following the closing of the private placement, Qin engaged in a series of transactions with preferred affiliated persons designed to deceive EFT's investors into believing that:  (A) EFT was a viable business and not a fraudulent pyramid scheme; and (B) the value of their shares would multiply several times.  In fact, the transactions were designed to maintain the EFT share price at an artificially high value while giving Qin the opportunity to loot cash from the company's operations.

64.     Qin failed to disclose to Plaintiffs and other shareholders that the money they invested in EFT, an on-line e-commerce company, was used to purchase interests in transportation companies, real estate holdings and other business interests that were unrelated to the stated business operations of the company. Several of these investments were made without the approval of EFT's Board of Directors, prompting two directors to resign.  Many of Defendants' investments resulted in litigation, thus further jeopardizing the value of Plaintiffs' investments in EFT.  None of this information was disclosed to Plaintiffs or other shareholders.

**F.  Qin's Purchase of Excalibur**

65.     Immediately following the private placement, Qin caused EFT to acquire 48.81% of a Taiwanese corporation called Excalibur, which operated a ferry boat in the straights of Taiwan.  EFT spent Nineteen Million ($19,000,000) on its investment in Excalibur.  EFT also issued a loan of One Million Five Hundred Thousand Dollars ($1,500,000) to an individual named Yeuh-Chi Liu ("Liu") so she could buy a 3% interest in Excalibur.  The loan to Liu, which was unsecured, was never repaid and was eventually written-off on December 31, 2010.  At the time of the loan, Liu was an EFT Board member and another of Qin's mistresses.

By arranging for EFT to issue the unsecured loan to Liu, Qin essentially gave his mistress a gift of One Million Five Hundred Thousand Dollars ($1,500,000).

66.     EFT's investment in Excalibur turned out to be a disaster; in August 2010, the ferry boat operated by the company was damaged and taken out of service, resulting in a Five Million Four Hundred Thousand Dollar ($5,400,000) impairment loss to EFT.  Nonetheless, EFT continues to make loans to Excalibur, totaling nearly Twenty Million Dollars ($20,000,000), to help it fund operations.

67.     Upon information and belief, the purchase of Excalibur and the funding of its continued operations were either undertaken by Qin without approval of EFT's management and Board of Directors or shareholders or, if they were taken with the approval of management and the Board or shareholders, these entities were so controlled by Qin that they were unable to function independently in approving the transactions.

## G. Qin Engages in Several Sham Transactions to Benefit his Sister

68.     EFT has engaged in a series of transactions with Qin's sister, Wendy Qin, in which she purportedly provides EFT with non-existent or highly overvalued services resulting in a dissipation of EFT assets to the detriment of Plaintiffs and other EFT shareholders.

69.     For example, EFT licenses the EFT name and trademark from EFT Assets, a company owned by Wendy Qin.  In exchange for licenses to use the EFT name and trademark, EFT pays and has paid EFT Assets and Wendy Qin 5% for the first Thirty Million Dollars ($30,000,000) of its gross revenue, 4% for the next Ten Million Dollars ($10,000,000) in gross revenue, 3% for the next Ten Million Dollars ($10,000,000) of gross revenue, and 2% for the next Ten Million Dollars ($10,000,000) of gross revenue.  EFT's agreement with EFT Assets has resulted,

and continues to result, in millions of dollars in payments to Wendy Qin that has damaged and continues to damage Plaintiffs and other Class members.

70.     Similarly, EFT has entered into an agreement with JFL Ltd., another entity in which Wendy Qin is the principal shareholder. Starting on April 1, 2010, EFT has paid JFL Ltd. approximately One Hundred Thousand Dollars ($100,000) per quarter, purportedly for administrative, financial, and business development consulting. In reality, Qin has arranged for EFT to pay his sister for non-existent consulting services.

71.     EFT also leases Six Thousand Three Hundred (6,300) square feet of office space from Wendy Qin in Hong Kong at a rental rate of Fifty Thousand Dollars ($50,000) per month. At this rental rate, EFT is continuing to pay Qin's sister Three Hundred Sixty Thousand Dollars ($360,000) per year in office rental payments.

72.     Upon information and belief, these actions were either undertaken by Qin without approval of EFT's management and Board of Directors or shareholders or, if they were taken with the approval of management and the Board or shareholders, the entities were so controlled by Qin that they were unable to function independently in approving these transactions.

**H. The Loan to CTX Technologies**

73.     In July 2010, EFT entered into a transaction in which it provided an unsecured loan of Five Million Dollars ($5,000,000) to CTX Virtual Technologies, Inc. ("CTX"). The agreement provided that either party to the loan could convert the loan into Eight Million Four Hundred Seventy Four Thousand Five Hundred Seventy Six (8,474,576) shares of CTX stock in lieu of repaying the loan. Upon information and belief, Defendants never intended for CTX to repay the loan and

they knew at the time of the transaction that the CTX stock offered in exchange for the loan was nearly worthless.

74.     In March 2011, CTX elected to convert the loan by issuing EFT millions of share of CTX stock that Defendants knew was worthless.  At the time the loan was converted to CTX stock, shares were trading at One Dollar Seventy Cents ($1.70) per share, but was trading at such a low volume that liquidating the millions of shares EFT was given in exchange for the loan would have caused the stock price to drop to virtually nothing.  As Defendants expected, and as stated in EFT's subsequent SEC filings, EFT determined, shortly after CTX converted the loan to EFT stock, that the CTX stock was thinly traded and EFT did not believe the One Dollar Seventy Cents ($1.70) valuation greatly overstated the value of the CTX stock.  The CTX transaction was arranged by an employee of Buckman, Buckman & Reid, the broker dealer who served as the placement agent for EFT's private placement and who acted as the market maker for EFT stock.  As a result of the CTX transaction, EFT declared Five Million Dollars ($5,000,000) of the CTX loan to be an impaired asset as of March 31, 2013.

75.     Upon information and belief, these actions were either undertaken by Qin without approval of EFT's management and Board of Directors or shareholders or, if they were taken with the approval of management and the Board or the shareholders, the entities were so controlled by Qin that they were unable to function independently in approving these transactions.

## I.   The Purchase of The Office Building in Taiwan

76.     In May 2011, without the approval of EFT's Board of Directors, Qin entered into two agreements to purchase an office building located in Taipei, Taiwan for Two Million Thirty Five Million Three Hundred Thousand Dollars ($235,300,000).  In July 2011, the agreement was taken over by an EFT subsidiary,

EFT Investment, and EFT Investment was obligated to make subsequent installment payments on the building until it was fully paid for.  As of June 30, 2013, EFT and its subsidiary have paid approximately Twenty Million Eight Hundred Thousand Dollars ($20,800,000) for the Taiwanese building.

77.     In June 2012, a dispute arose between EFT Investment and the counterparty to the purchase of the Taiwan building that resulted in the counterparty terminating its contracts with EFT Investment and claiming a forfeiture of EFT Investment's deposit of Sixteen Million Seven Hundred Thousand Dollars ($16,700,000).  The dispute is currently the subject of several litigations in Taiwan and the United States.

78.     As a result of Qin's actions, taken without Board approval, as of March 31, 2013, EFT has taken an impairment loss of Eleven Million Two Hundred Twenty Seven Thousand Dollars ($11,227,000) on its investment in the Taiwanese office building.

## J.  **Qin Embarks on a Business Strategy Designed to Damage EFT**

79.     Defendants' entire business model was based on the recruitment of unsuspecting consumers who were promised an ownership interest in a vibrant, growing, and legitimate company if they purchased EFT products, rather than on actual sales of EFT products to consumers.

80.     To join the "no-risk" EFT team," Plaintiffs and other Class members are promised "rewards" based on the amount of EFT products they ordered.  There are four levels of consumers, which are determined by the amount of product ordered. Today, those levers are as follows:  (1) Beginning Consumers, who make one purchase order of $450.00 (which includes $400 worth of products + $50 shipping and handling ("S&H"); (2) Standard Consumers, who make one purchase order of

EDWARDS WILDMAN
PALMER LLP
ATTORNEYS AT LAW
LOS ANGELES

- 21 -

$660.00 ($600 worth of products + $60 S&H); (3) Advisory Consumers, who make one purchase order of $990.00 ($900 worth of products + $90 S&H); and (4) Franchised Consumers, who make one purchase order of $3300.00 (which includes $3000 worth of products + $300 S&H).

81.   Beginning in April 2011, inexplicably and without the approval of the Board of Directors, Qin announced that EFT was changing its business model and that going forward, the cost to become an affiliate and the price of products affiliates were required to purchase would double.

82.   The negative impact on EFT's business as a result of these changes to its business model was devastating and immediate.  Affiliates immediately began buying large quantities of EFT products to avoid the price increase, but then stopped buying the products altogether.  EFT's ability to recruit new affiliates was also negatively impacted.  As a result, EFT's sales revenue and profitability declined significantly and its price per share dropped from the mid-Sixty Cents ($.60) per share range to less than $.009 per share at the time of this filing.

## K. EFT's Lack of Internal Controls and Board Member Resignations

83.   Shortly after Qin's purchase of the Taiwanese office building, on July 13, 2011, Defendant Jeffrey Cheung, one of EFT's Board members, resigned from EFT's Board of Directors.

84.   In the Form 8-K filing EFT made announcing Mr. Cheung's resignation, EFT stated that Mr. Cheung's resignation was due to a disagreement with EFT's President over the purchase of the Taiwanese office building.  As of the date of the 8-K filing, EFT's Board of Directors had not yet approved the purchase of the building.  The filing stated that Mr. Cheung resigned because the company's

1   Directors did not approve the purchase and, in his opinion, the company could not

2   afford to purchase the building.

3

4   85.     Similarly, on November 20, 2012, Defendant Jerry B. Lewin, an

    independent member of the Board of Directors, resigned from the EFT Board of

5   Directors.  EFT's 8-K filing announcing his resignation stated that he resigned as a

6   result of his concerns about the general status of the company's market, the lack of

7   sales in the second quarter of fiscal 2013, and several occasions where management

8   had not advised the Board on material purchases made by the company prior to

9   making such purchases.

10

11  86.     On August 17, 2011, EFT's accountants issued their Report of

12  Independent Registered Public Accounting Firm on Internal Control Over Financial

13  Reporting (the "Report").  The Report found several material weaknesses in EFT's

14  internal controls, including a security breach that was not caught in a timely manner

15  and which resulted in a significant loss to the company.  Among the material

16  weakness noted by the accountants was "that the company initiated material

17  investments without the proper approval of the Board of Directors."  Upon

18  information and belief, the material investments described in the Report are the

19  same transactions described in detail above.

20

21  87.     In its Form 10-K filing with the SEC for the year ended March 31, 2012,

    the company explained how it remediated the material weakness in EFT's internal

22  controls relating to the company initiating material investments without proper

23  approval of the Board of Directors.  The company stated that "in June 2012, the

24  Board agreed to pass a resolution that will reprimand the Company's chief

25  executive officer if he enters into significant transactions without the Board's

26  approval."  The company further stated that "other than the remedial measures

27  described above, there were no other changes in the Company's internal financial

28

control over financial reporting that have materially affected, or are likely to affect, its internal control over financial reporting."

88.     EFT's lack of internal controls and Qin's dominance over management and remaining Board members have allowed Qin and his associates to engage in an ongoing pattern of self-dealing and corporate waste that has profited them greatly and severely damaged EFT's shareholders.

## EQUITABLE TOLLING ALLEGATIONS

89.     Throughout the relevant time period, Plaintiffs' principal source of information regarding EFT and its business operations were the speeches Qin gave to affiliates and the limited information about company products on the EFT website.  In his speeches, Qin assured Plaintiffs and Class members that the value of EFT's stock would multiply and the company and its business were financially sound.  In fact, Qin engaged in a campaign to conceal the wrongful activities of himself and others.

90.     EFT held no shareholder meetings during the relevant time period.

91.     EFT did not post copies of its filings with the SEC on its website. Moreover, to the extent those filings were somehow made available to Plaintiffs, they were made available in English – a language most Plaintiffs and Class members do not speak or understand.

92.     At various times after purchasing their initial shares in EFT, and before the value of the shares dropped to below one cent, Plaintiff Li and other Class members of the Class approached Qin to discuss EFT's stock price, product quality, team leadership structure and other issues relating to the company and the declining value of its shares.  During these meetings, Qin repeatedly assured Li and others, both in public and private meetings, that EFT's business was strong, its products

were good and that the value of the company's shares would increase as long as Li and others recruited more individuals to purchase EFT products and invest in the company. Throughout their discussions, Qin continued to promote EFT and its business and assured Plaintiffs their investments would be safe and would pay off.

93.     Notwithstanding their standing as EFT shareholders, Defendants intentionally omitted and failed to disclose material information about EFT and its business operations to Plaintiffs and other Class members. Among other things, Defendants failed to disclose that EFT products had been the subject to Warning Letter issued by the U.S. Food and Drug Administration ("FDA") and that the FDA had instructed the company to withdraw many of its products from the market. Defendants also did not disclose that money invested by shareholders in EFT was used to purchase interests in transportation companies and real estate holdings that were unrelated to the stated business operations of the Company.

94.     After years of Defendants' repeated representations that the value of Plaintiffs' investment in EFT was secure and would be realized once the Company held its IPO, Plaintiffs began to suspect that Defendants' assurances were false and misleading. Thus, in 2012, Plaintiffs set out to locate other similarly situated shareholders who had attended meetings with Qin, purchased EFT products, and became company shareholders. Through their efforts, Plaintiffs determined that there were tens of thousands of EFT shareholders – both rich and poor – who, based on Qin's speeches about the stability of EFT's business and the promises of riches, invested tens of millions of dollars in the company.

95.     After discovering that they were not alone and that Defendants' fraudulent scheme had ensnarled so many other unsuspecting Chinese citizens, Plaintiffs engaged counsel, first in China and later in the U.S., to explore their legal options.

It was only after engaging counsel in 2013 that Plaintiffs first learned of Defendants' pyramid scheme, false promises, and misuse of the money they had invested in EFT.

96.     Even after counsel was engaged, in June 2013, Defendants continued their campaign of obfuscation and deceit by removing all of the prior news items from the EFT website and blocking certain Plaintiffs' access to their EFT affiliate accounts.  Such actions were taken with the intention of making it more difficult for Plaintiffs to gather facts regarding Defendants' wrongful conduct and to inhibit Plaintiffs' ability to file this action.

## CLASS ACTION ALLEGATIONS

97.     Plaintiffs bring this class action pursuant to Federal Rule of Civil Procedure 23(a), (b) (1), (b)(2), and (b)(3) on behalf of all EFT affiliates who purchased EFT stock between January 1, 2008 to the present (the "Class"). Excluded from the Class are Defendants, their employees, family members, officers, directors, and any entity in which Defendants have or had a controlling interest.

98.     <u>Numerosity</u>:  Members of the Class are so numerous that their individual joinder herein is impracticable.  Members of the Class number in the tens of thousands.  The precise number of Class members and their identities are unknown to Plaintiffs at this time but will be determined through discovery.  Class members may be notified of the pendency of this action by mail and/or publication and through the records of Defendants and their agents, as well as third parties.

99.     <u>Common Questions Predominate</u>:  Common questions of law and fact exist as to all Class members and predominate over questions affecting only individual Class members.  Common legal and factual questions include, but are not limited to:

(A)     Whether Defendant Qin breached his fiduciary duty to Plaintiffs by

engaging in transactions designed to benefit himself and his associates to the detriment of Plaintiffs' and the other members of the Class;

(B)     Whether Defendants breached their fiduciary duties to Plaintiffs by failing to ensure that the affairs of EFT were carried out in an efficient, business-like manner so as to make it possible to provide the highest quality performance of EFT's business;

(C)     Whether Defendants exercised reasonable and prudent supervision over management, policies practices and controls of the Company;

(D)     Whether Defendants exercised good faith in ensuring that EFT was operated in a diligent, honest and prudent manner and complied with all applicable international, federal and state laws, rules, regulations and requirements;

(E)     Whether Defendants took steps to prevent Defendant Qin from using the assets of EFT to unduly benefit himself and his affiliates;

(F)     Whether Defendants were unjustly enriched by their conduct;

(G)     Whether Defendants aided and abetted Defendant Qin in engaging in his wrongful conduct;

(H)     Whether Defendants committed constructive fraud;

(I)     Whether Defendants engaged in corporate waste in overseeing and managing the affairs of EFT;

(J)     Whether Defendants engaged in gross mismanagement of the affairs of EFT;

(K)     Whether a constructive trust should be imposed on the proceeds of Qin's improper transactions and the remaining assets of EFT; and

(L)     Whether, as a result of Defendants' misconduct as alleged herein, Plaintiffs and Class members are entitled to restitution, injunctive and/or monetary relief and, if so, the amount and nature of such relief.

100.   Typicality:  Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct.  Plaintiffs have no interests antagonistic to the interests of the other members of the Class.  Plaintiffs and all members of the Class have sustained economic injury arising out of Defendants' violations of common and statutory law as alleged herein.

101.   Adequacy:  Plaintiffs are adequate representatives of the Class because their interests do not conflict with the interests of the Class members they seek to represent, they have retained counsel competent and experienced in class actions, and they intend to prosecute this action vigorously.  The interests of Class members will be fairly and adequately protected by Plaintiffs and their counsel.

102.   Superiority:  The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of Plaintiffs and Class members. Each individual Class member may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendants' liability.  Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case.  In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scales, and comprehensive supervision by a single court on the issue of Defendants' liability.  Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of liability issues.

## COUNT I

### (Breach of Fiduciary Duty)

### Against All Defendants

103.   Plaintiffs repeat, reallege, and incorporate herein by reference each and every allegation above as if fully set forth herein.

104.   By reason of his position as President, Chief Executive Officer, and Chairman of the Board of EFT, and because of his ability to control the business and corporate affairs of EFT, Defendant Qin owes Plaintiffs and the other members

of the Class fiduciary obligations of good faith, trust, loyalty, and due care, and is required to use his utmost ability to control and manage EFT in a fair, honest, and equitable manner. Qin was and is required to act in furtherance of the best interests of Plaintiffs and other Class members equally and not in furtherance of his personal interests or benefit. Qin owes Plaintiffs and other Class members the fiduciary duty to exercise good faith and diligence in the administration of the company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

105.   By reason of their positions as officers and members of the Board of Directors of EFT, the Officer and Director Defendants owe Plaintiffs and other Class members fiduciary obligations of good faith, trust, loyalty, and due care, and are required to use their utmost ability to control and manage EFT in a fair, honest, and equitable manner. The Officer and Director Defendants are required to act in furtherance of the best interests of Plaintiffs and other Class members equally and not in furtherance of their personal interests or benefit. The Officer and Director Defendants owe Plaintiffs and other Class members the fiduciary duty to exercise good faith and diligence in the administration of the company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

106.   Defendants violated and breached these duties by their actions described herein.

107.   As a result of these Defendants' wrongful conduct, and the wrongful conduct of each of them, Plaintiffs and Class members have suffered and continue to suffer economic and non-economic losses, all in an amount in excess of Seventy Five Thousand Dollars ($75,000), to be determined according to proof at the time of trial.

108.   It has been necessary for Plaintiffs to retain legal counsel to commence this action and Plaintiffs are entitled to reasonable attorneys' fees and costs of suit to pursue this action.

## COUNT II

### (Unjust Enrichment)

### All Defendants

109.   Plaintiffs repeat, reallege, and incorporate herein by reference each and every allegation above as if fully set forth herein.

110.   As alleged herein, Defendants were unjustly enriched by the illegal transactions and activities of Qin and his associates.

111.   It would be unjust and inequitable for these Defendants to retain the proceeds of the illegal transactions and activities of Qin and his associates.

112.   As a result of these Defendants' wrongful conduct, and the wrongful conduct of each of them, Plaintiffs and Class members have suffered and continue to suffer economic and non-economic losses, all in an amount in excess of Seventy Five Thousand Dollar ($75,000), to be determined according to proof at the time of trial.

113.   It has been necessary for Plaintiffs to retain legal counsel to commence this action and Plaintiffs are entitled to reasonable attorneys' fees and costs of suit to pursue this action.

## COUNT III

### (Aiding and Abetting)

### Against the Officer and Director Defendants

Edwards Wildman
Palmer LLP
Attorneys At Law
Los Angeles

AM 25898826.1

114.   Plaintiffs repeat, reallege, and incorporate herein by reference each and every allegation above as if fully set forth herein.

115.   The Officer and Director Defendants are sued as participants and as aiders and abettors as herein alleged.  At all times herein mentioned, each of these Defendants was the agent, servant, partner, aider and abettor, co-conspirator, and/or joint venturer of Defendant Qin.  They were at all times operating and acting within the purpose and scope of said agency, service, employment, partnership, conspiracy, and/or joint venture and rendered substantial assistance and encouragement to Qin.

116.   As a result of the foregoing conduct, the Officer and Director Defendants participated in and facilitated the breach of fiduciary duties described herein.

117.   As a result of these Defendants' wrongful conduct, and the wrongful conduct of each of them, Plaintiffs have suffered and continue to suffer economic and non-economic losses, all in an amount in excess of Seventy Five Thousand Dollars ($75,000), to be determined according to proof at the time of trial.

118.   The acts of Defendants named herein, and each of them, were done maliciously, oppressively, and with intent to defraud.  Plaintiffs are entitled to punitive and exemplary damages in an amount to be shown according to proof at the time of trial.

119.   It has been necessary for Plaintiffs to retain legal counsel to commence this action and Plaintiffs are entitled to reasonable attorneys' fees and costs of suit to pursue this action.

## COUNT IV

### (Constructive Fraud)

### Against All Defendants

EDWARDS WILDMAN
PALMER LLP
ATTORNEYS AT LAW
LOS ANGELES

AM 25898826.1

120.   Plaintiffs repeat, reallege, and incorporate herein by reference each and every allegation above as if fully set forth herein.

121.   As fiduciaries to Plaintiffs and the other members of the Class, Defendants owe Plaintiffs and other Class members a duty of candor and full and accurate disclosures regarding the true state of EFT's business and assets and Defendants' conduct with regard thereto.

122.   As described above, Defendants made, or aided and abetted the making of, misrepresentations and concealment of material facts, despite their duties to, *inter alia*, disclose the true facts regarding EFT.

123.   As a result of these Defendants' wrongful conduct, and the wrongful conduct of each of them, Plaintiffs have suffered and continue to suffer economic and non-economic losses, all in an amount in excess of Seventy Five Thousand ($75,000), to be determined according to proof at the time of trial.

124.   The acts of the Defendants named herein, and each of them, were done maliciously, oppressively, and with intent to defraud.  Plaintiffs are entitled to punitive and exemplary damages in an amount to be shown according to proof at the time of trial.

125.   It has been necessary for Plaintiffs to retain legal counsel to commence this action and Plaintiffs are entitled to reasonable attorneys' fees and costs of suit to pursue this action.

## COUNT V

### (Corporate Waste and Gift)

### Against All Defendants

126.   Plaintiffs repeat, reallege, and incorporate herein by reference each and every allegation above as if fully set forth herein.

127.   By failing to properly consider the interests of Plaintiffs and other Class members, Defendants, without any valid corporate purpose, have caused EFT to waste valuable corporate assets solely for the financial gain of these Defendants.

128.   In return for such wrongful diversion of corporate assets, EFT received no consideration, rendering the transactions in effect a gift to Defendants.

129.   The conduct of Defendants, and each of them, was not in good faith. Defendants intentionally and directly diverted EFT's assets to their own use or benefit.

130.   As a result of these Defendants' wrongful conduct, and the wrongful conduct of each of them, Plaintiffs have suffered and continue to suffer economic and non-economic losses, all in an amount in excess of Seventy Five Thousand ($75,000), to be determined according to proof at the time of trial.

131.   It has been necessary for Plaintiffs to retain legal counsel to commence this action and Plaintiffs are entitled to reasonable attorneys' fees and costs of suit to pursue this action.

## COUNT VI
### (Gross Mismanagement)
### Against all Defendants

132.   Plaintiffs repeat, reallege, and incorporate herein by reference each and every allegation above as if fully set forth herein.

133.   By their actions alleged herein, Defendants abandoned and abdicated their responsibilities and fiduciary duties with regard to managing prudently the assets and business of Plaintiffs and other Class members in a manner consistent with the operations of an e-commerce retailing company.

EDWARDS WILDMAN
PALMER LLP
ATTORNEYS AT LAW
LOS ANGELES

AM 25898826.1

- 33 -

134.   As a result of these Defendants' wrongful conduct, and the wrongful conduct of each of them, Plaintiffs have suffered and continue to suffer economic and non-economic losses, all in an amount in excess of Seventy Five Thousand ($75,000), to be determined according to proof at the time of trial.

135.   The acts of Defendants were done maliciously, oppressively, and with intent to defraud.  Plaintiffs are entitled to punitive and exemplary damages in an amount to be shown according to proof at the time of trial.

136.   It has been necessary for Plaintiffs to retain legal counsel to commence this action and Plaintiffs are entitled to reasonable attorneys' fees and costs of suit to pursue this action.

## COUNT VII

### (Imposition of a Constructive Trust)

### Against All Defendants

137.   Plaintiffs repeat, reallege, and incorporate herein by reference each and every allegation above as if fully set forth herein.

138.   By reason of their positions as officers and directors of EFT, Defendants owe Plaintiffs and other Class members fiduciary obligations of good faith, trust, loyalty, and due care, and are required to use their utmost abilities to control and manage EFT in a fair, honest, and equitable manner.

139.   As officers and directors of EFT, Defendants promised to operate EFT in an efficient, businesslike manner so as to make it possible to provide the highest quality performance of EFT's business and to exercise reasonable and prudent supervision over management, policies, practices and controls of EFT.  Defendants further promised to exercise reasonable supervision over the affairs of EFT so as to

1   not allow Qin and his associates to engage in transactions designed to benefit Qin

2   and his associates at the expense of Plaintiffs' and the other members of the Class.

3
4   140.   In reliance on Defendants' promises, Plaintiffs and the members of the

5   Class invested in EFT and held on to their stock even after the stock price began to

6   decline.

7   141.   As a direct result of Defendants' breach of their promises, and Plaintiffs'

8   reliance thereon, Defendants were unjustly enriched.

9
10   142.   As a result of Defendants' wrongful conduct, a constructive trust should

11   be imposed on the proceeds of Defendants' wrongful transactions and the remaining

12   assets of EFT.

13   143.   It has been necessary for Plaintiffs to retain legal counsel to commence

14   this action and Plaintiffs are entitled to reasonable attorneys' fees and costs of suit

15   to pursue this action.

16

17   **PRAYER FOR RELIEF**

18   WHEREFORE, Plaintiffs, individually and on behalf of other members of

19   the

20   Class, pray for judgment as follows:

21   144.   Awarding damages against all Defendants, jointly and severally, and in

22   favor of the Class for the amount of damages sustained by them as a result of the

23   Defendants' breaches of fiduciary duties and wrongful conduct.

24   145.   Awarding restitution, disgorgement of all illicit proceeds generated as a

25   result of the wrongful conduct alleged herein, and punitive damages.

26

27   146.   Awarding appropriate equitable relief to remedy Defendants' breaches of

28   fiduciary duty and unjust enrichment.

EDWARDS WILDMAN
PALMER LLP
ATTORNEYS AT LAW
LOS ANGELES

AM 25898826.1

- 35 -

147.   Imposing a constructive trust on the proceeds of Defendants' wrongful conduct and the remaining assets of EFT.

148.   Awarding Plaintiffs prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

149.   Awarding such other and further relief as the Court may deem just and proper.

Dated:   November 27, 2013          Edwards Wildman Palmer LLP


By: _____
          Ronie M. Schmelz
          Attorneys for Plaintiffs
          Shuxin Li, Youngpu Cheng,
          Miaozhou Zhu and Zhanyuan Tong


## **DEMAND FOR TRIAL BY JURY**

Plaintiffs hereby demand a trial by jury on all claims so triable in this action.

Dated:   November 27, 2013          Edwards Wildman Palmer LLP


By: _____
          Ronie M. Schmelz
          Attorneys for Plaintiffs
          Shuxin Li, Youngpu Cheng,
          Miaozhou Zhu and Zhanyuan Tong

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

## NOTICE OF ASSIGNMENT TO UNITED STATES JUDGES

This case has been assigned to District Judge _____ Dale S. Fischer _____ and the assigned Magistrate Judge is _____ Carla Woehrle _____ .

The case number on all documents filed with the Court should read as follows:

## 13-CV-08832 DSF-CWx

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge.

Clerk, U. S. District Court

November 27, 2013
_____
Date

By   SBOURGEOIS
_____
Deputy Clerk

---

## NOTICE TO COUNSEL

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

### Subsequent documents must be filed at the following location:

| [x] Western Division | [ ] Southern Division | [ ] Eastern Division |
|---|---|---|
| 312 N. Spring Street, G-8 | 411 West Fourth St., Ste 1053 | 3470 Twelfth Street, Room 134 |
| Los Angeles, CA 90012 | Santa Ana, CA 92701 | Riverside, CA 92501 |

**Failure to file at the proper location will result in your documents being returned to you.**

AO 440 (Rev. 06/12) Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

CENTRAL DISTRICT OF CALIFORNIA

SHUXIN LI, YONGPU CHENG, MIAOZHOU ZHU,
AND ZHANYUAN TONG, on Behalf of Themselves
and All Others Similarly Situated,

*Plaintiff(s)*

v.

JACK J. QIN, Individually and as President, Chief
Executive Officer and Chairman of the Board of
Directors of EFT Holdings, Inc.; EFT HOLDINGS,
INC.; VISMAN CHOW; NORMAN KO, WILLIAM
SLUSS; PYNG SOON,

*Defendant(s)*

)
)
)
)
)
)
)
)
)
)
)
)
)

Civil Action No.

CV13-8832 DSF-CW

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

Ronie M. Schmelz, Esq.
Edwards Wildman Palmer LLP
1901 Avenue of the Stars, Suite 1700
Los Angeles, CA 900067
Telephone:  (310) 860-8700

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

CLERK OF COURT

SHEA BOURGEOIS

Date:  NOV  2 7  2013

_____
Signature of Clerk or Deputy Clerk

1184

AM 25888515.1


American LegalNet, Inc.
www.FormsWorkFlow.com

AO 440 (Rev. 06/12) Summons in a Civil Action (Page 2)

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____

☐ I personally served the summons on the individual at *(place)* _____

_____ on *(date)* _____ ; or

☐ I left the summons at the individual's residence or usual place of abode with *(name)* _____

_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

☐ I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)* _____

_____ on *(date)* _____ ; or

☐ I returned the summons unexecuted because _____ ; or

☐ Other *(specify):*



My fees are $ _____ for travel and $ _____ for services, for a total of $ 0.00 _____

I declare under penalty of perjury that this information is true.


Date: _____              _____
                                                                    *Server's signature*

                                                            _____
                                                                     *Printed name and title*


                                                            _____
                                                                      *Server's address*

Additional information regarding attempted service, etc:



**I. (a) PLAINTIFFS** ( Check box if you are representing yourself ☐ )

SHUXIN LI, YONGPU CHENG, MIAOZHOU ZHU, and ZHANYUAN TONG, on Behalf of Themselves, etc.

**DEFENDANTS** ( Check box if you are representing yourself ☐ )

JACK J. QIN, individually & as President, Chief Executive Officer and Chairman of Board of Directors of EFT Holdings, Inc.; et al.

**(b)** County of Residence of First Listed Plaintiff **Los Angeles**
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant **Los Angeles**
*(IN U.S. PLAINTIFF CASES ONLY)*

**(c) Attorneys** *(Firm Name, Address and Telephone Number)* If you are representing yourself, provide the same information.

Ronie M. Schmelz (SBN 130798)
Edwards Wildman Palmer LLP
1901 Avenue of the Stars, Suite 1700
Los Angeles, CA 90067 / Telephone: (310) 860-8700

**Attorneys** *(Firm Name, Address and Telephone Number)* If you are representing yourself, provide the same information.

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1. U.S. Government Plaintiff

☐ 3. Federal Question (U.S. Government Not a Party)

☐ 2. U.S. Government Defendant

☒ 4. Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES**-For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☒ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☒ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☒ 1. Original Proceeding  ☐ 2. Removed from State Court  ☐ 3. Remanded from Appellate Court  ☐ 4. Reinstated or Reopened  ☐ 5. Transferred from Another District (Specify)  ☐ 6. Multi-District Litigation

**V. REQUESTED IN COMPLAINT: JURY DEMAND:** ☒ Yes ☐ No  (Check "Yes" only if demanded in complaint.)

**CLASS ACTION under F.R.Cv.P. 23:** ☒ Yes ☐ No  ☐ **MONEY DEMANDED IN COMPLAINT:** $ In excess of $15 Mil.

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)

**VII. NATURE OF SUIT** (Place an X in one box only).

| OTHER STATUTES | CONTRACT | REAL PROPERTY CONT. | IMMIGRATION | PRISONER PETITIONS | PROPERTY RIGHTS |
|---|---|---|---|---|---|
| ☐ 375 False Claims Act | ☐ 110 Insurance | ☐ 240 Torts to Land | ☐ 462 Naturalization Application | **Habeas Corpus:** | ☐ 820 Copyrights |
| ☐ 400 State Reapportionment | ☐ 120 Marine | ☐ 245 Tort Product Liability | ☐ 465 Other Immigration Actions | ☐ 463 Alien Detainee | ☐ 830 Patent |
| ☐ 410 Antitrust | ☐ 130 Miller Act | ☐ 290 All Other Real Property | | ☐ 510 Motions to Vacate Sentence | ☐ 840 Trademark |
| ☐ 430 Banks and Banking | ☐ 140 Negotiable Instrument | **TORTS** | **TORTS** | ☐ 530 General | **SOCIAL SECURITY** |
| ☐ 450 Commerce/ICC Rates/Etc. | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | **PERSONAL INJURY** | **PERSONAL PROPERTY** | ☐ 535 Death Penalty | ☐ 861 HIA (1395ff) |
| ☐ 460 Deportation | | ☐ 310 Airplane | ☐ 370 Other Fraud | **Other:** | ☐ 862 Black Lung (923) |
| ☐ 470 Racketeer Influenced & Corrupt Org. | ☐ 151 Medicare Act | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | ☐ 540 Mandamus/Other | ☐ 863 DIWC/DIWW (405 (g)) |
| ☐ 480 Consumer Credit | ☐ 152 Recovery of Defaulted Student Loan (Excl. Vet.) | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 550 Civil Rights | ☐ 864 SSID Title XVI |
| ☐ 490 Cable/Sat TV | | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 555 Prison Condition | ☐ 865 RSI (405 (g)) |
| ☐ 850 Securities/Commodities/Exchange | ☐ 153 Recovery of Overpayment of Vet. Benefits | ☐ 340 Marine | **BANKRUPTCY** | ☐ 560 Civil Detainee Conditions of Confinement | **FEDERAL TAX SUITS** |
| ☐ 890 Other Statutory Actions | ☐ 160 Stockholders' Suits | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | **FORFEITURE/PENALTY** | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 891 Agricultural Acts | ☒ 160 Stockholders' Suits | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 871 IRS-Third Party 26 USC 7609 |
| ☐ 893 Environmental Matters | ☐ 190 Other Contract | ☐ 355 Motor Vehicle Product Liability | **CIVIL RIGHTS** | ☐ 690 Other | |
| ☐ 895 Freedom of Info. Act | ☐ 195 Contract Product Liability | ☐ 360 Other Personal Injury | ☐ 440 Other Civil Rights | **LABOR** | |
| ☐ 896 Arbitration | ☐ 196 Franchise | ☐ 362 Personal Injury-Med Malpractice | ☐ 441 Voting | ☐ 710 Fair Labor Standards Act | |
| ☐ 899 Admin. Procedures Act/Review of Appeal of Agency Decision | **REAL PROPERTY** | ☐ 365 Personal Injury-Product Liability | ☐ 442 Employment | ☐ 720 Labor/Mgmt. Relations | |
| | ☐ 210 Land Condemnation | ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability | ☐ 443 Housing/ Accomodations | ☐ 740 Railway Labor Act | |
| ☐ 950 Constitutionality of State Statutes | ☐ 220 Foreclosure | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 445 American with Disabilities-Employment | ☐ 751 Family and Medical Leave Act | |
| | ☐ 230 Rent Lease & Ejectment | | ☐ 446 American with Disabilities-Other | ☐ 790 Other Labor Litigation | |
| | | | ☐ 448 Education | ☐ 791 Employee Ret. Inc. Security Act | |

**FOR OFFICE USE ONLY:** Case Number:

CV13-8832

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
CIVIL COVER SHEET

**VIII. VENUE:** Your answers to the questions below will determine the division of the Court to which this case will most likely be initially assigned. This initial assignment is subject to change, in accordance with the Court's General Orders, upon review by the Court of your Complaint or Notice of Removal.

| Question A: Was this case removed from state court?<br>☐ Yes  ☒ No<br><br>If "no," go to Question B. If "yes," check the box to the right that applies, enter the corresponding division in response to Question D, below, and skip to Section IX. | STATE CASE WAS PENDING IN THE COUNTY OF: | INITIAL DIVISION IN CACD IS: |
|---|---|---|
| | ☐ Los Angeles | Western |
| | ☐ Ventura, Santa Barbara, or San Luis Obispo | Western |
| | ☐ Orange | Southern |
| | ☐ Riverside or San Bernardino | Eastern |

| Question B: Is the United States, or one of its agencies or employees, a party to this action?<br>☐ Yes  ☒ No<br><br>If "no," go to Question C. If "yes," check the box to the right that applies, enter the corresponding division in response to Question D, below, and skip to Section IX. | If the United States, or one of its agencies or employees, is a party, is it: | | INITIAL DIVISION IN CACD IS: |
|---|---|---|---|
| | **A PLAINTIFF?**<br>Then check the box below for the county in which the majority of DEFENDANTS reside. | **A DEFENDANT?**<br>Then check the box below for the county in which the majority of PLAINTIFFS reside. | |
| | ☐ Los Angeles | ☐ Los Angeles | Western |
| | ☐ Ventura, Santa Barbara, or San Luis Obispo | ☐ Ventura, Santa Barbara, or San Luis Obispo | Western |
| | ☐ Orange | ☐ Orange | Southern |
| | ☐ Riverside or San Bernardino | ☐ Riverside or San Bernardino | Eastern |
| | ☐ Other | ☐ Other | Western |

| Question C: Location of plaintiffs, defendants, and claims?<br>(Make only one selection per row) | A.<br>Los Angeles County | B.<br>Ventura, Santa Barbara, or San Luis Obispo Counties | C.<br>Orange County | D.<br>Riverside or San Bernardino Counties | E.<br>Outside the Central District of California | F.<br>Other |
|---|---|---|---|---|---|---|
| Indicate the location in which a majority of plaintiffs reside: | ☒ | ☐ | ☐ | ☐ | ☐ | ☐ |
| Indicate the location in which a majority of defendants reside: | ☒ | ☐ | ☐ | ☐ | ☐ | ☐ |
| Indicate the location in which a majority of claims arose: | ☒ | ☐ | ☐ | ☐ | ☐ | ☐ |

**C.1. Is either of the following true? If so, check the one that applies:**

☐ 2 or more answers in Column C

☐ only 1 answer in Column C and no answers in Column D

Your case will initially be assigned to the
SOUTHERN DIVISION.
Enter "Southern" in response to Question D, below.

If none applies, answer question C2 to the right. ➡

**C.2. Is either of the following true? If so, check the one that applies:**

☐ 2 or more answers in Column D

☐ only 1 answer in Column D and no answers in Column C

Your case will initially be assigned to the
EASTERN DIVISION.
Enter "Eastern" in response to Question D, below.

If none applies, go to the box below. ⬇

Your case will initially be assigned to the
WESTERN DIVISION.
Enter "Western" in response to Question D below.

| Question D: Initial Division? | INITIAL DIVISION IN CACD |
|---|---|
| Enter the initial division determined by Question A, B, or C above: ➡ | WESTERN |


American LegalNet, Inc.
www.FormsWorkFlow.com

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
**CIVIL COVER SHEET**

**IX(a). IDENTICAL CASES**: Has this action been previously filed **in this court** and dismissed, remanded or closed?   ☒ NO   ☐ YES

If yes, list case number(s): _____

**IX(b). RELATED CASES**: Have any cases been previously filed **in this court** that are related to the present case?   ☒ NO   ☐ YES

If yes, list case number(s): _____

Civil cases are deemed related if a previously filed case and the present case:

(Check all boxes that apply)   ☐ A. Arise from the same or closely related transactions, happenings, or events; or

☐ B. Call for determination of the same or substantially related or similar questions of law and fact; or

☐ C. For other reasons would entail substantial duplication of labor if heard by different judges; or

☐ D. Involve the same patent, trademark or copyright, _and_ one of the factors identified above in a, b or c also is present.

**X. SIGNATURE OF ATTORNEY**
**(OR SELF-REPRESENTED LITIGANT):**   DATE: November 27, 2013

Ronie M. Schmelz

**Notice to Counsel/Parties:** The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet).

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405 (g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405 (g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405 (g)) |

American LegalNet, Inc.
www.FormsWorkFlow.com