1  Edwards Wildman Palmer LLP
2  Ronie M. Schmelz, Bar No. 130798
   rschmelz@edwardswildman.com
3  1901 Avenue of the Stars, Suite 1700
   Los Angeles, CA 90067
4  Telephone:   310.860.8700
   Facsimile:    310.860.3800
5
6  Edwin Larkin (Admitted *pro hac vice*)
   elarkin@edwardswildman.com
7  750 Lexington Avenue
   New York, NY 10022
8  Telephone:   212.912.2762
   Facsimile:    866.227.5761
9
10 Attorneys for Plaintiffs Shuxin
   Li, Haiyuan Zhao, Yu Hu, and
11 Hongyan Liu

```
FILED
CLERK, U.S. DISTRICT COURT

JUL 1 0 2014

CENTRAL DISTRICT OF CALIFORNIA
BY                      DEPUTY
```

12              UNITED STATES DISTRICT COURT

13              CENTRAL DISTRICT OF CALIFORNIA

14

15 | SHUXIN LI, HAIYUAN ZHAO, YU          Case No. 2:13-cv-08832-DSF-CW
   | HU, and HONGYAN LIU, on Behalf of
16 | Themselves and All Others Similarly
   | Situated,
17 |                                       **AMENDED CLASS ACTION**
   |                                       **COMPLAINT AND DEMAND FOR**
18 |              Plaintiffs,               **JURY TRIAL**

19 |         v.

20 | EFT HOLDINGS, INC., a Nevada          Action File:  November 27, 2013
   | Corporation, BUCKMAN, BUCKMAN         Trial Date:    None Set
21 | & REID, INC., a New Jersey
   | Corporation, GREENSTONE
22 | HOLDINGS, INC., a New York
   | Corporation, BROWN DOOR, INC., a
23 | Delaware Corporation, PIERSTONE
   | GROUP, LLC, a New York Limited
24 | Liability Company, REGAL WALNUT
   | LLC, a California Limited Liability
25 | Company, and JACK J. QIN, VISMAN
   | CHOW, NORMAN KO, WILLIAM
26 | SLUSS, PYNG SOON, GEORGE
27 |

28

Edwards Wildman
Palmer LLP
Attorneys At Law
Los Angeles

AM 34840718.1

AMENDED CLASS ACTION COMPLAINT
AND DEMAND FOR JURY TRIAL

1 | CURRY, JOHN HUEMOELLER II,
2 | WALLACE GAIKAS, and PETER
  | LAU, individuals,
3 |
  |         Defendants.
4 |

5      Plaintiffs, by their attorneys, make the following allegations pursuant to the

6 investigation of their counsel and based upon information and belief, except as to

7 allegations specifically pertaining to themselves and their counsel, which are based

8 upon personal knowledge.

9                          **NATURE OF THE ACTION**

10     1.     Defendants orchestrated a massive fraud that siphoned millions of

11 dollars from Plaintiffs and other similarly situated individuals (the "Class," as

12 defined herein). Consequently, Plaintiffs bring this class action against Defendants

13 EFT Holdings, Inc. ("EFT"), its founder Jack Qin ("Qin"), current and former EFT

14 officers and directors Visman Chow ("Chow"), Norman Ko ("Ko"), William Sluss

15 ("Sluss"), Pyng Soon ("Soon"), and George Curry ("Curry") (collectively, "EFT

16 Officers and Directors"), as well as Buckman, Buckman & Reid, Inc.

17 ("Buckman"), its directors and employees Wallace Gaikas ("Gaikas"), Peter Lau

18 ("Lau"), and John Huemoeller II ("Huemoeller") (collectively, "Buckman Team"),

19 and related shell companies Greenstone Holdings, Inc. ("Greenstone"), Brown

20 Door, Inc. ("Brown Door"), Pierstone Group, LLC ("Pierstone"), and Regal

21 Walnut LLC ("Regal Walnut") (collectively, "Shell Companies").

22     2.     Defendants' fraudulent scheme was centered on pushing an illegal

23 endless chain investment scam on a vulnerable class of Chinese consumers who

24 relied upon the integrity of the U.S. market and U.S. regulation of these products.

25 Defendants specifically targeted these Chinese consumers because of their relative

26 lack of sophistication concerning U.S. laws and because, by selling their products

27 abroad, Defendants hoped to avoid U.S. scrutiny -- a scheme which succeeded for

28 many years.

3.     Defendants offered ownership in this endless chain through product purchases. Defendants promised purchasers that by joining the chain and investing in EFT they could earn substantial returns through retail product sales, recruiting new participants into the chain, and owning part of the EFT business.

4.     In actuality, EFT products were defective, the chain structure was illegal, and the alleged ownership was illusory. Defendants transformed shell-company penny stocks into dollar investments, tied these investments to purchases of defective products, and then looted these investments right back out of the company, all while executing an elaborate pump-and-dump operation.

5.     Qin sold EFT's endless chain as a "sure-fire" and "risk-free" way of "unlocking a cash explosion." But to do so, Defendants constructed a Byzantine shell by which Plaintiffs could realize rewards in this chain only by recruiting others, effectively luring new investors to funnel money up the chain to existing investors. As such, EFT's endless chain was based on the recruitment of unsuspecting consumers into the chain rather than on actual retail sales of EFT products.

6.     EFT products themselves were falsely labeled, exorbitantly priced, and often virtually worthless. For example, one EFT product, a special kind of dirt extract packed into pills, was creatively marketed as "mineral rich prehistoric decomposed plant life" and sold for $120 per bottle. EFT claims this product will "[i]mprove[] every biochemical process your body requires," "diminish painful cold sores," "enhance[] cellular memory transfer," give "balanced energy that lasts for hours," and allow for "[m]ore stamina during sports activities." The FDA, in turn, claims this product is "poisonous," "deleterious," "adulterated," and "injurious to health," noting that "[i]f a child under the age of seven is exposed to lead at the levels present in your product on a routine basis, permanent damage to the central nervous system can occur." Product testing has revealed that many other EFT products are similarly misrepresented, either because they do not

Edwards Wildman
Palmer LLP
Attorneys At Law
Los Angeles

AM 34840718.1

- 3 -

AMENDED CLASS ACTION COMPLAINT
AND DEMAND FOR JURY TRIAL

1 contain the stated amount of ingredients listed, are adulterated with ingredients not
2 listed on the product label, or are incapable of delivering the promised results.
3 Plaintiffs believe EFT products do not have the composition, attributes,
4 characteristics, nutritional value, health qualities, or value as represented by
5 Defendants.

6      7.    Beginning in at least 2007, EFT, Qin, Curry, and other EFT
7 employees and directors conspired with Buckman and the Buckman Team to
8 operate an elaborate pump-and-dump scheme whereby they would list EFT on the
9 OTC Bulletin Board through a reverse merger, manipulate market demand, and
10 simultaneously liquidate huge blocks of covertly-issued stocks.

11      8.    To encourage investment demand, Qin, Curry, and other EFT officers
12 and directors deliberately misrepresented EFT's business results. For example, in
13 January of 2008, Qin, Curry, and other EFT officers and directors caused various
14 misrepresentations of material facts to be posted to http://www.eftb.us, a website
15 EFT directs and controls. One such misrepresentation was a graph showing the
16 supposed growth of EFT from 2001 to 2007, rounded to the nearest *billion* dollars.
17 The amounts listed ranged from a low of $420,000,000,000 in 2002 to a high of
18 $782,000,000,000 in 2007. This 2007 amount is more than the 2007 market
19 capitalizations of Google, Apple, and Microsoft combined. Per EFT's audited SEC
20 filings, however, this amount overstated stockholders' equity by an astounding
21 factor of more than 400,000. In other words, EFT appears to have promised
22 investors more than $40,000,000 in value for every $100 of value reported to the
23 SEC. Using the imprimatur of U.S. markets, Defendants converted security that
24 was "too good to be true" into something that was credible because "America is the
25 land of opportunity."

26      9.    Buckman, the Buckman Team, and the affiliated Shell Companies
27 provided the financial expertise and corporate vehicles necessary to coordinate EFT's
28 reverse merger onto the OTC Bulletin Board and promote the stock. In return, Qin,

EDWARDS WILDMAN
PALMER LLP
ATTORNEYS AT LAW
LOS ANGELES

AM 34840718.1      - 4 -      AMENDED CLASS ACTION COMPLAINT
AND DEMAND FOR JURY TRIAL

1    Curry, and other EFT officers and directors provided the Buckman Team and
2    affiliated Shell Companies with millions of shares for virtually no legitimate
3    consideration. Plaintiffs believe Qin and EFT conspired with Buckman and used the
4    Buckman Teams' collective expertise to carefully select various complacent attorneys,
5    brokers, and accountants to facilitate Defendants' efforts to skirt regulatory safeguards
6    during the listing process. For example, the attorney whom Buckman found to draft
7    EFT's initial SEC filings has since been suspended from appearing or practicing
8    before the SEC due to her involvement in another pump-and-dump operation that also
9    involved Buckman parties. The accounting firm that Defendants selected to provide
10   the initial reporting for EFT's reverse-merger onto the stock market has subsequently
11   been criticized by the Public Company Accounting Oversight Board for various audit
12   deficiencies, including "the failure, on five audits, to perform sufficient procedures
13   related to reverse mergers and other business combinations." And some members of
14   the Buckman Team itself, whom Defendants selected to manage EFT's reverse
15   merger and private placement, have since been named as defendants in a separate
16   pump-and-dump lawsuit brought by the SEC.

17       10.    Meanwhile, Qin and the Buckman Team coordinated the management
18   of ghost accounts for supposed investors. Investors were told they had purchased
19   stock that they were not allowed to sell for two years, and this stock was
20   supposedly placed in holding accounts at Buckman which were subject to
21   undisclosed quarterly holding fees. Many investors, however, did not actually
22   receive any real stock certificates, and others received counterfeit certificates. By
23   the time the investors that did receive certificates expected to be able to sell,
24   Buckman claimed to have liquidated their shares to cover previously-undisclosed
25   management fees.

26       11.    The pump-and-dump portion of Defendants' plan worked through
27   Qin's inducement to have Plaintiffs to hold onto or increase their investments
28   while insiders liquidated their insider-priced holdings. For example, while Qin

EDWARDS WILDMAN
PALMER LLP
ATTORNEYS AT LAW
LOS ANGELES

AM 34840718.1                          - 5 -          AMENDED CLASS ACTION COMPLAINT
                                                        AND DEMAND FOR JURY TRIAL

1  primed Plaintiffs and others to buy and hold onto shares of EFT and wait for

2  promised riches, he grossly diluted any potential ownership they might have had

3  by issuing over 52,000,000 new shares, representing nearly 60% of the total

4  outstanding ownership of the business, to a British Virgin Island shell corporation

5  managed by his mistress. This transfer was effectuated for no apparent

6  consideration, and Qin, while never disclosing his effective control over this block

7  of shares, eventually liquidated over 50,000,000 of the shares for Defendants'

8  benefit. Various Defendants further funneled shares to themselves for little to no

9  consideration; for example, where EFT charged Plaintiffs $3.80 per share of

10  ownership, it charged the Buckman Team and affiliated Shell Companies as little

11  as $0.00175 per share. In other words, Defendant insiders could pay $100 to own

12  what Plaintiffs had to pay over $200,000 to acquire. And Defendants, while

13  concealing the true ownership of many of these shares, liquidated them while

14  failing to disclose they were running a pump-and-dump operation.

15       12.    To the extent Defendants acquired capital within EFT, they siphoned

16  it back out through a series of insider "consulting" arrangements, questionable

17  loans, insider payments for rentals and royalties, and various supposed catastrophic

18  investments and lawsuits. Among other things, Defendants created a shell

19  company in the British Virgin Islands, gave this shell company the rights to the

20  EFT logo, gave Qin's sister control of this shell company, and then made EFT pay

21  millions of dollars per year to this shell company for the right to use the same EFT

22  logo it had already been using for years. Defendants also began paying Qin's sister

23  and other insiders millions more for various unspecified consulting services and for

24  supposedly leasing office space in Hong Kong. Further, EFT made a number of

25  multimillion dollar loans to insiders and related parties, few of which (if any) were

26  ever paid back.  Meanwhile, EFT made and lost enormous investments of the

27  looted funds in various unrelated business ventures, including a phone company, a

28  technology company, a marine shipping company, an office building, and a water

1  factory, all of which Plaintiffs believe were disguised transactions with insiders or

2  parties otherwise affiliated with the insiders of EFT and Buckman.

3      13.    Plaintiffs seek relief in this action for themselves individually and as a

4  class on behalf of all of the others who purchased EFT products in exchange for

5  ownership interest in EFT under California's Endless Chain Scheme Law

6  (California's Penal Code § 327 and California Civil Code § 1689.2), California's

7  Deception Statute (Civil Code §§ 1709-1710 and California Penal Code §§ 487,

8  12022, 186.11), common law fraud, and the Racketeer Influenced and Corrupt

9  Organizations Act (18 U.S.C. § 1961 et seq.),

10                              **THE PARTIES**

11      14.    Plaintiff Shuxin Li is a resident of the City of Dalian located in the

12  People's Republic of China.

13      15.    Plaintiff Haiyuan Zhao is a resident of the City of Dalian located in

14  the People's Republic of China.

15      16.    Plaintiff Yu Hu is a resident of the City of Taiyuan located in the

16  People's Republic of China.

17      17.    Plaintiff Hongyan Liu is a resident of the City of Dalian located in the

18  People's Republic of China.

19      18.    Defendant EFT is an e-Commerce, publicly traded Nevada

20  Corporation with its principal place of business at 17800 Castleton Street, Suite

21  300, City of Industry, California 91748. According to its website,

22  http://www.eftb.us, EFT, through its subsidiaries, engages in the merchandising

23  and sale of EFT-brand products over the internet. EFT claims to operate through

24  over one million registered "affiliate members" located throughout Hong Kong, the

25  People's Republic of China, Asia, and Europe. EFT claims all its products, which

26  include bio-available nutritional and nutritional spray products, are manufactured

27  in the United States and sold to consumers around the world, including China.

28

EDWARDS WILDMAN
PALMER LLP
ATTORNEYS AT LAW
LOS ANGELES

AM 34840718.1                     - 7 -            AMENDED CLASS ACTION COMPLAINT
                                                    AND DEMAND FOR JURY TRIAL

1    19.    Defendant Qin is a California resident who founded EFT in 1998 and,
2  since its inception, has served as the company's Chief Executive Officer,
3  President, and Chairman of the Board.

4    20.    Defendant Chow is a resident of California and has been a member of
5  EFT's Board of Directors since July 2009.

6    21.    Defendant Ko is a resident of California and has been a member of
7  EFT's Board of Directors since July 2009.

8    22.    Defendant Sluss is a resident of California and is EFT's principal
9  financial and accounting officer.

10    23.    Defendant Soon is a resident of California and has been a member of
11  EFT's Board of Directors since July 2009.

12    24.    Defendant Curry is a resident of California and has previously served
13  as a member of EFT's Board of Directors.

14    25.    Defendant Buckman is a registered Broker/Dealer with its principal
15  place of business at 174 Patterson Avenue, Shrewsbury, NJ 07702. Buckman is
16  registered with the SEC and with FINRA. It is licensed to do business in the state
17  of California.

18    26.    Defendant Greenstone, a Florida corporation, was originally
19  incorporated in November 2000 as Tel-One, Inc. In 2002, Tel-One, Inc. changed
20  its name to Teleon Corporation, in 2004 changed its name to Auto Centrix, Inc.,
21  and in January 2006, it became Greenstone Holdings, Inc. From January 2006
22  through at least June 2008, Greenstone's headquarters were in New York, New
23  York and are currently in Jersey City, New Jersey. Beginning in approximately
24  August 2006, Greenstone's stock was quoted under the symbol "GSHG" on Pink
25  OTC Markets Inc. ("Pink Sheets"), an electronic stock quotation system for certain
26  over-the-counter securities. On or about September 19, 2007, Greenstone changed
27  its stock ticker symbol to "GSHN." Greenstone is closely affiliated with Buckman
28  and is managed and controlled by Buckman managing directors Gaikas and Lau.

EDWARDS WILDMAN
PALMER LLP
ATTORNEYS AT LAW
LOS ANGELES

AM 34840718.1                - 8 -        AMENDED CLASS ACTION COMPLAINT
                                          AND DEMAND FOR JURY TRIAL

1       27.    Defendant Gaikas is a managing director of Buckman and a managing

2    director of Greenstone. He also owns and operates Brown Door, a shell company,

3    with his wife. Gaikas conducts business within the state of California.

4       28.    Defendant Lau is a managing director of Buckman and a managing

5    director of Greenstone. He also owns and operates Pierstone, a shell company. Lau

6    conducts business within the state of California.

7       29.    Defendant Huemoeller is a Buckman employee and a consultant for

8    Greenstone. He was also the owner and CEO of HumWare Media Corporation,

9    Inc. ("HumWare"), a Nevada shell corporation listed on the Pink Sheets that was

10   used as the vehicle for EFT's reverse merger onto the OTC Bulletin Board.

11   Huemoeller conducts business within the state of California.

12      30.    Defendant Brown Door is a Delaware corporation with its principal

13   place of business located at a residence at 4 Tall Oaks Court in Farmingdale, NJ

14   07727. It is owned and operated by Gaikas and his wife.

15      31.    Defendant Pierstone is a New York Limited Liability Company with

16   its principal place of business located at 40 Park Avenue, #19B, New York, NY

17   10016. It is owned and operated by Lau.

18      32.    Defendant Regal Walnut is a California Limited Liability Company

19   owned and operated by Qin. It is a shell corporation as well as a million-dollar

20   residence located at 1168 Regal Canyon Drive, Walnut, California 91789.

21                        **JURISDICTION AND VENUE**

22      33.    Defendants EFT, Qin, and the EFT Officers and Directors are subject

23   to the jurisdiction of this Court. They have engaged in continuous and systematic

24   business in California. EFT has its principal place of business in California and

25   EFT, Qin, and the EFT Officers and Directors have committed tortious acts in this

26   State.

27      34.    Defendant Buckman is subject to the jurisdiction of this Court. It has

28   engaged in continuous and systematic business in California and is registered and

EDWARDS WILDMAN
PALMER LLP
ATTORNEYS AT LAW
LOS ANGELES

AM 34840718.1                          - 9 -           AMENDED CLASS ACTION COMPLAINT
                                                        AND DEMAND FOR JURY TRIAL

1    licensed with California as an active brokerage firm.

2        35.    Defendants Huemoeller, Gaikas, and Lau are subject to the
3    jurisdiction of this Court. They have regularly engaged in business in California
4    and were active parties to several of the tortious California transactions and
5    schemes alleged herein.

6        36.    Defendant Greenstone is subject to the jurisdiction of this Court. It has
7    conducted business in California and was an active party to several of the tortious
8    California transactions and schemes alleged herein.

9        37.    Defendant Regal Walnut is a California Limited Liability Company
10   that is subject to the jurisdiction of this Court. It has engaged in continuous and
11   systematic business in California. It has its principle place of business in this this
12   State and was an active party to several of the tortious California transactions and
13   schemes alleged herein.

14       38.    Defendants Brown Door and Pierstone are subject to the jurisdiction
15   of this Court as parties to several of the tortious California transactions and
16   schemes alleged herein.

17       39.    This Court has original subject matter jurisdiction over this action
18   pursuant to 28 U.S.C. § 1332(a)(2) because the amount in controversy exceeds the
19   sum or value of $75,000, exclusive of interest and costs, and is between citizens of
20   a State and citizens or subjects of a foreign state.

21       40.    This Court also has subject matter jurisdiction over this action
22   pursuant to 28 U.S.C. § 1332 (d)(2)(B) because there are more than 100 Class
23   members and the aggregate amount in controversy exceeds $5,000,000.00,
24   exclusive of interest and costs, and is a class action in which at least one Class
25   member is a citizen or subject of a foreign state.

26       41.    Pursuant to 28 U.S.C. § 1391, this Court is the proper venue for this
27   action because a substantial part of the events, omissions, and acts giving rise to
28   the claims herein occurred in this District. Defendant EFT's principal place of

EDWARDS WILDMAN
PALMER LLP
ATTORNEYS AT LAW
LOS ANGELES

AM 34840718.1                    - 10 -                AMENDED CLASS ACTION COMPLAINT
AND DEMAND FOR JURY TRIAL

1   business is located within this District and the endless chain, including the
2   marketing, advertising, and sales plans for EFT products, which are at the core of
3   Defendants' unlawful scheme, were devised in this District.

### FACTS COMMON TO ALL CLAIMS

**A.    Endless Chain Scheme**

6      42.    EFT is an American-based e-Commerce publicly traded company that
7   claims to operate through over one-million registered affiliate members, many of
8   whom, like Plaintiffs and other Class members, are located in China. EFT only
9   sells products to affiliates. Potential affiliates only become affiliates by being
10  sponsored by an existing affiliate and making an initial purchase. EFT affiliates
11  purchase EFT products, including health care, anti-aging, skin care, and natural
12  cosmetics via the internet.

13     43.    EFT operates a multi-level distribution system which relies on
14  individual affiliates to market, promote, and sell its products. Anyone can become
15  an EFT affiliate if they are sponsored by an existing affiliate and purchase EFT
16  products. EFT represents "a no risk philosophy in joining the EFT team, [which]
17  ensures the continuation of EFT's success."

18     44.    As in other illegal endless chain schemes, the focus of the EFT
19  Endless Chain Scheme is in promoting the program rather than selling the
20  products. Qin has advertised EFT as "the first step to unlocking a cash explosion
21  that could help make your financial dreams come true. Ordinary people, who have
22  tried everything before to become successful and failed, are now using our
23  breakthrough fast cash system to go from past financial failure toward financial
24  freedom within a very short period of time" by using what is "without a doubt the
25  fastest, easiest, most sure-fire and lucrative way for the average person to create
26  instant financial success." "Jack [Qin] also shows us how to create wealth through
27  the wonderful world of network marketing by giving us lots of worthwhile tips,
28  hints, and advice which will benefit anyone wanting to succeed in the same field

Edwards Wildman
Palmer LLP
Attorneys At Law
Los Angeles

AM 34840718.1                           - 11 -              AMENDED CLASS ACTION COMPLAINT
                                                              AND DEMAND FOR JURY TRIAL

1    that has generated roughly 6 out of 10 millionaires in the last 15 years."
2    Defendants also posted statements on the EFT website alleging that the EFT
3    system is a "powerful program can help everybody; even people new to the
4    industry make a high income" and that EFT has "one of the highest affiliate
5    payouts in the industry." Part of the EFT sales pitch relies upon the credibility of
6    the U.S. markets, which EFT is listed and from which it purports to operate.

7       45.   To join the "no-risk EFT team," Plaintiffs and other Class members
8    had to make an initial investment purchase of EFT products in exchange for the
9    right to recruit other affiliates and earn various rewards. The rewards are structured
10   to incentivize recruitment over product sales and are tied to each affiliate's initial
11   investment amount and subsequent recruiting successes. There are four levels of
12   affiliates, which are determined by the initial investment amounts: (1) Beginning
13   Consumers, who make one purchase order of $450.00 (which includes $400 worth
14   of products + $50 shipping and handling); (2) Standard Consumers, who make one
15   purchase order of $660.00 ($600 worth of products + $60 shipping and handling);
16   (3) Advisory Consumers, who make one purchase order of $990.00 ($900 worth of
17   products + $90 shipping and handling); and (4) Franchised Consumers, who make
18   one purchase order of $3300.00 (which includes $3000 worth of products + $300
19   shipping and handling).

20       46.   Recruitment rewards are unrelated to the sales of products to ultimate
21   users but rather are tied to the initial investment amounts of the sponsor and the
22   recruit. For example, EFT's "Instant Bonus" for sponsors is calculated as follows:

23      Instant Bonus:

24          a. Beginner Consumers: Regardless of the sponsor entry level,
25          they can only receive $50 USD instant bonus.

26          b. Standard Consumers: Receive $50 USD instant bonus by
            sponsor beginner level consumer; Receive $150 USD instant
27         bonus by sponsor standard level consumer; Receive $150 USD
            instant bonus by sponsor advisory level consumer; Receive
28         $150 USD instant bonus by sponsor franchised level consumer.

EDWARDS WILDMAN
PALMER LLP
ATTORNEYS AT LAW
LOS ANGELES

AM 34840718.1             - 12 -         AMENDED CLASS ACTION COMPLAINT
                                         AND DEMAND FOR JURY TRIAL

c. Advisory Consumers: Receive $50 USD instant bonus by sponsor beginner level consumer; Receive $150 USD instant bonus by sponsor standard level consumer; Receive $350 USD instant bonus by sponsor advisory level consumer; Receive $350 USD instant bonus by sponsor franchise level consumer.

d. Franchised Consumers: Receive $50 USD instant bonus by sponsor beginner level consumer; Receive $150 USD instant bonus by sponsor standard level consumer; Receive $350 USD instant bonus by sponsor advisory level consumer; Receive $1350 USD instant bonus by sponsor franchised level consumer.

47.    Furthermore, EFT continually pressures affiliates to invest at higher levels and to continue recruiting into the endless chain. For example, in 2010 EFT implemented an endless-chain-within-an-endless-chain scheme exclusively for its $3,000-level affiliates:

Starting from December 2010, the Company introduced reward programs to its Affiliates. For example, upon joining a $3,000 program, each Affiliate must pay $3,000 as a non-refundable deposit. When the Affiliate sponsors one new Affiliate, the Company will reward the first Affiliate with a $1,500 instant sponsor bonus. When the first Affiliate sponsors at least two new Affiliates, and those two new Affiliates each also sponsor two new Affiliates, the first Affiliate will have completed the first cycle of the program. The Company will then reward the first Affiliate with an additional $1,500 bonus and deliver an EFT-phone and an e-pad for the cost of $1.

After the completion of the first cycle, each Affiliate will enter into the matrix of the second cycle. Upon completion of the second cycle, the Company will reward the first Affiliate with $3,000. For each subsequent cycle thereafter within the matrix, each Affiliate will need to sponsor a new Affiliate in each cycle in order to qualify for the reward.

48.    In order to purchase EFT products, consumers are directed to fax a form to a U.S. fax number and directed to remit the purchase price in U.S. dollars, which is the only currency EFT accepts. Consumer orders are processed by EFT's offices in the City of Industry, California, and products are shipped to consumers from the United States.

EDWARDS WILDMAN
PALMER LLP
ATTORNEYS AT LAW
LOS ANGELES

AM 34840718.1

- 13 -

AMENDED CLASS ACTION COMPLAINT
AND DEMAND FOR JURY TRIAL

49. Included in the products EFT sells are the following dietary supplements:

(A) "Collodial Silver #2003" which EFT advertises as a "natural shield and antibiotic" whereby "[a]ll fungus, virus, bacterium, streptococcus, staphylococcus, and other pathogenic organisms are killed in three or four minutes;" and "in fact, there is no microbe know that is not killed by #2003 in six minutes or less" and "[t]here are also no side effects whatsoever from higher concentrations." "It would appear highly unlikely that even germ warfare agents could survive an encounter with #2003, since viruses like E Bola and Hanta, or even the dreaded 'flesh-eating bacteria' are, in the end, merely hapless viruses and bacteria. To top it off, #2003 is virtually non-toxic, making it safe for both children and adults, as well as pets . . . Nor does one have to worry about the FDA (Food and Drug Administration) fox being put in charge of this home remedy hen house. #2003 is a pre-1938 healing modality, making it exempt from the FDA jurisdiction under the grandfather clause";

(B) "Super Re-vitl-izer #3002" which EFT advertises as an all-natural nutritional supplement that "[h]elps restore drinking-impaired motor facilities, - in minutes! (which is reflected also in a Breathalyzer test)";

(C) "PerformPlus #3006 Performance, Endurance, & Libido Support" which EFT markets on its website as "I Can't Believe It's Not Viagra" and professes is "proven to be powerful endurance, performance, and libido enhancing stimulants for thousands of men and women – some for thousands of years. These pharmacologically standardized extracts are all from natural sources and manufactured in full compliance with US FDA regulations";

(D) "Zeolite Plus #2005" which EFT advertises as an all-natural nutritional supplement that "[c]onverts in-organic metals (toxic)into organic (absorbable) minerals" and "[i]mproves every biochemical process your body requires";

(E) "Celprotect I #2006" which EFT advertises as a "[b]road spectrum anti-viral" that "[i]mproves every biochemical process your body requires," "[e]nhances cellular memory transfer," and "[d]rives out toxins and heavy metals";

(F)   "Celprotect II #2007" which EFT claims "[c]an eliminate foot poisoning within minutes" and "[h]as the ability to detoxify herbicides, pesticides, and other poisons";

(G)   "MSM + Ionics #3003" which EFT advertises as an all-natural nutritional supplement that "benefits the body overall while relieving and rebuilding connective tissue and joints"; and

(H)   "Slim'n Easy #3005 Carbohydrate Craving Control (with 5-HTP)" which EFT advertises as "The Appetite Suppressant in a Spray."

50.   EFT's products did not have the composition, attributes, characteristics, nutritional value, health qualities, or value promised. In August 2009, the U.S. Food and Drug Administration ("FDA") issued a Warning Letter to Defendants setting forth numerous violations of the Federal Food, Drug, and Cosmetic Act for several EFT products, including Collodial Silver #2003, Celprotect I #2006, Celprotect II # 2007, MSM + Ionics #3003, and PerformPlus #3006.

51.   As EFT products were generally mislabeled or adulterated, they were difficult to resell at the price paid by affiliates, much less at a profit. Furthermore, per the FDA's Warning Letter, EFT's "products are all misbranded within the meaning of section 502(f)(1) of the Act [21 U.S.C. § 355(a)] in that the labeling for these drugs fails to bear adequate directions for use." As such, affiliates could not even legally market their inventories of EFT products within the U.S. unless they re-labeled such products to comply with FDA regulations. The complications and expense required for such re-labeling makes legal product resale within the U.S. a practical impossibility, which explains in part Defendants' focus on selling abroad.

52.   In addition to being defective, EFT products were overpriced. Because EFT sends such a large percentage of every dollar it receives to reward recruiting into the chain – per its website, up to 70% – EFT sets its product pricing at an inflated level well over what EFT products could sell for in the open marketplace.

EDWARDS WILDMAN
PALMER LLP
ATTORNEYS AT LAW
LOS ANGELES

AM 34840718.1                    - 15 -                    AMENDED CLASS ACTION COMPLAINT
AND DEMAND FOR JURY TRIAL

53.    In addition to these inflated product prices, EFT charged excessive shipping and handling fees and other service fees so it could increase profit margins without directly inflating product prices even further. From the affiliates' perspectives, however, the effects of these fees were the same, such that the total out-of-pocket amounts affiliates paid for EFT products further exceeded what EFT products could reasonably sell for in the open marketplace.

54.    Moreover, the shipping and handling charges levied by EFT grossly exceed EFT's actual shipping and handling costs, thereby further denying affiliates the possibility of being able to profitably resell EFT products at retail. For example, EFT lists its 2013 shipping costs as totaling only $9,000 yet lists its shipping charges to affiliates as totaling $449,000, representing a markup to affiliates of nearly 5,000%.

55.    In addition to inflated product prices and inflated shipping and handling charges, EFT charges an additional service fee of $40 for each order placed. This service charge is separate from EFT's shipping and handling charges and serves to further deny affiliates the possibility of being able to profitably resell EFT products at retail.

56.    Because of the inflated prices, inflated shipping and handling charges, and inflated service fees, the prices affiliates pay for EFT products are so high that the profits EFT promises on retail sales are impossible to achieve.

57.    It falls on affiliate investors to attempt to recoup EFT's exorbitant product markups, yet EFT's products are inherently uncompetitive for retail sale at the quality EFT provides and at the prices EFT sets.

58.    EFT further defeats any opportunity for affiliates to resell products by flooding the market in a manner, as disclosed in its latest 10-K filing, that evidences just how little chance its affiliates have to make any profit by retail sales: "The Company has been selling some of its overstocked items and items nearing obsolescence at significantly reduced prices to a third party in an ongoing

Edwards Wildman
Palmer LLP
Attorneys At Law
Los Angeles

AM 34840718.1                    - 16 -                    AMENDED CLASS ACTION COMPLAINT
AND DEMAND FOR JURY TRIAL

1  effort to maintain acceptable inventory levels."

2  59.  Inflated prices, inflated shipping and handling fees, inflated service
3  fees, market flooding, and defective products make it unlikely that affiliates have
4  any meaningful opportunities to engage in profitable retail sales to end consumers.

5  60.  Although it is virtually impossible to profitably resell EFT products in
6  the retail marketplace, there is still a systematic incentive for existing affiliates to
7  recruit new affiliates into the program since EFT pays out recruitment rewards
8  regardless of whether affiliates actually sell products at retail to end consumers.

9  61.  The promise of lucrative rewards for recruiting others and the relative
10  impossibility of profitably selling EFT products at retail tends to induce EFT
11  affiliates to focus on the recruitment side of the business at the expense of retail
12  marketing efforts, making it unlikely that meaningful retail sales or meaningful
13  opportunities for retail sales will occur. Any EFT product purchases that do occur
14  are generally just incidental to purchases of the right to participate in EFT's
15  recruitment chain.

16  62.  EFT's focus is on recruitment, and rewards are paid in exchange for
17  recruiting others rather than for simply selling products. In practice, the rewards
18  EFT pays to affiliates are not tied to the consumer demand for the products being
19  ordered but rather are paid to affiliates for recruiting new participants. To the
20  extent affiliates made any profits, such profits came primarily from recruitment,
21  not product sales.

22  63.  EFT's compensation structure rewards recruiting of new participants
23  over retail sales and thereby leads to abuses. At a minimum, such abuses include:
24  (1) EFT and Defendants prey on and mislead consumers with false statements
25  about potential earnings and the business opportunities available for affiliates;
26  (2) affiliates focus on recruiting new affiliates rather than on making retail sales of
27  products to end consumers; (3) affiliates load up on products they neither want nor
28  need nor can feasibly sell just to purchase extra ownership in the company;

EDWARDS WILDMAN
PALMER LLP
ATTORNEYS AT LAW
LOS ANGELES

AM 34840718.1                    - 17 -        AMENDED CLASS ACTION COMPLAINT
                                                AND DEMAND FOR JURY TRIAL

1  (4) Defendants encourage affiliates to make large, unnecessary, and unwanted
2  purchases just to jump up the chain to higher levels and/or take more ownership in
3  the company; and (5) Defendants encourage affiliates to recruit other affiliates in
4  return for extra bonuses and incentives.

5      64.    Defendants    induce    affiliates    to    join    using    material    false
6  representations such as that recruits can realistically re-sell EFT product for retail
7  profit and can move up the chain and earn commissions, bonuses, and other
8  incentives.

9      65.    EFT has never disclosed that it operates an Endless Chain Scheme or
10  that affiliate investors have virtually no chance to actually profit by investing in
11  EFT.

12     66.    Actual and prospective affiliates were promised riches but had no way
13  of knowing what commissions, bonuses, and other incentives other affiliates
14  typically received or could reasonably expect to receive through investments and
15  participation in the EFT Endless Chain Scheme.

16     67.    Grand overstatements regarding affiliates' potential earnings and
17  opportunities are part of a pattern and practice throughout the EFT Endless Chain
18  Scheme.

19  **B.    EFT's Lack of Safeguards for its Endless Chain Scheme**

20     68.    In endless chain schemes, all but the earliest investors necessarily lose
21  their investments as the pool of potential recruits eventually and inevitably dries
22  up, breaking the chain. Additionally, those joining endless chain schemes are often
23  pressured to purchase products far in excess of their own potential retail or
24  personal needs and are thus left saddled with piles of inventory that hold little
25  value to them. However, if a purported chain is actually driven by retail sales to
26  end consumers instead of recruitment, then the chain-like structure is less
27  invidious. Consequently, direct marketers can sometimes avoid being labeled an
28  illegal endless chain scheme by actively enforcing sufficient safeguards designed

Edwards Wildman
Palmer LLP
Attorneys At Law
Los Angeles

AM 34840718.1            - 18 -        AMENDED CLASS ACTION COMPLAINT
AND DEMAND FOR JURY TRIAL

1   to deter inventory loading and encourage actual retail sales to end consumers.
2   Some such safeguards include the initial investment rule, the 70% rule, the
3   buyback rule, and the 10 customer rule.

4       69.   EFT employs no such safeguards and instead encourages recruiting
5   over and above retail sales.

6       70.   The initial investment rule considers the existence and degree of
7   initial investment required to participate in an alleged chain scheme. Illegal endless
8   chain schemes tend to require a meaningful payment or initial disbursement by a
9   new participant in exchange for the right to sell products and the right to earn
10  rewards in return for recruiting other participants into the program. These initial
11  investments are largely unrelated to the sale of products to ultimate users.
12  Legitimate direct marketing businesses, on the other hand, charge nothing or
13  virtually nothing for the right to participate, and to the extent they levy charges,
14  such charges are meaningfully related to the sale of products to ultimate users.

15      71.   The EFT chain requires an initial investment of $450 to participate in
16  the scheme at the lowest level. This is a meaningful amount that is unrelated to the
17  sale of products to ultimate users, and in fact EFT does not require any sales of
18  products at all to ultimate users.

19      72.   Further, EFT requires an initial investment well beyond $450 if an
20  affiliate wants to move up the EFT chain to where they can earn full recruitment
21  commissions. EFT's website notes that "[i]t is suggested you come in at [the
22  $3,300] franchised level, so you can compete at all levels; this will help support
23  your duplication, and bring you great residual income." These distinctions in
24  recruitment levels are entirely contingent upon initial investment amounts and
25  completely unrelated to retail product sales to end users.

26      73.   As further example of recruitment rewards unrelated to the sales of
27  products to the ultimate users but rather tied to initial investment amounts, EFT
28  offers the "Instant Bonus" program as described in paragraph 45 above.

74.   EFT cannot claim that it does not require a substantial charge for the right to sell its products, as the only way to get products to sell is to become an affiliate by virtue of making a minimum $450 purchase. Further, the distinctions between different investment levels are entirely unrelated to sales to ultimate end users. EFT's rewards are based on recruitment and affiliate purchase orders instead of on retail sales to end consumers.

75.   The 70% rule considers whether participants in a chain earn performance bonuses on the basis of purchases from the distributor or on the basis of retail sales to end users. Where a direct marketer enforces a rule requiring affiliates to prove that they resell at least 70% of the products they purchase to end consumers, then revenues are somewhat more likely to be coming from retail sales and less likely to be coming from mere recruitment into the chain.

76.   Here, EFT specifically denies requiring its affiliates to make any retail sales whatsoever, much less a minimum of 70%.

77.   The 10 customer rule considers the extent to which participants in a chain are required to sell to different retail customers. Where a direct marketer enforces a policy that withholds performance bonuses to affiliates unless they prove sales to each of 10 different retail customers during each month, then revenues are somewhat more likely to be driven by retail sales and less likely to be driven by mere recruitment into the chain.

78.   Again, EFT does not require affiliates to make any retail sales whatsoever, much less to a minimum of ten different retail customers during each month.

79.   The buy-back rule considers the extent to which participants in a chain are discouraged from pushing inventory loading on downstream recruits. When a direct marketer requires affiliates to buy back saleable, unsold inventory from their recruits as such recruits leave the chain, new affiliates are less likely to saddle themselves with thousands of dollars' worth of unsaleable products and

EDWARDS WILDMAN
PALMER LLP
ATTORNEYS AT LAW
LOS ANGELES

AM 34840718.1                    - 20 -          AMENDED CLASS ACTION COMPLAINT
                                                   AND DEMAND FOR JURY TRIAL

1   senior affiliates are less likely to encourage downstream affiliates to engage in

2   inventory loading.

3        80.   Here, EFT has no buy-back policy whatsoever.

4   **C.   Pump-and-Dump Scheme**

5        81.   Defendants engaged in a concerted effort to induce Plaintiffs and

6   Class members to purchase and hold ownership interests in EFT, and thus pump up

7   or maintain market value, while the Defendants themselves dumped their own

8   holdings and fraudulently reaped huge profits.

9        82.   Beginning in 2005, Qin held a series of public meetings during which

10  he gave speeches to induce Plaintiffs and other Class members to purchase EFT

11  products and become company affiliates. Some of Qin's speeches were recorded

12  and discs of the speeches were handed out during subsequent meetings in the

13  China and circulated among Plaintiffs and Class members. The discs were used as

14  marketing tools to educate Class members who did not attend Qin's meetings in

15  person about EFT, its products, and the opportunity to invest in the company by

16  purchasing products and becoming an affiliate.

17       83.   During these meetings, Qin espoused the benefits of EFT's products.

18  He also represented that consumers who purchased the company's products would

19  not only receive the products ordered, they would also receive ownership interests

20  in EFT, or the right to purchase ownership interests in EFT, in the form of stock

21  certificates which Qin represented as "negotiable securities" that could be sold for

22  money. The number and value of shares issued or made available for purchase

23  depended on the consumer level of products purchased. Qin and the EFT website

24  recommends that consumers purchase products at the Franchised Consumer level

25  so they would "compete at all levels, [] help support your duplication, and bring

26  you great residual income."

27       84.   In 2007, Qin, Curry, EFT, and other EFT officers and directors

28  contacted Greenstone in regards to getting EFT's common stock quoted on the

EDWARDS WILDMAN
PALMER LLP
ATTORNEYS AT LAW
LOS ANGELES

AM 34840718.1                    - 21 -         AMENDED CLASS ACTION COMPLAINT
                                                AND DEMAND FOR JURY TRIAL

1    OTC Bulletin Board. Pursuant to this contact, Greenstone provided the trading

2    vehicle and public shell, HumWare, through which EFT performed a reverse-

3    merger to get listed on the OTC Bulletin Board.

4        85.    Greenstone, under the control of the Buckman Team, connected Qin,

5    Curry, EFT, and other EFT officers and directors with Child, Van Wagoner, &

6    Bradshaw, PLLC ("Wagoner"), an accounting firm headquartered in Salt Lake

7    City, Utah. Wagoner was hand-picked by Greenstone to assist with creating EFT's

8    audited financials for EFT's reverse-merger onto the stock market, in furtherance

9    of the Defendants' Pump-and-Dump Scheme. Wagoner has since been

10   reprimanded by the Public Company Accounting Oversight Board for various

11   material auditing deficiencies, including "the failure, on five audits, to perform

12   sufficient procedures related to reverse mergers and other business combinations."

13   Plaintiffs believe one of these audit failures may have involved EFT.

14       86.    Greenstone also connected Qin, EFT, Curry, and other EFT officers

15   and directors with Virginia Sourlis ("Sourlis"), an attorney hand-picked by

16   Greenstone to assist with creating EFT's SEC filings, in furtherance of the

17   Defendants' Pump-and-Dump Scheme. Sourlis has since been suspended from

18   appearing in front of the SEC as a result of her involvement with other Greenstone-

19   related pump-and-dump matters.

20       87.    Greenstone and the Buckman Team also connected Qin, EFT, Curry,

21   and other EFT employees and directors with HumWare, the shell corporation used

22   for EFT's reverse merger onto the OTC Bulletin Board. On November 7, 2007,

23   HumWare changed its name to EFT BioTech Holdings, Inc., and effected a reverse

24   stock split of 20,000 shares of common stock for 1 share of common stock.

25   Subsequently, on November 18, 2007, EFT did a reverse merger with EFT

26   BioTech Holdings, Inc., pursuant to which EFT acquired 100% of the issued and

27   outstanding shares of EFT BioTech Holdings, Inc. During this time period, Gaikas

28   and Lau, managing directors of Buckman, had voting and dispositive control of

EDWARDS WILDMAN
PALMER LLP
ATTORNEYS AT LAW
LOS ANGELES

AM 34840718.1                    - 22 -        AMENDED CLASS ACTION COMPLAINT
                                                AND DEMAND FOR JURY TRIAL

1    Greenstone, and Huemoeller, an employee of Buckman and a consultant to

2    Greenstone, was the CEO and primary owner of HumWare.

3          88.    Pursuant to the above transactions, on or about November 18, 2007,

4    Greenstone received 4,000,000 EFT shares, Brown Door received 1,000,000

5    shares, Pierstone received 1,000,000 shares, and Huemoeller received 350,000

6    shares of EFT stock. All together, these 6,350,000 shares were transferred in

7    exchange for $11,430.

8          89.    Also in November of 2007, Qin, Curry, EFT, and other EFT officers

9    and directors caused 52,099,000 shares of EFT stock to be issued to Dragon Win

10   Management, Ltd. ("Dragon Win"), a shell company located in the British Virgin

11   Islands, for apparently no consideration. The fact that these shares were effectively

12   owned and controlled by Qin was never disclosed.

13         90.    Control of Dragon Win was given to Qin's mistress, Jun(e) Qin Liu

14   ("Liu"). Before being given control of Dragon Win and its nearly $200,000,000

15   worth of stock, Liu had been an administrative assistant for eFastTeam, and she

16   had only earned an $18,000 salary the year before. In actuality, Liu was a

17   figurehead used to disguise the extent of Qin's ownership, and at all relevant times

18   Qin was the beneficiary and person with *de facto* control over Dragon Win.

19         91.    Starting in January of 2008, Buckman administered a purported

20   Regulation S Offering (the "Offering") where 14,890,040 shares were purportedly

21   sold to Plaintiffs and Class members for $51,149,412, representing a price increase

22   of 211,111% over what was charged to various insiders less than two months prior.

23         92.    To successfully push this incredible valuation and perpetrate their

24   Pump-and-Dump Scheme, various Defendants knowingly and willfully distributed

25   numerous material misrepresentations and concealed numerous material facts.

26         93.    For example, in January of 2008, Qin, Curry, and other EFT officers

27   and directors caused the misrepresentation that EFT had grown into a $782 billion

28   business to appear on the EFT website at http://www.eftb.us. This

EDWARDS WILDMAN
PALMER LLP
ATTORNEYS AT LAW
LOS ANGELES

AM 34840718.1                           - 23 -        AMENDED CLASS ACTION COMPLAINT
                                                       AND DEMAND FOR JURY TRIAL

1   misrepresentation was broadcast worldwide from a server located in Dallas, Texas,
2   with a server IP address of 50.23.225.63, and remained posted from the beginning
3   and through the duration of the Offering. This assertion of fact was not true and
4   Defendants neither believed it to be true nor had reasonable grounds for believing
5   it to be true.

6      94.   Additionally, from 2007 and continuing through at least 2010, Qin
7   knowingly and willfully made misrepresentations in speeches, made both in person
8   and also distributed over the internet through EFT's websites, which claimed EFT
9   would soon be listed for sale on the New York Stock Exchange and that the shares
10  owned by Plaintiffs and Class members would soon double in value. For example,
11  in April of 2007, Qin gave a speech in Hong Kong where he claimed that "[w]e
12  can make the value of shares double many times" and that "[t]he worst condition is
13  to make the value [only] double once." On April 15, 2007, in a conference room of
14  a hotel in Tainjin, China, Qin promised that "franchise-level consumers will
15  become millionaires one year later after following our company just because they
16  are franchise-level." On January 28, 2008, Qin maintained that "we will buy a
17  mine in Chinese mainland" "[a]nd the meaning of buying this mine is that the
18  value of our stocks will increase to $40 USD if the value of the mine could be
19  accepted in the international market." On January 9, 2009, Qin gave a speech in
20  Bali where he urged investors to hold onto their shares and maintained that
21  investor recovery through EFT stock "will definitely happen" and "will not go
22  wrong." And in August of 2010, at a conference in Halong Bay, Vietnam, Qin
23  represented that an EFT stock "blowout" would occur the following year, would be
24  listed on the main board of the NYSE in three months, and that "EFTB stock rising
25  up to $60-100 per share is not a dream." All of these assertions or suggestions of
26  fact were not true and Defendants neither believed them to be true nor had
27  reasonable grounds for believing them to be true.

28

Edwards Wildman
Palmer LLP
Attorneys At Law
Los Angeles

AM 34840718.1                    - 24 -            AMENDED CLASS ACTION COMPLAINT
                                                    AND DEMAND FOR JURY TRIAL

95.     Further, from 2007 and continuing through the present, Defendants knowingly and willfully suppressed the material fact that they were operating a pump-and-dump scheme and that as a consequence of this scheme the shares held by Plaintiffs and Class members would eventually have little to no value. Defendants were bound to disclose the material fact that they intended to and were in fact operating a pump-and-dump scheme, yet Defendants suppressed this fact. Instead, Defendants gave information of other facts, such as promises of high investment returns and other facts as mentioned above, which were materially misleading for want of communication of the fact that Defendants were actually operating a pump-and-dump scheme. For example, during his speeches, Qin represented to Plaintiffs and other Class members that the value of their ownership interests in EFT would increase as more consumers purchased products. In 2010, as Defendants were still liquidating their shares and the price of the shares was still falling, Qin told Plaintiffs and Class members that:

> "The coming years shall be a harvest period for EFTB investors . . . Recently, minority shareholders are quite unsatisfied with the news that Buckman shall charge $40 on June 25 as the account quarter management fee . . . At this time, shareholders need to be calm and patient. Try to observe and think. The sole purpose of investment is to gain high return. Only actions that help us to gain high returns are correct; others are useless . . . Totally we have 20 to 30 thousand shareholders. Let's say each shareholder buys in 5 stocks, then there shall be 100 to 150 thousand purchasing power. That means stock crash can be avoided . . . the 150 thousand stock shall push the stock price up."

All the while, Qin and Defendants failed to disclose that they were running a pump-and-dump scheme.

96.     Qin and the Buckman Team coordinated the management of ghost accounts for supposed investors; investors were told that they had purchased stock that they were not allowed to sell for two years, and this stock was supposedly placed in holding accounts at Buckman which were subject to undisclosed quarterly holding fees. Many investors, however, did not in fact actually receive

EDWARDS WILDMAN
PALMER LLP
ATTORNEYS AT LAW
LOS ANGELES

AM 34840718.1                                    - 25 -                AMENDED CLASS ACTION COMPLAINT
AND DEMAND FOR JURY TRIAL

1 | any real stock certificates. Further, by the time investors expected to be able to sell,
2 | Defendants' Pump-and-Dump Scheme reduced the value of shares to nearly
3 | nothing, and Buckman claimed to have liquidated such shares to cover its
4 | previously-undisclosed management fees.

5 | 97. While Qin was pumping the market, he and other Defendants were
6 | liquidating their own holdings. For example, Dragon Win now only holds
7 | 1,600,000 shares out of its original stockpile of 52,099,000 shares. Although the
8 | transactions behind the missing 50,499,000 shares were never officially disclosed
9 | to the SEC as required by law, Plaintiffs believe many were sold at the peak of the
10 | pump for over $6.00 each, wrongfully enriching Dragon Win and Qin by
11 | approximately $300,000,000 while taking the same from Plaintiffs, class members,
12 | and the investing public.

13 | 98. Qin continued giving speeches into at least 2010, during which, in
14 | addition to touting EFT products and extolling their benefits, he solicited
15 | investments in EFT through the sale of company shares which he promised would
16 | at least double in value as long as investors held onto their shares until the
17 | company was able to go through with its expected listing on the New York Stock
18 | Exchange. This listing never occurred, nor did Qin believe or ever have reasonable
19 | grounds for believing it would occur.

20 | **D.** **Corporate Looting Scheme**

21 | 99. Once the investments from the Offering were on the books of EFT,
22 | Qin and the EFT Officers and Directors conspired in various ways to funnel these
23 | investments back off the books and into the pockets of insiders. This looting was
24 | generally accomplished through variations of the same four methods:
25 | (1) exorbitant insider consulting payments; (2) exorbitant insider rental or royalty
26 | payments; (3) insider "loans" that were never collected; and (4) insider
27 | "investments" that met with disaster right before beginning to pay a return. These
28 | insider transactions were carried out behind closed doors without following the

EDWARDS WILDMAN
PALMER LLP
ATTORNEYS AT LAW
LOS ANGELES

AM 34840718.1

- 26 -

AMENDED CLASS ACTION COMPLAINT
AND DEMAND FOR JURY TRIAL

1    necessary procedural steps and safeguards, including the steps of obtaining proper

2    approval of the shareholders or board of directors and of making proper and timely

3    disclosures.

4        100.  For example, as detailed below, millions of dollars have been

5    transferred from EFT to Wendy Qin ("Wendy") and affiliated entities. Wendy is

6    Qin's sister, a director of EFT International Ltd. ("EFT International"), and an

7    owner or director of EFT Assets Limited ("Assets Limited"), JFL Capital Limited

8    ("JFL"), Regal Walnut, and a 6,500 square foot office space located at 8 Arglye

9    Street, Suite 3706, Kowloon, Hong Kong SAR ("Hong Kong Office").   All of

10   these entities have received millions of dollars in cash and/or stocks in exchange

11   for little to no value in return.

12       101.  Assets Limited is a shell corporation located in the British Virgin

13   Islands that is owned by Wendy and affiliated with EFT. Per EFT's SEC filings,

14   sometime in 2009 EFT started paying Assets Limited millions of dollars each year

15   for the rights to use Asset Limited's "Washington EFT" logo. But EFT itself had

16   already been using the Washington EFT logo since at least 2003; Asset Limited

17   was thus licensing EFT the right to use its own logo. In reality, Asset Limited was

18   only formed and the Washington EFT logo was only trademarked for the purpose

19   of funneling capital out of EFT. Asset Limited did not register a trademark for the

20   Washington EFT logo until September 22, 2009, more than five years after EFT

21   started using the logo but only a few months after the Offering left EFT with

22   money to burn off the books. And Asset Limited "abandoned" the Washington

23   EFT logo as of December 03, 2012, yet still receives massive royalty payments

24   from EFT.

25       102.  Between June 25, 2009, and January 15, 2014, Asset Limited received

26   the following $8,233,266 in royalty checks for licensing to EFT its own logo:

27

28

EDWARDS WILDMAN
PALMER LLP
ATTORNEYS AT LAW
LOS ANGELES

AM 34840718.1                          - 27 -              AMENDED CLASS ACTION COMPLAINT
                                                            AND DEMAND FOR JURY TRIAL

| Approximate Check Mailing Date: | Paid To: | Amount $USD: |
|---|---|---|
| 06/25/2009 | Cash | $ 2,313,137.00 |
| 07/10/2009 | Cash | 600,000.00 |
| 12/15/2009 | EFT Assets Ltd | 600,000.00 |
| 03/12/2010 | EFT Assets Ltd | 600,000.00 |
| 05/25/2010 | _____ | 749,134.00 |
| 01/19/2011 | EFT Assets Ltd | 502,566.00 |
| 02/28/2011 | _____ | 529,996.00 |
| 03/30/2011 | EFT Assets Ltd | 275,491.00 |
| 10/10/2012 | EFT Assets Ltd | 1,243,378.00 |
| 02/05/2013 | EFT Assets Ltd | 77,739.00 |
| 03/16/2013 | EFT Assets Ltd | 293,372.00 |
| 03/27/2013 | EFT Assets Ltd | 31,786.00 |
| 09/10/2013 | EFT Assets Ltd | 74,794.00 |
| 12/15/2013 | EFT Assets Ltd | 32,045.00 |
| | | $ 8,233,266.00 |

103. Similarly, JFL is a shell corporation located in the British Virgin Islands that is owned by Wendy and affiliated with EFT. It receives hundreds of thousands of dollars from EFT annually for consulting services that Wendy apparently provides outside of her regular duties as director of EFT International (for which she already receives $300,000 annually). From October of 2010 through March of 2014, EFT has paid $1,350,000 to JFL for the consulting services Wendy provided to EFT. Again, Wendy is already an EFT employee that receives a $300,000 annual salary for her services.

104. Wendy also purportedly owns a 6,500 square foot Hong Kong Office which she leases to EFT. Per EFT's SEC disclosures, EFT pays Wendy approximately $375,000 per year for this space (e.g., "During the years ended March 31, 2011, 2010, and 2009 we paid the lessor $377,892, $379,355 and $362,271 in rental"). In reality, EFT pays Wendy almost twice as much. For example, in 2010 alone, EFT paid Wendy $4,800,000 in Hong Kong Dollars ("HKD"):

| Date: | Check #: | Amount $HKD: |
|---|---|---|
| 1/29/2010 | 917335 | $ 400,000.00 |
| 2/19/2010 | 917344 | $ 400,000.00 |
| 3/11/2010 | 917354 | $ 400,000.00 |
| 4/13/2010 | 917368 | $ 400,000.00 |
| 5/25/2010 | 917383 | $ 400,000.00 |
| 6/21/2010 | 917396 | $ 400,000.00 |
| 7/19/2010 | 417977 | $ 400,000.00 |
| 8/23/2010 | 417992 | $ 400,000.00 |
| 9/23/2010 | 418012 | $ 400,000.00 |
| 10/8/2010 | 418029 | $ 400,000.00 |
| 11/24/2010 | 008452 | $ 400,000.00 |
| 12/17/2010 | 008466 | $ 400,000.00 |
| | | $4,800,000.00 |

105.   Since the exchange rate between United States Dollars ("USD") and HKD has, since May 2005, been set by law to fluctuate within the range of USD$1:HK$7.75–7.85, this $4,800,000 HKD per year represents at least $611,464.97 USD.

106.   In October 2008, EFT purchased a 49% interest in Excalibur International Marine Corporation ("Excalibur") for an aggregate purchase price of $19,193,000. EFT also subsequently loaned Excalibur over $10,000,000. Allegedly, these loans enabled Excalibur to buy a ship called Ocean LaLa, but the Ocean LaLa was allegedly destroyed by misuse shortly after its purchase, rendering this asset relatively worthless. Further, apparently this ship and EFT's cash were Excalibur's main assets, which calls into question the initial ~$40,000,000 valuation for the company before it even had the ship. Additionally, the CEO of Excalibur is Soon, one of the EFT Officers and Directors. Plaintiffs believe Excalibur is further owned and operated by other inside parties and that its true purpose is just to be another vehicle for siphoning millions off of EFT's books.

107.   In July of 2010, EFT lent $5,000,000 to CTX Virtual Technologies, Inc. ("CTX"). This loan was unsecured and was convertible to CTX stock at the election of CTX. As is usual with large EFT loans, this one was never collected.

EDWARDS WILDMAN
PALMER LLP
ATTORNEYS AT LAW
LOS ANGELES

AM 34840718.1                - 29 -                AMENDED CLASS ACTION COMPLAINT
AND DEMAND FOR JURY TRIAL

1  On March 12, 2011, CTX elected to convert the full $5,000,000 into CTX stock.
2  EFT has since written off the entire value of this stock, ultimately removing
3  another $5,000,000 from the EFT books. Additionally, the CEO of CTX is Curry, a
4  former EFT director, and one of the directors of CTX is Lau, part-owner of
5  Greenstone and a managing director of Buckman. Plaintiffs believe CTX is owned
6  or otherwise operated by inside parties and that the true purpose of this effectively
7  defaulted loan to CTX was to gift or otherwise siphon millions more off of EFT's
8  books.

9      108.  On May 2, 2011, Qin entered EFT into an agreement with Meifu
10  Development Co., Ltd. ("Meifu") to construct a building in Taiwan for
11  approximately $235,000,000. As of December 31, 2013, payment of approximately
12  $20,800,000 has been made. EFT now alleges that Meifu has not complied with
13  the conditions of the agreement, and so the building project is on hold. In reality,
14  Plaintiffs believe Meifu is owned or operated by inside parties and that the true
15  purpose of these purportedly failed arrangements are just another vehicle for
16  siphoning millions off of EFT's books.

17      109.  On July 25, 2008, EFT loaned $1,567,000 to Yeuh-Chi Liu ("Yeuh-
18  Chi"). At the time, Yeuh-Chi was a vendor to EFT. Plaintiffs believe Yeuh-Chi
19  may be otherwise affiliated with Qin or one of the EFT Officers and Directors. As
20  is usual with large EFT loans, this one was never collected. This loan was written
21  off on December 31, 2010, and no effort has been expended to enforce the loan or
22  collect on any collateral. Rather, Yeuh-Chi has since been made a director of
23  Excalibur. In reality, Plaintiffs believe the true purpose of the defaulted loan to
24  Yeuh-Chi was to gift or otherwise siphon another million or so off of EFT's books.

25      110.  In 2009, EFT engaged a general contractor to construct a water
26  manufacturing plant at a cost of approximately $755,000. EFT had planned to
27  begin selling water during 2012. As usual, however, things went awry right before
28  this investment was to start paying off. EFT alleges it began and then ceased

Edwards Wildman
Palmer LLP
Attorneys At Law
Los Angeles

AM 34840718.1                          - 30 -          AMENDED CLASS ACTION COMPLAINT
                                                        AND DEMAND FOR JURY TRIAL

1    production because of defective construction, and that production will not be

2    resumed until a dispute with the contractor has resolved. Plaintiffs believe this loss

3    is just another means to siphon money off of EFT's books.

4    **E.    Plaintiffs Become Shareholders and the Equitable Tolling of their**

5    **Claims**

6    111.   Plaintiff Li attended five public meetings with Qin and listened to

7    recordings of some of his later speeches. Li also reviewed written EFT marketing

8    materials. In reliance on Qin's misrepresentations about the value and quality of

9    EFT's products and investment opportunities in the company, and after reviewing

10   the written materials, Li purchased approximately $32,000 worth of EFT products,

11   for which he received what he was told were over 30,000 shares in the company.

12   112.   Plaintiff Zhao attended three public meetings with Qin and listened to

13   recordings of some of his later speeches. Zhao also reviewed written EFT

14   marketing materials. In reliance on Qin's misrepresentations about the value and

15   quality of EFT's products and investment opportunities in the company, and after

16   reviewing the written materials, Zhao purchased approximately $46,530 worth of

17   EFT products, for which he received the right to purchase and did in fact purchase

18   what he was told were 13,000 shares in the company for an additional $49,400.

19   113.   Plaintiff Hu attended five public meetings with Qin and listened to

20   recordings of some of his later speeches. Hu also reviewed written EFT marketing

21   materials. In reliance on Qin's misrepresentations about the value and quality of

22   EFT's products and investment opportunities in the company, and after reviewing

23   the written materials, Hu and her family purchased approximately $25,080 worth

24   of EFT products, for which she received the right to purchase and did in fact

25   purchase what she was told were 15,000 shares in the company for an additional

26   $57,000.

27   114.   Plaintiff Liu attended one public meeting with Qin and listened to

28   recordings of some of his later speeches. Liu also reviewed written EFT marketing

EDWARDS WILDMAN
PALMER LLP
ATTORNEYS AT LAW
LOS ANGELES

AM 34840718.1                          - 31 -              AMENDED CLASS ACTION COMPLAINT
                                                              AND DEMAND FOR JURY TRIAL

materials. In reliance on Qin's misrepresentations about the value and quality of EFT's products and investment opportunities in the company, and after reviewing the written materials, Liu purchased approximately $29,700 worth of EFT products, for which she received the right to purchase and did in fact purchase what she was told were 3,300 shares in the company for an additional $12,540.

115. When Plaintiffs purchased their shares in EFT, they were valued at $3.80 per share. The value of Plaintiffs' shares in EFT eventually dropped to less than a penny. At various times after purchasing their initial shares in EFT, and before the value of shares dropped to below one cent, Plaintiff Li and others approached Defendant Qin to discuss EFT's stock price, product quality, EFT's team leadership structure, and other issues relating to the EFT and the declining value of its shares. During these meetings, Qin repeatedly assured Mr. Li and others, both in public and private meetings, that EFT's products were good and that the value of the Company's shares would increase as long as long as Mr. Li and other Class members maintained their holdings and recruited more individuals to purchase EFT product and invest in the Company. Throughout their discussions, Qin continued to promote EFT and its products and assured Plaintiffs and Class members that their investments were safe and would pay off.

116. Qin and EFT repeatedly and willfully made knowingly false claims for the purpose of inducing Plaintiffs and Class members to forebear from trying to sell their supposed investments in EFT. Generally, Qin would purposefully make a false claim for the future, the future would come and prove the falsity of the claim, and then Qin would cover with a false excuse while simultaneously making another false claim for the future.

117. For example, in April of 2007, Qin made and publicized online a speech where he spoke of getting EFT stock "listed" and claimed "We can make the value of shares double many times. The worst condition is to make the value [just] double once." But instead of doubling in value, EFT stock dropped in value.

EDWARDS WILDMAN
PALMER LLP
ATTORNEYS AT LAW
LOS ANGELES

AM 34840718.1

- 32 -

AMENDED CLASS ACTION COMPLAINT
AND DEMAND FOR JURY TRIAL

To explain this turn of events, Qin gave a speech on June 28, 2008, where he made up a false and fantastical story about a single short-seller being responsible for bringing down the value of EFT stock, and stated "In the future, you do not need to pay too much attention to the fluctuation of price . . . [y]ou could concern about the price and do not need to worry. Nothing will happen to EFT who can buy [business] with NT 19.9 billion dollar . . . The increase of up and down is healthy. You never see the price to go straight up . . . the big generation of EFT will come." But instead of the "big generation of EFT" coming, the value of EFT stock continued to drop. To explain this turn of events, Qin gave a speech in Bali on January 9, 2009, where he made up false and fantastical financial projections while blaming the financial markets at large, maintaining that "According to our original plan, if no financial crisis, the price of our stocks should be $8 to $10 and the end of last year. But the premise was no financial crisis. According to our original plan and development condition, the price of our stock will be doubled at the end of 2009. And there will be doubled once or twice at the end of 2010. This is the original anticipation. But the condition now has changed. And you should be patient." Qin also maintained that "According to our original plan, our stocks would be listed in 19 November 2007 and would be listed in the main board in April or May or June or July 2008 . . . In September, many people were still expecting to knock the bell in the U.S. and I promised to take 200 people to knock the bell. I think we were so lucky no to go there . . . EFT is so lucky because our stocks are not listed in the main board. . . but in the beginning or the second half of this year, a favorable turn may appear. There will be a chance before the turn . . . I hope shareholders or consumers who had lost great amount of money in Chinese stock market could recover in EFT stock market. I sincerely hope that will happen and I know this will definitely happen." But the value of EFT declined instead of doubling by the end of 2010, EFT stock was never listed in the main board as promised, and the "definite" recovery coming to shareholders never actually came.

Edwards Wildman
Palmer LLP
Attorneys At Law
Los Angeles

AM 34840718.1          - 33 -          AMENDED CLASS ACTION COMPLAINT
AND DEMAND FOR JURY TRIAL

1    To explain this turn of events, Qin gave a 2010 speech where he blamed third
2    parties, claiming that "due to our investment in ocean shipping, we were cheated
3    by Renhe Jiao, a partner from Taiwan. So, we're litigating. After the lawsuit is
4    won, the stock will go up." But, again, the value of EFT stock went down, not up.
5    To explain this turn of events, Qin gave a 2011 speech where he claimed that "the
6    shipyard will compensate us with more money than the purchase cost of the ship,
7    and the later the compensation, the more the money will be given, and the stock
8    'blowout' will occur." But, as usual, the shipyard never compensated EFT, much
9    less for more than the purchase cost of the ship, and no stock "blowout" ever
10   occurred.

11       118.  After years of Defendants' repeated misrepresentations that the value
12   of Plaintiffs' investment in EFT was secure and would be realized once the
13   company was listed on the main stock board, Plaintiffs began to suspect that
14   Defendants' assurance were false and misleading. Thus, in 2012, Plaintiffs set out
15   to locate other similarly situated Chinese consumers who had attended meetings
16   with Qin, purchased EFT products, and become company shareholders. Through
17   their efforts, Plaintiffs determined that there are tens of thousands of Chinese
18   consumers – both rich and poor – who, based on Qin's speeches about the benefits
19   of EFT's products and promises of riches, invested tens of millions of dollars in
20   EFT by becoming company affiliates.

21       119.  After discovering that they were not alone and that Defendants'
22   fraudulent scheme had ensnarled so many unsuspecting Chinese consumers,
23   Plaintiffs engaged counsel, first in China and later the U.S., to explore their legal
24   options. It was only after engaging counsel in 2012 that Plaintiffs first learned of
25   Defendants' endless chain, false promises, and misuse of the money they had
26   invested in EFT. This was also the first time that Plaintiffs learned that the
27   products they purchased were mislabeled and that some of the products contained
28   unlisted ingredients and others did not contain the full amount of ingredients listed

Edwards Wildman
Palmer LLP
Attorneys At Law
Los Angeles

AM 34840718.1                    - 34 -                    AMENDED CLASS ACTION COMPLAINT
                                                           AND DEMAND FOR JURY TRIAL

1    on product labels. Further, it was not until May 21, 2013, that Plaintiffs discovered

2    that some of their stockholder certificates were counterfeit and of the mass

3    involuntary share liquidations perpetrated by Buckman.

**CLASS ACTION ALLEGATIONS**

5    120.   Plaintiffs bring this class action pursuant to Federal Rule of Civil

6    Procedure 23(a), (b) (1), (b)(2), and (b)(3) on behalf of all purchasers of EFT

7    products (the "Class"). Excluded from the Class are Defendants, their employees,

8    family members, officers, directors, and any entity in which Defendants have or

9    had a controlling interest.

10    121.   Members of the Class are so numerous that their individual joinder

11    herein is impracticable. Members of the Class number in the tens of thousands. The

12    precise number of Class members and their identities are unknown to Plaintiffs at

13    this time but will be determined through discovery. Class members may be notified

14    of the pendency of this action by mail and/or publication and through the records

15    of Defendants and their agents, as well as third parties.

16    122.   Common questions of law and fact exist as to all Class members and

17    predominate over questions affecting only individual Class members. Common

18    legal and factual questions include, but are not limited to:

19    (A)   Whether Defendants have operated an unlawful scheme;

20    (B)   Whether EFT's products fail to conform to the representations
      which were published, disseminated, and advertised;

22    (C)   Whether Defendants concealed from Plaintiffs and the Class
      that EFT's products did not conform to their stated
      representations;

24    (D)   Whether Plaintiffs paid money to Defendants for the right to
      sell a product;

25    (E)   Whether Plaintiffs paid money to Defendants for the right to
      receive, in return for recruiting others, rewards which were
      unrelated to the sale of products to retail consumers;

28    (F)   Whether affiliates had to make an initial investment in EFT;

EDWARDS WILDMAN
PALMER LLP
ATTORNEYS AT LAW
LOS ANGELES

AM 34840718.1

- 35 -

AMENDED CLASS ACTION COMPLAINT
AND DEMAND FOR JURY TRIAL

(G) Whether EFT had and enforced sufficient corporate safeguards;

(H) Whether EFT constitutes an endless chain under California state law;

(I) Whether Defendants omitted to inform Plaintiffs that they were entering into an illegal scheme where an overwhelming number of participants lose money;

(J) Whether Defendants statements of potential affiliate earnings were deceptive and misleading;

(K) Whether Defendants representations of EFT's business value and prospects were materially false, deceptive, and misleading;

(L) Whether EFT's business model primarily incentivizes the payment of compensation facially unrelated to the sale of products to ultimate users because such compensation is paid on the amount ordered from EFT rather than on actual sales to consumers;

(M) Whether EFT overcharged for shipping and handling products;

(N) Whether Defendants operated a pump-and-dump scheme;

(O) Whether Defendants engaged in fraudulent corporate looting;

(P) Whether Defendants engaged in acts of mail and/or wire fraud, money laundering, or knowing interstate transfers of stolen funds, all in direct violation of RICO;

(Q) Whether Class members suffered an ascertainable loss as a result of Defendants' fraudulent scheme;

(R) The extent that Defendants' conduct injured the class;

(S) Whether Defendants were unjustly enriched by their conduct; and

(T) Whether, as a result of Defendants' misconduct as alleged herein, Plaintiffs and Class members are entitled to restitution and other monetary relief and, if so, the amount and nature of such relief.

123. Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct. Plaintiffs have no interests antagonistic to the interests of the other members of the Class. Plaintiffs and all members of the Class have sustained

EDWARDS WILDMAN PALMER LLP
ATTORNEYS AT LAW
LOS ANGELES

AM 34840718.1

- 36 -

AMENDED CLASS ACTION COMPLAINT
AND DEMAND FOR JURY TRIAL

1   economic injury arising out of Defendants' violations of common and statutory law

2   as alleged herein.

3       124.  Plaintiffs are adequate representatives of the Class because their

4   interests do not conflict with the interests of the Class members they seek to

5   represent, they have retained counsel competent and experienced in class actions,

6   and they intend to prosecute this action vigorously. The interests of Class members

7   will be fairly and adequately protected by Plaintiffs and their counsel.

8       125.  The class mechanism is superior to other available means for the fair

9   and efficient adjudication of the claims of Plaintiffs and Class members. Each

10  individual Class member may lack the resources to undergo the burden and

11  expense of individual prosecution of the complex and extensive litigation

12  necessary to establish Defendants' liability. Individualized litigation increases the

13  delay and expense to all parties and multiplies the burden on the judicial system

14  presented by the complex legal and factual issues of this case. In contrast, the class

15  action device presents far fewer management difficulties and provides the benefits

16  of single adjudication, economy of scales, and comprehensive supervision by a

17  single court on the issue of Defendants' liability. Class treatment of the liability

18  issues will ensure that all claims and claimants are before this Court for consistent

19  adjudication of liability issues.

20                    <u>**COUNT I**</u>

21          **(ENDLESS CHAIN SCHEME; California Penal**

22      **Code § 327 and California Civil Code § 1689.2.)**

23                 **Against All Defendants**

24      126.  Plaintiffs repeat, reallege, and incorporate by reference the allegations

25  contained in the paragraphs above as if fully set forth herein.

26      127.  Plaintiffs bring this claim on behalf of themselves and all Class

27  members.

28

Edwards Wildman
Palmer LLP
Attorneys At Law
Los Angeles

AM 34840718.1                    - 37 -           AMENDED CLASS ACTION COMPLAINT
                                                   AND DEMAND FOR JURY TRIAL

128.   California Penal Code § 327 renders endless chain schemes illegal. Section 1689.2 of the California Civil Code provides:

> A participant in an endless chain scheme, as defined in Section 327 of the Penal Code, may rescind the contract upon which the scheme is based, and may recover all consideration paid pursuant to the scheme, less any amounts paid or consideration provided to the participant pursuant to the scheme.

129.   Qin, EFT, and the EFT Officers and Directors operated an endless chain scheme.

130.   Plaintiffs and Class members have suffered injuries in fact and have lost money or property because of the business acts, omissions, and practices of Qin, EFT, and the EFT Officers and Directors.

131.   Plaintiffs and the class are entitled to recover all consideration paid under the scheme, less any amounts paid or consideration provided to the participants under the scheme.

132.   As violations of California Penal Code §327 are punishable by imprisonment for over one year, violations of California Penal Code §327 can provide the basis for a RICO predicate act of racketeering.

133.   As Defendants' violations of California Penal Code §327 constitute a pattern of felonious fraud and grand theft causing injury in excess of $3,200,000, such acts and omissions are punishable by imprisonment for over one year under California Penal Code §§ 487, 12022, and 186.1, and thus can provide the basis for a RICO predicate act of racketeering.

## COUNT II

### (DECEPTION and COMMON LAW FRAUD: California Civil Code §§ 1709- 1710; California Penal Code §§ 487, 12022, 186.11)

### Against All Defendants

134.   Plaintiffs repeat, reallege, and incorporate by reference the allegations contained in the paragraphs above as if fully set forth herein.

EDWARDS WILDMAN
PALMER LLP
ATTORNEYS AT LAW
LOS ANGELES

AM 34840718.1                              - 38 -                    AMENDED CLASS ACTION COMPLAINT
AND DEMAND FOR JURY TRIAL

135. Plaintiffs bring this claim on behalf of themselves and all Class members.

136. California Civil Code § 1709 provides:

> One who willfully deceives another with intent to induce him to alter his position to his injury or risk, is liable for any damage which he thereby suffers.

137. California Civil Code § 1710 provides:

> A deceit, within the meaning of the last section, is either:
>
> 1. The suggestion, as a fact, of that which is not true, by one who does not believe it to be true;
>
> 2. The assertion, as a fact, of that which is not true, by one who has no reasonable ground for believing it to be true;
>
> 3. The suppression of a fact, by one who is bound to disclose it, or who gives information of other facts which are likely to mislead for want of communication of that fact; or,
>
> 4. A promise, made without any intention of performing it.

138. As alleged in specific detail previously in this Amended Complaint, Defendants knowingly and willfully made numerous misrepresentations and suppressions of material fact to Plaintiffs and the class. For example:

> (A)   In January of 2008, Qin, Curry, and other EFT officers and directors knowingly and willfully caused the misrepresentation that EFT had grown into a $782 billion business to appear on the EFT website. This assertion or suggestion of fact was not true and Defendants neither believed it to be true nor had reasonable grounds for believing it to be true.
>
> (B)   From 2007 and continuing through at least 2010, Qin knowingly and willfully made misrepresentations in speeches, made both in person and also distributed over the internet, which claimed EFT would soon be listed for sale on the New York Stock Exchange and that the shares owned by Plaintiffs and class members would soon double in value. For example, in April of 2007, Qin claimed that "[w]e can make the value of shares double many times" and that "[t]he worst condition is to

Edwards Wildman
Palmer LLP
Attorneys At Law
Los Angeles

AM 34840718.1

- 39 -

AMENDED CLASS ACTION COMPLAINT
AND DEMAND FOR JURY TRIAL

make the value [only] double once." On April 15, 2007, in a conference room of a hotel in Tainjin, China, Qin promised that "franchise-level consumers will become millionaires one year later after following our company just because they are franchise-level." On January 28, 2008, Qin maintained that "we will buy a mine in Chinese mainland" "[a]nd the meaning of buying this mine is that the value of our stocks will increase to $40 USD if the value of the mine could be accepted in the international market." On January 9, 2009, Qin gave a speech in Bali where he urged investors to hold onto their shares and maintained that investor recovery through EFT stock "will definitely happen" and "will not go wrong." And in August of 2010, at a conference in Halong Bay, Vietnam, Qin represented that an EFT stock "blowout" would occur the following year, would be listed on the main board of the NYSE in three months, and that "EFTB stock rising up to $60-100 per share is not a dream." All of these assertions or suggestions of fact were not true and Defendants neither believed them to be true nor had reasonable grounds for believing them to be true.

(C) From 2007 and continuing through the present, Defendants knowingly and willfully suppressed the material fact that they were operating a pump-and-dump scheme, an endless chain scheme, and a corporate looting scheme, and that as a consequence of these schemes the shares held by Plaintiffs and class members would eventually have little to no value. Defendants were bound to disclose the material fact that they intended to and were in fact operating such schemes, yet Defendants suppressed this fact. Instead, Defendants gave information of other facts, such as promises of high investment returns and other facts as mentioned above, which were materially misleading for want of communication of the fact that Defendants were actually operating a pump-and-dump scheme, an endless chain scheme, and a corporate looting scheme.

139. Plaintiffs and class members purchased shares in EFT at $3.80 per share. Subsequently, during and after the "dump" phase of Defendants' Pump-and-Dump Scheme, Plaintiffs' shares dropped in value, eventually becoming worth less than a penny. At various times after purchasing their initial shares in EFT, and

1 before the value of shares dropped to below one cent, Plaintiff Li and others
2 approached Defendant Qin to discuss EFT's stock price, product quality, EFT's
3 team leadership structure, and other issues relating to the Company and the
4 declining value of its shares. During these meetings, Qin repeatedly issued and
5 used the aforementioned misrepresentations and suppressions of material facts to
6 assure Mr. Li and others, both in public and private meetings, that EFT's products
7 were good and that the value of the Company's shares would increase as long as
8 Mr. Li and other class members maintained their shares and recruited more
9 individuals to purchase EFT product and invest in the Company. Throughout their
10 discussions, Qin continued to promote EFT and its products and assured Plaintiffs
11 and class members that their investments were safe and would pay-off. For
12 example, in a speech on June 28, 2008, Qin made up a false story about a single
13 short-seller being responsible for bringing down the value of EFT stock, and then
14 stated that "In the future, you do not need to pay too much attention to the
15 fluctuation of price . . . [y]ou could concern about the price and do not need to
16 worry. Nothing will happen to EFT who can buy [business] with NT 19.9 billion
17 dollar . . . The increase of up and down is healthy. You never see the price to go
18 straight up . . . the big generation of EFT will come." At no time did Defendants
19 disclose that they were operating a pump-and-dump scheme, an endless chain
20 scheme, or a corporate looting scheme.

21     140. Defendants made such misrepresentations and suppressions willfully
22 and knowingly, with the purpose and intent of inducing Plaintiffs and class
23 members to forebear from selling their shares until after Defendants could execute
24 their various schemes.

25     141. Had Qin and Defendants made truthful disclosures instead of the
26 aforementioned misrepresentations and suppressions of material fact, Plaintiffs and
27 Class members would have sold their shares. But for Defendants' deceptive acts
28 and omissions, Plaintiffs and Class members would not have held their shares

Edwards Wildman
Palmer LLP
Attorneys At Law
Los Angeles

AM 34840718.1                    - 41 -         AMENDED CLASS ACTION COMPLAINT
                                                AND DEMAND FOR JURY TRIAL

1   through the duration of Defendants' various schemes.

2        142.   Plaintiffs and Class members justifiably relied on Defendants'

3   misrepresentations and concealments and were in fact induced to retain their shares

4   until after Defendants executed their Pump-and-Dump Scheme.

5        143.   Plaintiffs and Class members have suffered injuries in fact and have

6   lost money or property because of Defendants' deceptive acts.

7        144.   Plaintiffs and the Class are entitled to recover all losses suffered as a

8   result of Defendants' deceptive acts.

9        145.   Defendants' deceptive acts and omissions constitute a pattern of

10  felonious fraud and grand theft causing injury in excess of $3,200,000. Under

11  California Penal Code §§ 487, 12022, 186.1, such acts and omissions are

12  punishable by imprisonment for over one year and thus can provide the basis for a

13  RICO predicate act of racketeering.

## COUNT III

### (CORPORATE WASTE AND GIFT)

#### Against All Defendants

17       146.   Plaintiffs repeat, reallege, and incorporate by reference the allegations

18  contained in the paragraphs above as if fully set forth herein.

19       147.   By failing to properly consider the interests of Plaintiffs and other

20  Class members, Defendants, without any valid corporate purpose, have caused

21  EFT to waste valuable corporate assets solely for the financial gain of Defendants.

22       148.   In return for such wrongful diversion of corporate assets, EFT

23  received no consideration, rendering the transactions in effect a gift to Defendants.

24       149.   The conduct of Defendants, and each of them, was not in good faith.

25       150.   Defendants intentionally and directly diverted EFT's assets to their

26  own use or benefit.

27       151.   As a result of these Defendants' wrongful conduct, and the wrongful

28  conduct of each of them, Plaintiffs have suffered and continue to suffer economic

EDWARDS WILDMAN
PALMER LLP
ATTORNEYS AT LAW
LOS ANGELES

AM 34840718.1                    - 42 -          AMENDED CLASS ACTION COMPLAINT
                                                   AND DEMAND FOR JURY TRIAL

1    and non-economic losses.

2        152.  Defendants' thefts of corporate assets constitute a pattern of felonious

3    fraud and grand theft causing injury in excess of $3,200,000. Under California

4    Penal Code §§ 487, 12022, 186.1, such acts and omissions are punishable by

5    imprisonment for over one year and thus can provide the basis for a RICO

6    predicate act of racketeering.

7    <center>**COUNT IV**</center>

8    <center>**(RICO 18 U.S.C. § 1962(c))**</center>

9    <center>**Against All Defendants**</center>

10       153.  Plaintiffs repeat, reallege, and incorporate by reference the allegations

11   contained in the paragraphs above as if fully set forth herein.

12       154.  EFT, Qin, the EFT Officers and Directors, Buckman, the Buckman

13   Team, the Shell Companies, and others known and unknown make up the "EFT

14   Enterprise," an association of entities and individuals associated in fact to operate

15   multiple illegal schemes, including but not limited to the Endless Chain Scheme,

16   the Pump-and-Dump Scheme, and the Corporate Looting Scheme. Defendants are

17   engaged in activities affecting federal interstate and foreign commerce and are

18   entities capable of holding a legal or beneficial interest in property. EFT, Qin, the

19   EFT Officers and Directors, Buckman, the Buckman Team, the Shell Companies,

20   and other participants in the EFT Enterprise are all "persons" as that term is

21   defined by 18 U.S.C. §1961(3).

22       155. Except for Chow, Soon, Sluss, and Ko, Defendants have been

23   members of the EFT Enterprise since at least 2007 and continuing until the present.

24   Chow, Soon, and Ko joined the EFT Enterprise in 2009 and Sluss joined the EFT

25   Enterprise in 2010. Qin, the EFT Officers and Directors, Buckman, the Buckman

26   Team, the Shell Companies, and others are separate entities from the EFT

27   Enterprise and play separate and distinct roles in the operation of the EFT

28   Enterprise. Among others, participants in the EFT Enterprise include:

EDWARDS WILDMAN
PALMER LLP
ATTORNEYS AT LAW
LOS ANGELES

AM 34840718.1       - 43 -      AMENDED CLASS ACTION COMPLAINT
AND DEMAND FOR JURY TRIAL

(A) Qin is the founder, architect, and beneficiary of the current EFT Endless Chain Scheme, the EFT Pump-and-Dump Scheme, the EFT Corporate Looting Scheme, and various endless chain schemes. Through interstate wire and mails, he coordinates the EFT Enterprise, a worldwide scheme. Qin is also affiliated with numerous shell companies and individuals, through which he coordinates and operates his schemes.

(B) EFT is the official front business structured to run the EFT Endless Chain Scheme and to be used as a vehicle in various other schemes. It is the most recent iteration of a long succession of front businesses used to run endless chains and other scams operated by Qin and others, such as eFastTeam, eFastTeam2000, and ef2t. EFT is affiliated with numerous shell companies and individuals that reap fraudulent profits by using it in various schemes.

(C) Jun(e) Qin Liu ("Liu") was Qin's mistress and an administrative assistant at eFastTeam, one of the predecessor versions of EFT. After earning a salary of $18,000 in 2007, Liu was appointed to EFT's Board of Directors in 2008 and given control over 52,099,000 shares of EFT stock (representing over 68% of issued and outstanding common stock, or more than $192,000,000 at the OTC valuation of $3.70 per share). She gained control over this stock when Qin placed her in control of the British Virgin Islands shell company Dragon Win. In fact, Qin was the beneficiary and person with control over Dragon Win.

(D) Dragon Win is a shell corporation located in the British Virgin Islands that at its inception was created to be *de jure* managed by Liu, Qin's mistress, and *de facto* controlled by Qin himself, through Liu. Dragon Win's purpose was to facilitate the Pump-and-Dump Scheme of Qin and Defendants. EFT, under the control of Qin and with the assistance of Liu and other accomplices, ultimately funneled 52,099,000 shares of EFT into Dragon Win, at a total market value of over $192,000,000, before pumping the market value up to over $300,000,000. Dragon Win currently owns approximately 1,600,000 shares, having successfully unloaded the other 50,499,000 during the dump phase of the EFT Enterprise's Pump-and-Dump Scheme.

(E) Buckman is a Broker/Dealer incorporated in New Jersey. It, in conjunction with various affiliated companies owned and operated by Buckman managers and employees, provided the financial expertise and business vehicles needed for the EFT Enterprise's schemes to operate. Buckman is registered with the SEC and with FINRA, and has 13 FINRA public disclosure events. Nine of these relate to final, formal proceedings initiated by regulatory authorities for violations of investment-related rules or regulations. Four of these are FINRA arbitration awards involving securities and commodities disputes between public customers and Buckman. Buckman served as EFT's placement agent for its Regulation S Offering and market maker of EFT's common stock on the OTC Bulletin Board. Various owners and employees of Buckman also operated the entities which enabled EFT's reverse-merger onto the OTC Bulletin Board. While providing these services, Buckman and its owners, managing directors, and employees funneled millions of EFT shares into various shell corporations and facilitated the EFT Enterprise's Pump-and-Dump Scheme.

(F) Huemoeller is an employee of Buckman, the ex-CEO and President of HumWare, and a consultant to Greenstone. Huemoeller is registered with FINRA and has two disclosure events for arbitrations where he was ordered to pay approximately $199,000 in damages to his customers. In November of 2007, and before the execution of the EFT Enterprise's Pump-and-Dump Scheme, Huemoeller received 350,000 shares of EFT stock for virtually no consideration.

(G) HumWare was the shell corporation used as the reverse-merger vehicle for getting EFT listed on the OTC Bulletin Board. HumWare was owned and operated by Buckman employee and Greenstone consultant Huemoeller. HumWare's value to the EFT Enterprise was that it was trading on the Pink Sheets as a typical penny stock. As such, it could be used as a reverse-merger vehicle to bypass many of the extensive regulatory hurdles for listing normally imposed by the SEC and quickly get EFT listed for public trading. On November 7, 2007, HumWare changed its name to EFT BioTech Holdings, Inc., and effected a reverse stock split of 20,000 shares of common stock for 1 share of common stock.

Edwards Wildman
Palmer LLP
Attorneys At Law
Los Angeles

AM 34840718.1

- 45 -

AMENDED CLASS ACTION COMPLAINT
AND DEMAND FOR JURY TRIAL

(H) Lau is a managing director and 5-10% owner of Buckman, a co-founder/president of Greenstone, director or owner of Pierstone, and a director CTX.

(I)   Gaikas is a managing director and 5-10% owner of Buckman, a co-founder/director of Greenstone, and a director or owner of Brown Door.

(J) Greenstone is a shell corporation founded and by Lau and Gaikas. Lau and Gaikas have voting and dispositive control of Greenstone. In 2006, Lau and Gaikas, with assistance from Buckman, got Greenstone listed for public trading on the Pink Sheets. Greenstone, Buckman, Heumoeller, Lau, and Gaikas, in turn, subsequently served as the financial advisors to get EFT listed on for public trading on the OTC Bulletin Board. In November of 2007, and before the execution of EFT's Pump-and-Dump scheme, Greenstone received 4,000,000 shares of EFT stock for virtually no consideration. Greenstone has subsequently been sued by the SEC for facilitating other pump-and-dump schemes.

(K) Pierstone is a shell corporation located in New York that is directed or controlled by Lau. In November of 2007, and before the execution of EFT's Pump-and-Dump Scheme, it received 1,000,000 shares of EFT stock for virtually no consideration.

(L) Brown Door is a shell corporation located in Farmingdale, New Jersey, that is directed or controlled by Gaikas. In November of 2007, and before the execution of EFT's Pump-and-Dump Scheme, it received 1,000,000 shares of EFT stock for virtually no consideration.

(M) Sourlis is the attorney hand-picked by Buckman to assist with EFT's SEC filings in furtherance of the EFT Enterprise's Pump-and-Dump Scheme. Sourlis was also used to facilitate Greenstone's listing on the OTC Markets. Sourlis has since been suspended from appearing in front of the SEC as a result of her involvement with Greenstone.

(N) Wagoner is an accounting firm headquartered in Salt Lake City, Utah. It was hand-picked by Buckman to assist with creating EFT's audited financials for EFT's reverse-merger onto the stock market, in furtherance of the EFT Enterprise's Pump-and-Dump Scheme. Wagoner has since been reprimanded by the Public Company Accounting Oversight

EDWARDS WILDMAN
PALMER LLP
ATTORNEYS AT LAW
LOS ANGELES

AM 34840718.1

- 46 -

AMENDED CLASS ACTION COMPLAINT
AND DEMAND FOR JURY TRIAL

Board for various material auditing deficiencies, including "the failure, on five audits, to perform sufficient procedures related to reverse mergers and other business combinations."

(O)  Wendy is Qin's sister. Wendy is also a director of EFT International, which pays her a salary of $300,000 per year. Wendy is also the owner or director of Assets Limited, JFL, Regal Walnut, and  the 6,500 square foot Hong Kong Office located at 8 Arglye Street, Suite 3706, Kowloon, Hong Kong SAR. Directly and indirectly, Wendy has received millions of dollars from her participation in the various EFT Enterprise schemes.

(P)  Assets Limited is a shell corporation located in the British Virgin Islands that is owned by Wendy and affiliated with EFT. Since at least 2007, EFT has paid Assets Limited millions of dollars in royalties for the right to use the "EFT" name.

(Q)  JFL is a shell corporation located in the British Virgin Islands that is owned by Wendy and affiliated with EFT. It receives hundreds of thousands of dollars annually from EFT for consulting services that Wendy apparently provides outside of her regular duties as director of EFT International.

(R)  The Hong Kong Office is a 6,500 square foot facility owned by Wendy and leased to EFT for hundreds of thousands of dollars per year.

(S)  Regal Walnut is a California limited liability company owned by Wendy in conjunction with her brother Qin. Walnut is a shell corporation as well as a million-dollar residence located at 1168 Regal Canyon Drive, Walnut, California 91789. In November of 2007, before the execution of EFT's Pump-and-Dump Scheme, Walnut received 1,000,000 shares of EFT stock for virtually no consideration.

(T)  Excalibur is a marine shipping and transportation company located in Taiwan. It is operated by Soon, an EFT Director.

(U)  Meifu is a construction company that on belief is operated by affiliates of Qin, the EFT Directors, Buckman, or the Buckman Team.

(V)  CTX is a technology company operated by Curry and directed by Lau.

Edwards Wildman
Palmer LLP
Attorneys At Law
Los Angeles

AM 34840718.1

- 47 -

AMENDED CLASS ACTION COMPLAINT
AND DEMAND FOR JURY TRIAL

(W)  Soon, Curry, Chow, Ko, and Sluss are current or former EFT officers and directors.

156.  Defendants are all employed by or associated with the EFT Enterprise.

157.  Qin, EFT, the EFT Officers and Directors, Buckman, the Buckman Team, and others, both known and unknown, all agreed to and did conduct and participate in the conduct of the EFT Enterprise's affairs through a pattern of racketeering activity and for the unlawful purpose of intentionally defrauding Plaintiffs and class members. Specifically, Defendants willfully and intentionally violated and continue to violate numerous State and Federal laws with the goal of obtaining money, directly and indirectly, through a pattern of racketeering activities composed of numerous indictable offenses, including but not limited to violations of the mail and wire fraud statutes 18 U.S.C. §§ 1341 and 1343, the National Stolen Property Acts, 18 U.S.C. §§ 2314 and 2315, the Money Laundering Acts 18 U.S.C. §§ 1956 and 1957, and California Penal Code §§ 327, 487, 12022, and 186.1.

158.  From at least 2007 and continuing until the present, and with respect to Chow, Soon, Ko, and Sluss from at least 2010 until the present, within the Central District of California and elsewhere, EFT, Qin, the EFT Officers and Directors, Buckman, the Buckman Team, the Shell Companies, and others, in association with each other, did knowingly, willfully, and unlawfully conduct and participate, directly and indirectly, in the conduct of the affairs of the EFT Enterprise through a pattern of racketeering activity.

159.  From at least 2007 and continuing until the present, and with respect to Chow, Soon, Ko, and Sluss from at least 2010 until the present, EFT, Qin, the EFT Officers and Directors, Buckman, the Buckman Team, the Shell Companies, and others, in association with each other, executed a per se scheme to defraud through a pattern of racketeering made up of distinct and indictable acts of mail

EDWARDS WILDMAN
PALMER LLP
ATTORNEYS AT LAW
LOS ANGELES

AM 34840718.1

- 48 -

AMENDED CLASS ACTION COMPLAINT
AND DEMAND FOR JURY TRIAL

1    and wire fraud under 18 U.S.C. §§ 1341 and 1343 transfers of stolen property in

2    violation of the National Stolen Property Acts, 18 U.S.C. §§ 2314 and 2315, and

3    money laundering in violation Money Laundering Acts, 18 U.S.C. §§ 1956 and

4    1957.

5        160.  The EFT Enterprise engaged in and affected interstate and foreign

6    trade. The EFT Enterprise transacts business through the instrumentalities of

7    interstate commerce such as telephones, facsimile machines, the internet, email,

8    and the United States mail and interstate commercial carrier to communicate in

9    furtherance of the activities of the EFT Enterprise. The EFT Enterprise advertises,

10   markets, and sells products and services throughout the world, and manufactures

11   and ships products specifically from the United States. The operation of the EFT

12   Enterprise has continued over several years, including activities in every state, and

13   has affected and damaged, and continues to affect and damage, commercial

14   activity.

15       161.  To further the goals of the EFT Enterprise, which include (1) earning

16   money through fraudulent means; (2) enticing individuals to become EFT

17   affiliates; (3) enticing individuals to purchase products from EFT; (4) enticing

18   individuals to recruit others to become EFT affiliates and profit off those recruits'

19   purchases of EFT products; (5) selling adulterated and mislabeled products through

20   the channels of interstate commerce; (6) inducing individuals to invest in

21   ownership in EFT; (7) perpetrating a Pump-and-Dump Scheme; (8) inducing

22   individual investors to forebear from attempting to sell their investments during the

23   execution of a Pump-and-Dump Scheme; (9) looting invested capital out from the

24   EFT corporation; and (10) reaping large profits for themselves based on fraud and

25   false representations, EFT, Qin, the EFT Officers and Directors, Buckman, the

26   Buckman Team, the Shell Companies, and others known and unknown engaged in

27   various forms of illegal activity, including but not limited to, mail fraud, wire

28   fraud, money laundering, conspiracy, corporate looting, the transfer and receipt

Edwards Wildman
Palmer LLP
Attorneys At Law
Los Angeles

AM 34840718.1                          - 49 -                    AMENDED CLASS ACTION COMPLAINT
                                                                 AND DEMAND FOR JURY TRIAL

1   stolen property, the sale of adulterated and mislabeled goods in violation of FDA
2   rules and California law, manipulation of financial markets, common law fraud,
3   and operation of an endless chain scheme.

4       162.   The pattern of racketeering activity alleged is distinct from the EFT
5   Enterprise. Each act of racketeering activity is distinct from the EFT Enterprise in
6   that each is a separate offense committed by an entity or individual while the EFT
7   Enterprise is an association of entities and individuals. The EFT Enterprise has an
8   ongoing structure and/or organization supported by personnel and/or associates
9   with continuing functions or duties.

10       163.   The racketeering acts set out in this Amended Complaint, and others,
11   all had the same pattern and similar purpose of defrauding Plaintiffs and the Class
12   for the benefit of the EFT Enterprise and its members. Each racketeering act was
13   related, had a similar purpose, involved the same or similar participants and
14   methods of commission and had similar results affecting Plaintiffs and the Class.
15   The racketeering acts of mail fraud, wire fraud, transfers of stolen property, and
16   money laundering were also related to each other in that they were part of the EFT
17   Enterprise's goal to reap illicit and unlawful profits while fraudulently inducing
18   Plaintiffs and the Class to join the illegal schemes, purchase products, and recruit
19   others to join the schemes.

20       164.   The wrongful conduct of EFT, Qin, the EFT Officers and Directors,
21   Buckman, the Buckman Team, the Shell Companies, and others has been and
22   remains part of the EFT Enterprise's ongoing way of doing business and
23   constitutes a continuing threat to the property of Plaintiffs and the Class. Without
24   the repeated acts of mail fraud, wire fraud, transfers of stolen property, and money
25   laundering, the EFT Enterprise's fraudulent scheme would not have succeeded.

26       165.   In connection with promoting and executing their illegal schemes,
27   members of the EFT Enterprise knowingly and recklessly placed and caused to be
28   placed in the United States mail or by interstate commercial carrier, or took or

EDWARDS WILDMAN
PALMER LLP
ATTORNEYS AT LAW
LOS ANGELES

AM 34840718.1      - 50 -    AMENDED CLASS ACTION COMPLAINT
AND DEMAND FOR JURY TRIAL

1    received therefrom, matters or things to be sent to or delivered by the United States
2    mail or by interstate commercial carrier comprising, among other things product,
3    invoices, letters, promotional materials, brochures, products, and wire transfers to
4    Plaintiffs and the Class and received communications between and among
5    themselves through the United States mail, in the United States. It was reasonably
6    foreseeable that these mailings or receipts would take place in furtherance of the
7    fraudulent schemes.

8        166.  In connection with promoting and executing their illegal schemes,
9    members of the EFT Enterprise engaged in wire fraud, in violation of 18 U.S.C.
10   § 1343 by, among other things, knowingly and recklessly transmitting or causing
11   to be transmitted with wire communications, in interstate and foreign trade,
12   materials promoting the illegal EFT chain on internet web sites, radio, satellite
13   radio, television, email, facsimile, telephone, and text messages, including
14   promotional materials, registration information, product information, and invoices.
15   Qin, EFT, and Defendants maintain websites on the internet where EFT affiliates
16   can and do buy products and are given inducements to continue working as
17   affiliates within the EFT chain. EFT maintains various websites hosting
18   promotional videos featuring Qin and others promoting the unlawful scheme and
19   other marketing materials featuring Defendants promoting the illegal scheme. EFT
20   sent and received these interstate wire communications to and from all fifty states
21   and the District of Columbia.

22       167.  Each Defendant has promoted the EFT chain and EFT Enterprise.
23   Each use of the mail or wire by Defendants done in furtherance of the EFT chain
24   was an act of racketeering.

25       168.  The pattern of racketeering activity through which the affairs of the
26   EFT Enterprise were conducted and in which Defendants participated consisted of
27   at least the following:

28

EDWARDS WILDMAN
PALMER LLP
ATTORNEYS AT LAW
LOS ANGELES

AM 34840718.1

- 51 -

AMENDED CLASS ACTION COMPLAINT
AND DEMAND FOR JURY TRIAL

**Predicate Acts of Mail or Wire Fraud**

169.   Criminal mail or wire fraud involves a scheme based on an intent to defraud and the use of the mails or wires to further that scheme. A scheme to defraud encompasses acts of artifice or deceit which are intended to deprive an owner of his property or money. The elements of mail and wire fraud are (1) a plan or scheme to defraud, (2) intent to defraud, (3) reasonable foreseeability that the mail or wires will be used, and (4) actual use of the mails or wires to further the scheme.

170.   As described in detail in the preceding allegations of this Amended Complaint, Defendants' Endless Chain Scheme, Pump-and-Dump Scheme, and Corporate Looting Scheme all involved numerous acts of artifice or deceit which were intended to deprive Plaintiffs and Class members of their property or money.

171.   As described in detail in the preceding allegations of this Amended Complaint, Defendants, through the EFT Enterprise, perpetrated the Endless Chain Scheme, Pump-and-Dump Scheme, and Corporate Looting Scheme with the intent to defraud Plaintiffs and Class members.

172.   It was reasonably foreseeable that the mails or wires would be used to further Defendants' Endless Chain Scheme, Pump-and-Dump Scheme, and Corporate Looting Scheme. Defendants shipped all of EFT's products by mail from within the United States. The shipment of products was a necessary component of Defendant's Endless Chain Scheme, as without product shipments the chain would not function. Defendants allowed for EFT product orders to be placed by mail and accepted such orders when received. Where product orders were not placed by mail, Defendants accepted orders by fax or email and accepted payment by wire. The accepting of EFT product orders was necessary for the execution of all of Defendants' schemes. Defendants encouraged EFT investment checks to be sent by mail or wire and accepted and received the same by mail and wire. Accepting investments was necessary for Defendants' Pump-and-Dump

EDWARDS WILDMAN PALMER LLP
ATTORNEYS AT LAW
LOS ANGELES

AM 34840718.1

- 52 -

AMENDED CLASS ACTION COMPLAINT
AND DEMAND FOR JURY TRIAL

1    Scheme and Corporate Looting Scheme, since without investments there would be
2    no market to pump-and-dump nor deep corporate coffers to loot. Defendants sent
3    materials promoting the schemes by mail. Defendants sent and received (and fully
4    expected to send and receive) checks by mail and funds by wire which were used
5    in furtherance of Defendants' schemes. And as this Amended Complaint has
6    previously alleged in specific detail, Defendants regularly sent electronic
7    transmissions of promotional and often false and fraudulent information over the
8    internet, in furtherance of all their schemes.

9        173.    From at least early 2007, and with respect to Chow, Soon, Sluss, and
10   Ko from at least 2010, in California and elsewhere, Qin, the EFT Officers and
11   Directors, Buckman, the Buckman Team, and others known and unknown,
12   willfully and knowingly did combine, conspire, and agree together and with each
13   other to commit mail and wire fraud.

14       174.    It was a part and object of the conspiracy between them that Qin, the
15   EFT Officers and Directors, Buckman, the Buckman Team, and others known and
16   unknown, would and did use the mails and wires to further their various schemes
17   to defraud, including but not limited to their Endless Chain Scheme, Pump-and-
18   Dump Scheme, and Corporate Looting Scheme, all as previously described in
19   specific detail in this Amended Complaint. Qin, the EFT Officers and Directors,
20   Buckman, the Buckman Team, and others known and unknown, with the intent and
21   purpose of furthering their schemes, did send and receive products,
22   communications, funds, and securities to and from places within the U.S. by use of
23   the mails and wires, thereby committing numerous indictable offenses in violation
24   of 18 U.S.C. §§ 1341 and 1343, each punishable by imprisonment in excess of one
25   year and constituting RICO predicate acts of racketeering under 18 U.S.C. § 1962
26   et seq.

27       175.    Examples of the mails and wires being used to further Defendants'
28   Endless Chain Scheme, Pump-and-Dump Scheme, and Corporate Looting Scheme

include, but are not limited to, the following:

(A)   This Amended Complaint previously alleged specific details for 27 checks that went to Wendy Qin, EFT Assets Limited, and/or JFL Capital. Each and every one of these checks was sent through the mails and/or processed through wires, and such was done in furtherance of Defendants' aforementioned schemes. As such, each and every one of these 27 mailings and/or wires constitutes a predicate act of mail or wire fraud.

(B)   On February 27, 2008, Defendants induced K. Chow to issue and place in the mail check number 1098 from his Fidelity account, in the amount of $1,140 and payable to EFT Biotech Holdings, Inc., purportedly in exchange for 300 shares of ownership in EFT. This mailing was sent from within the U.S., specifically from Texas to the EFT offices in California, was a foreseeable and intended consequence of actions by Defendants, and was mailed, delivered, and accepted all in furtherance of Defendants' fraudulent schemes.

(C)   On March 27, 2008, Defendants induced Ms. J. Chen to issue and place in the mail check number 1009 from her Bank of America account, in the amount of $25,000 and payable to EFT Biotech Holdings, Inc., purportedly in exchange for shares of ownership in EFT. This mailing was sent from within the U.S., specifically from Texas to the EFT offices in California, was a foreseeable and intended consequence of actions by Defendants, and was mailed, delivered, and accepted all in furtherance of Defendants' fraudulent schemes.

(D)   This Amended Complaint previously alleged specific details concerning investments and product purchases made by the named Plaintiffs. As previously alleged in specific detail, each such investment and product purchase was induced by the various fraudulent actions of one or more of the Defendants. Each such investment and product purchase required the use of the mails and/or use of the wires, and each such use was foreseeable, intended, and solicited by one or more of the Defendants. Each product order, fax, or investment order was send via mail or wire to EFT's California office, and each such sending, delivering, and acceptance of forms, funds, and securities furthered one or more of Defendants' fraudulent schemes.

EDWARDS WILDMAN PALMER LLP
ATTORNEYS AT LAW
LOS ANGELES

AM 34840718.1

- 54 -

AMENDED CLASS ACTION COMPLAINT
AND DEMAND FOR JURY TRIAL

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

(E)     This Amended Complaint previously alleged specific details for numerous speeches given by Qin in furtherance of Defendants' schemes. The speeches Qin gave on April 21, 2007, June 28, 2008, and January 9, 2009, were all recorded on DVDs. Such DVDs were distributed through the mails as well as posted electronically on the EFT website at http://www.eftb.us. Transmissions from this website are sent worldwide from a server located in Dallas, Texas, with a server IP address of 50.23.225.63. Each and every mailing of one of these DVDs was done in furtherance of Defendants' aforementioned schemes and constitutes a predicate act of mail fraud. Each and every posting of a speech online was done in furtherance of Defendants' aforementioned schemes. Each and every download of a speech by a Class member from the http://www.eftb.us website has the foreseeable potential effect of furthering Defendants' aforementioned schemes.

(F)     This Amended Complaint previously alleged specific details for numerous false product claims given in furtherance of Defendants' schemes. These product claims were posted electronically on the EFT website http://www.eftb.us. in January of 2008 and remain on the website to this day. Transmissions from this website are sent worldwide from a server located in Dallas, Texas, with a server IP address of 50.23.225.63. Each and every posting of a false product claim online was done in furtherance of Defendants' aforementioned schemes and constitutes a predicate act of wire fraud. Each and every download of a false product claim has the foreseeable potential effect of furthering Defendants' aforementioned schemes and constitutes a predicate act of wire fraud.

(G)     This Amended Complaint previously alleged specific details concerning numerous EFT products that are falsely labeled and adulterated. Each and every order of such products from EFT is shipped through the mails. Each one of these mailings is sent in furtherance of Defendants' schemes. As such, each and every one of the tens of thousands of falsely labeled and adulterated EFT products shipped by Defendants constitutes a predicate act of mail fraud.

(H)     This Amended Complaint previously alleged specific details for numerous false business claims that were posted electronically on the EFT website at http://www.eftb.us. These

Edwards Wildman
Palmer LLP
Attorneys At Law
Los Angeles

AM 34840718.1

- 55 -

AMENDED CLASS ACTION COMPLAINT
AND DEMAND FOR JURY TRIAL

false claims were given in furtherance of Defendants' schemes. Transmissions from http://www.eftb.us broadcast worldwide from a server located in Dallas, Texas, with a server IP address of 50.23.225.63. Each and every posting of false business claims online was done in furtherance of Defendants' aforementioned schemes and constitutes a predicate act of wire fraud. Each and every download of a false business claim has the foreseeable potential effect of furthering Defendants' aforementioned schemes and constitutes a predicate act of wire fraud.

(I)    This Amended Complaint previously alleged specific details for numerous acts of Corporate Looting done by Defendants. Each and every transfer of funds during the effectuation of such lootings required use of the mails and/or wires, and such was done in furtherance of Defendants' aforementioned schemes. As such, each and every one of these mailings and/or wires constitutes a predicate act of mail or wire fraud.

176.    Because of the material misrepresentations made by Defendants through the wires and/or delivered through the mails, Plaintiff and Class members became EFT affiliates and maintained their positions as EFT affiliates and continued to order EFT products and recruit others to do the same, as alleged in specific detail throughout this Amended Complaint. In reality, and as previously detailed, Plaintiffs and Class members had no real hope of profiting by participating in Defendants' schemes, and were consequently defrauded out of their money by Defendants' material misrepresentations.

177.    Qin, EFT, and various others known and unknown distributed these material misrepresentations by interstate wire transmissions over the internet from web servers based in the U.S., especially the server broadcasting from Dallas, Texas, from the IP address of 50.23.225.63, using various website addresses including, but not limited to, http://www.eftb.us, http://www.eftb.net, http://eftbeftb.com, http://eftbt.com, http://2by2.eftb.us, http://ezgt.eftb.net, http://eftk.us, http://www.efasteam.com, http://www.efasteam2000.com,

EDWARDS WILDMAN
PALMER LLP
ATTORNEYS AT LAW
LOS ANGELES

AM 34840718.1                              - 56 -                    AMENDED CLASS ACTION COMPLAINT
                                                                       AND DEMAND FOR JURY TRIAL

http://www.ef2t.com, and http://ddp.eftb.us. These transmissions were done with the purpose and intent of recruiting affiliates such as Plaintiffs and Class members into the EFT Enterprise's illegal schemes. As a result, Plaintiffs and class members became EFT affiliates, maintained their positions as EFT affiliates, initiated or increased investments in EFT securities, and continued to order EFT products and recruit others to do the same. Each product order that Plaintiffs and Class members placed necessitated the use of bank wires and the shipment of products through the U.S. Postal Service. Each investment in EFT securities that Plaintiffs and Class members made necessitated the use of bank wires or the mails. These orders and shipments were necessary for carrying out Defendants' fraudulent schemes and were among the direct, intended consequences of Defendants' purposeful and material misrepresentations.

178. All of these claims were purposeful material misrepresentations made by Defendants to induce Plaintiffs and the Class to send funds into the EFT Enterprise, and Plaintiffs and class members did so because of such material misrepresentations. Defendants posted these misrepresentations to their website with the purpose and intent of promoting the EFT Enterprise's illegal scheme, and participation in the scheme required use of bank wires and use of the U.S. Postal Service.

179. To the extent proof of reliance is legally required, in engaging in the aforementioned wire and mail fraud, Defendants knew that Plaintiffs and the Class members would reasonably rely on their representations and omissions which would cause the Plaintiffs and the class members to pay funds into the fraudulent schemes as well as purchase the mislabeled and adulterated products.

180. Defendants and the beneficiaries and promoters knew that the misrepresentations and omissions described above in promoting and executing the fraudulent scheme were material because they caused Plaintiffs and the Class members to join and participate in the illegal scheme.

Edwards Wildman
Palmer LLP
Attorneys At Law
Los Angeles

AM 34840718.1

- 57 -

AMENDED CLASS ACTION COMPLAINT
AND DEMAND FOR JURY TRIAL

1    181.   Had Plaintiffs and the Class known that Qin, EFT, and Defendants

2    were promoting illegal schemes, they would not have paid any money to

3    Defendants, placed any orders with Defendants, made any investments into EFT,

4    or otherwise engaged in transactions with Defendants.

5    182.   Each and every payment made by Plaintiffs and Class members

6    pursuant to Defendants' schemes, whether made through the mails or through the

7    wires, proximately caused injury to Plaintiffs and Class members.

8    183.   Defendants' thousands of predicate acts of mail and wire fraud were a

9    proximate cause of the injuries that Plaintiff and the Class suffered. Because of

10   Defendants' pattern of unlawful conduct, Plaintiffs and the Class members have

11   collectively suffered injuries in excess of $5,000,000 dollars.

12   **Predicate Acts of Transferring Stolen Property**

13   184.   Violations of the National Stolen Property Act occur when one

14   transports, transmits, transfers, or receives in interstate commerce any goods,

15   wares, merchandise, securities, or money worth more than $5,000 while knowing

16   that such were stolen, converted, or taken by fraud.

17   185.   From at least early 2007, and with respect to Chow, Soon, Sluss, and

18   Ko from at least 2010, in California and elsewhere, Qin, the EFT Officers and

19   Directors, Buckman, the Buckman Team, Wendy, and others known and unknown,

20   willfully and knowingly did combine, conspire, and agree together and with each

21   other to transport, transmit, transfer, and receive in interstate commerce money and

22   securities worth more than $5,000 with full knowledge that such money and

23   securities were stolen or taken by fraud.

24   186.   It was a part and object of the conspiracy between them that Qin, the

25   EFT Officers and Directors, Buckman, the Buckman Team, Wendy, and others

26   known and unknown, would and did transport, transmit, transfer, and receive

27   monetary instruments, funds, and securities from places in the U.S. to and through

28   places within and outside the U.S., with the intent to promote the carrying on of

Edwards Wildman
Palmer LLP
Attorneys At Law
Los Angeles

AM 34840718.1                    - 58 -          AMENDED CLASS ACTION COMPLAINT
                                                   AND DEMAND FOR JURY TRIAL

Defendants' fraudulent Endless Chain Scheme, Pump-and-Dump Scheme, and Corporate Looting Scheme, by knowingly transporting, transmitting, transferring, and receiving money and securities procured by the fraudulent schemes and worth more than $5,000, thereby committing numerous indictable offenses in violation of 18 U.S.C. §§ 2314 and 2315, each punishable by imprisonment in excess of one year and constituting RICO predicate acts of racketeering under 18 U.S.C. § 1962 *et seq.*

187.   Such violations include, but are not limited to, the following:

(A)   This Amended Complaint previously alleged specific details for 27 checks that went to Wendy Qin, EFT Assets Limited, and/or JFL Capital. Each of these checks was individually in excess of $5,000; collectively, they add up to millions. Wendy was an active and knowing participant in the various fraudulent schemes that were largely being orchestrated by her brother Qin, and she was in fact a major beneficiary of such schemes. She participated in these schemes with the purpose and intent of receiving money taken by fraud. As such, she accepted each of the 27 aforementioned checks fully knowing that they constituted money taken by fraud. Each such acceptance constitutes a predicate act of transferring stolen property in violation of the National Stolen Property Act.

(B)   This Amended Complaint previously alleged specific details for numerous Corporate Looting transactions. Each of these transactions were in excess of $5,000; collectively, they add up to tens of millions. The participants in these transactions were active and knowing participants in the various fraudulent schemes which provided the funds to be used in the transactions, and indeed participated in the transactions for the purposes of receiving money taken by fraud. As such, each transfer of money and each acceptance of money listed in the Corporate Looting section of this Amended Complaint was done with knowledge that the money was originally taken by fraud and thus constitutes a predicate act of transferring stolen property in violation of the National Stolen Property Act.

(C)   This Amended Complaint previously alleged specific details for numerous transfers of securities that were issued to

Edwards Wildman
Palmer LLP
Attorneys At Law
Los Angeles

AM 34840718.1                           - 59 -                  AMENDED CLASS ACTION COMPLAINT
                                                                AND DEMAND FOR JURY TRIAL

insiders for virtually no consideration within the months before the purported EFT Regulation S Offering. Each of these transactions conferred value in excess of $5,000; collectively, they add up to hundreds of millions. The participants in these transactions were active and knowing participants in the various fraudulent schemes which provided access to the securities to be transferred and received, and indeed participated in such transfers and receipts for the purposes of receiving securities issued as part of a fraudulent scheme. As such, each transfer of securities and each acceptance of securities performed by Defendants as mentioned in the Pump-and-Dump section of this Amended Complaint was done with knowledge that the securities were originally obtained through fraud and thus constitute predicate acts of transferring stolen property in violation of the National Stolen Property Act.

188.   But for Defendants' violations of the National Stolen Property Act, Defendants would not have been able to perpetrate or maintain the Endless Chain Scheme, Pump-and-Dump Scheme, or Corporate Looting Scheme, all of which proximately caused harm to Plaintiffs and Class members.

189.   As a proximate and foreseeable result of the various schemes enabled by Defendants' violations of the National Stolen Property Act, Plaintiffs and Class members have collectively suffered injuries in excess of $5,000,000.

### Predicate Acts of Money Laundering

190.   Money laundering occurs when one, while knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of such unlawful activity, where such is done with the intent to promote the carrying on of the unlawful activity or with the knowledge that the transaction is designed to conceal or disguise the nature, location, source, ownership, or control of the proceeds of such unlawful activity or to avoid a transaction reporting requirement under State or Federal law.

EDWARDS WILDMAN
PALMER LLP
ATTORNEYS AT LAW
LOS ANGELES

AM 34840718.1

- 60 -

AMENDED CLASS ACTION COMPLAINT
AND DEMAND FOR JURY TRIAL

191.   From at least early 2007, and with respect to Chow, Soon, Sluss, and Ko from at least 2010, in California and elsewhere, Qin, the EFT Officers and Directors, Buckman, the Buckman Team, Wendy, and others known and unknown, willfully and knowingly did combine, conspire, and agree together and with each other to commit money laundering.

192.   It was a part and object of the conspiracy between them that Qin, the EFT Officers and Directors, Buckman, the Buckman Team, Wendy, and others known and unknown, would and did transport, transmit, transfer, and receive monetary instruments and funds from places in the U.S. to and through places within and outside the U.S. These monetary instruments and funds represented the proceeds of Defendants' unlawful and fraudulent Endless Chain Scheme, Pump-and-Dump Scheme, and Corporate Looting Scheme, and were transported, transmitted, transferred, and received to and through places within and outside the U.S. with the intent and purpose of promoting the carrying on of Defendants' fraudulent Endless Chain Scheme, Pump-and-Dump Scheme, and Corporate Looting Scheme, and with the further intent and purpose of concealing the source, ownership, control, and location of such monetary instruments and funds, and also with the further intent and purpose of evading Federal and State reporting requirements. Therefore, Defendants and others committed numerous indictable offenses in violation of 18 U.S.C. §§ 1956 and 1957, each punishable by imprisonment in excess of one year and constituting RICO predicate acts of racketeering under 18 U.S.C. § 1962 et seq.

193.   Such violations include, but are not limited to, the following:

(A)   This Amended Complaint previously alleged specific details for 27 checks that went to Wendy Qin, EFT Assets Limited, and/or JFL Capital. Each of these fund transfers and receipts were made in furtherance of the Corporate Looting Scheme and in an effort to distribute proceeds acquired through the illegal Endless Chain Scheme and Pump-and-Dump

EDWARDS WILDMAN
PALMER LLP
ATTORNEYS AT LAW
LOS ANGELES

AM 34840718.1                          - 61 -                 AMENDED CLASS ACTION COMPLAINT
                                                              AND DEMAND FOR JURY TRIAL

1  Scheme. These fund transfers and receipts were made with the
2  purpose and intent of transmitting and receiving money taken
3  by fraud. Additionally, to the extent such payments were made
4  to shell companies in the British Virgin Islands, such were
   made in an attempt to avoid Federal and State taxes as well as
5  Federal and State reporting requirements. As such, each
6  transmission and each receipt of these 27 aforementioned
   checks constitutes a predicate act of money laundering.

7  (B)    This Amended Complaint previously alleged specific
8  details for numerous other Corporate Looting transactions.
   Each of these fund transfers and receipts were made in
9  furtherance of the Corporate Looting Scheme and in an effort to
10 distribute proceeds acquired through the illegal Endless Chain
   Scheme and Pump-and-Dump Scheme. The participants in
11 these transactions were active and knowing participants in the
12 various fraudulent schemes which provided the funds to be used
13 in the transactions, and indeed participated in the transactions
   for the purposes of receiving money taken by fraud.
14 Additionally, to the extent such payments were made to foreign
15 entities, such were made in an attempt to avoid Federal and
   State taxes as well as Federal and State reporting requirements.
16 As such, each transfer of money and each receipt of money
17 listed in the Corporate Looting section of this Amended
   Complaint constitutes a predicate act of money laundering.

18 (C)    This Amended Complaint previously alleged specific
19 details for the creation of Dragon Win, for the funneling of
   securities into Dragon Win, and for the funneling of securities
20 and funds out of Dragon Win. All the transfers to and from
21 Dragon Win were done with proceeds knowingly acquired
   through the Endless Chain Scheme, Pump-and-Dump Scheme,
22 or Corporate Looting Scheme, and were done in furtherance of
23 the Endless Chain Scheme, Pump-and-Dump Scheme, or
   Corporate Looting Scheme. Additionally, all such transfers
24 were done to avoid Federal and State taxes as well as Federal
25 and State reporting requirements. Defendants further evaded
   reporting requirements concerning the transfers of shares so as
26 to further conceal the extent of Qin's control as well as conceal
27 the active operation of the Pump-and-Dump Scheme and
   numerous transfers of securities that were issued to insiders for
28 virtually no consideration within the months before the

EDWARDS WILDMAN
PALMER LLP
ATTORNEYS AT LAW
LOS ANGELES

AM 34840718.1                              - 62 -                    AMENDED CLASS ACTION COMPLAINT
                                                                    AND DEMAND FOR JURY TRIAL

purported EFT Regulation S Offering. Each of these transactions conferred value in excess of $5,000; collectively, they add up to hundreds of millions. The participants in these transactions were active and knowing participants in the various fraudulent schemes which provided access to the securities to be transferred and received, and indeed participated in such transfers and receipts for the purposes of receiving securities issued as part of a fraudulent scheme. Consequently, each such transfer receipt of funds and securities into and out of Dragon Win or distributed or received by other Defendants constitutes a predicate act of money laundering.

194. But for Defendants' money laundering acts, Defendants would not have been able to perpetrate or maintain the Endless Chain Scheme, Pump-and-Dump Scheme, or Corporate Looting Scheme, all of which proximately caused harm to Plaintiffs and Class members.

195. Defendants had obligations under U.S. law to disclose the true nature of the aforementioned acts of money laundering, yet failed to do so.

196. Defendants knew that Plaintiffs and Class members would reasonably rely on the legitimacy of Defendants' transactions and would be deceived by Defendants' concealment of the true nature of Defendants' transactions. Plaintiffs and Class members did in fact rely on the legitimacy of Defendants' transactions and were deceived by Defendants' concealment of the true nature thereof.

197. As a proximate and foreseeable result of Defendants' money laundering, Plaintiffs and Class members have collectively suffered injuries in excess of $5,000,000.

198. Under 18 U.S.C. § 1964(c), Plaintiffs and the Class members are entitled to treble their damages, plus interest, costs and attorney's fees.

## COUNT V

### (RICO 18 U.S.C. § 1962(a))

### Against All Defendants

199. Plaintiffs repeat, reallege, and incorporate by reference the allegations

1    contained in the paragraphs above as if fully set forth herein.

2        200.   The EFT Enterprise is an enterprise engaged in and whose activities

3    affect interstate commerce.

4        201.   Defendants used and invested income that was derived from a pattern

5    of racketeering activity in an interstate enterprise. Specifically, revenue gained

6    from the pattern of racketeering activity as specifically alleged previously in this

7    Amended Complaint, and constituting a significant portion of the total income of

8    EFT, Qin, the EFT Officers and Directors, Buckman, the Buckman Team, the Shell

9    Companies, and others, was reinvested in the operations of the EFT Enterprise for

10   the following purposes: (a) to expand the operations of the EFT Enterprise and

11   provide additional false and misleading advertising and promotional materials

12   aimed at recruiting new affiliates into the Endless Chain Scheme and Pump-and-

13   Dump Scheme; (b) to facilitate the execution of the Endless Chain Scheme, Pump-

14   and-Dump Scheme, and Corporate Looting Scheme; (c) to maintain control of EFT

15   itself through the use of funds obtained by fraud; and (d) to convince current

16   affiliates to recruit new affiliates, to purchase EFT products, and to invest in EFT.

17       202.   As a direct and proximate result of Defendants' racketeering activities

18   and violations of 18 U.S.C. § 1962(a), Plaintiffs and the Class have been injured in

19   their business and property. Specifically, the reinvestment of the racketeering

20   income into the EFT Enterprise enabled the EFT Enterprise to grow and market

21   itself such that it was able to induce Plaintiffs and Class members to invest

22   millions of dollars of their own money through their purchasing of EFT products

23   and promotional materials, all of which were packaged and shipped at inflated

24   charges. The EFT Enterprise touted statistics concerning membership and

25   investment numbers in order to induce Plaintiffs and Class members to buy EFT

26   products, invest in EFT securities, or recruit others to buy EFT products and invest

27   in EFT securities. And the reinvestment of funds obtained by the EFT Enterprise's

28   fraudulent schemes into purchasing control of the EFT company itself reduced the

EDWARDS WILDMAN
PALMER LLP
ATTORNEYS AT LAW
LOS ANGELES

AM 34840718.1                 - 64 -        AMENDED CLASS ACTION COMPLAINT
                                              AND DEMAND FOR JURY TRIAL

1  economic value and voting power that Plaintiffs and Class members would have
2  otherwise held in the EFT company. But for the EFT Enterprise's reinvestment
3  into the EFT chain scheme, the EFT Enterprise would not have been able quote
4  membership and investment rates to induce Plaintiffs and Class members to invest
5  in the EFT Enterprise, and the EFT Enterprise would not have been able to dilute
6  the economic value and voting power that EFT investors such as Plaintiffs and
7  Class members would have otherwise held in the EFT company.

8      203.  As a direct and proximate result of Defendants' racketeering activities
9  and violations of 18 U.S.C. § 1962(a), Plaintiffs and the Class have been injured in
10  their business and property. Specifically, the reinvestment of the racketeering
11  income into the EFT Enterprise enabled the EFT Enterprise to grow and market
12  itself such that it was able to induce Plaintiffs and Class members to invest
13  millions of dollars of their own money through their purchasing of EFT products
14  and promotional materials, all of which were packaged and shipped at inflated
15  charges. The EFT Enterprise touted statistics concerning membership and
16  investment numbers in order to induce further investments from new and existing
17  consumers. And the EFT Enterprise's investments in EFT itself diluted the
18  economic value and voting power of the EFT company shares held by Plaintiffs
19  and Class members. But for the EFT Enterprise's reinvestment into the EFT
20  Enterprise's schemes and into expanded ownership of EFT itself, Plaintiffs and
21  Class members would have had increased economic value and voting power for
22  every share of EFT stock they owned, and the EFT Enterprise would not have been
23  able quote membership and investment rates to induce Plaintiffs and Class
24  members into buying EFT products, investing in EFT securities, or recruiting
25  others to buy EFT products and invest in EFT securities.

26      204.  Under 18 U.S.C. § 1964(c), Plaintiffs and the class members are
27  entitled to treble their damages, plus interest, costs and attorney's fees.

28

## COUNT VI

### (RICO 18 U.S.C. § 1962(b))

### Against All Defendants

205.   Plaintiffs repeat, reallege, and incorporate by reference the allegations contained in the paragraphs above as if fully set forth herein.

206.   The EFT Enterprise is an enterprise engaged in and whose activities affect interstate commerce.

207.   Qin, Buckman, the EFT Officers and Directors, the Buckman Team, Greenstone, Brown Door, Regal Walnut, and Pierstone, in conjunction with Dragon Win, JFL, Wendy Qin, and Liu, acquired and maintained interests in and control of the EFT Enterprise through a pattern of racketeering activity. As described in specific detail previously in this Amended Complaint, Defendants Qin, Buckman, the EFT Officers and Directors, the Buckman Team, Greenstone, Brown Door, and Pierstone, along with Dragon Win, JFL, Wendy Qin, and Liu, engaged in numerous transactions and acts of racketeering to acquire and maintain interests in the various entities EFT, HumWare, Excalibur, CTX, and Assets Limited.

208.   This racketeering activity described above constitutes a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5).

209.   Defendants have directly and indirectly acquired and maintained interests in and control of the EFT Enterprise through the pattern of racketeering activity described above, in violation of 18 U.S.C. § 1962(b).

210.   As a direct and proximate result of Defendants' racketeering activities and violations of 18 U.S.C. § 1962(b), Plaintiffs and Class members have been injured in their business and property. Specifically, Defendants' distribution of a controlling block of EFT stock to Dragon Win greatly diluted the economic value and voting rights that would have otherwise been held by Plaintiffs and Class members. This transaction took all potential for voting power or control away from

EDWARDS WILDMAN
PALMER LLP
ATTORNEYS AT LAW
LOS ANGELES

AM 34840718.1                    - 66 -          AMENDED CLASS ACTION COMPLAINT
                                                  AND DEMAND FOR JURY TRIAL

1   Plaintiffs and Class members and removed any opportunity they may otherwise
2   have had to limit Defendants' control and use of the EFT vehicle within the EFT
3   Enterprise.

4

5       211. Under 18 U.S.C. § 1964(c), Plaintiffs and the Class members are
6   entitled to treble their damages, plus interest, costs and attorney's fees.

7                                   **COUNT VII**

8                          **(RICO 18 U.S.C. § 1962(d))**

9                            **Against All Defendants**

10      212. Plaintiffs repeat, reallege, and incorporate by reference the allegations
11  contained in the paragraphs above as if fully set forth herein.

12      213. As set forth above in specific detail, Defendants agreed and conspired
13  to violate 18 U.S.C. § 1962(a) (b) and (c). For example, Defendants and other
14  participants in the EFT Enterprise coordinated amongst each other to conduct or
15  participate in the conduct of the affairs of the EFT Enterprise and run the EFT
16  Enterprise's Endless Chain Scheme, Pump-and-Dump Scheme, and Corporate
17  Looting Scheme; to acquire funds through the EFT Enterprise's Endless Chain
18  Scheme, Pump-and-Dump Scheme, and Corporate Looting Scheme; to reinvest
19  these funds into ownership of EFT stock and various other entities; and to reinvest
20  these funds into maintaining, growing, operating, and marketing EFT and the EFT
21  Enterprise.

22      214. As a direct and proximate result of Defendants' violation of 18 U.S.C.
23  § 1962(d), Plaintiffs and the Class members were injured by Defendants' unlawful
24  conduct. The funds used to buy EFT products and used to invest in EFT constitute
25  property of Plaintiffs and the Class members under 18 U.S.C. § 1964(c).

26      215. Under 18 U.S.C. § 1964(c), Plaintiffs and the Class members are
27  entitled to treble their damages, plus interest, costs and attorney's fees.

28                           *   *   *   *   *

EDWARDS WILDMAN
PALMER LLP
ATTORNEYS AT LAW
LOS ANGELES

AM 34840718.1                    - 67 -        AMENDED CLASS ACTION COMPLAINT
                                               AND DEMAND FOR JURY TRIAL

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, seek judgment against Defendants as follows:

A.     For an Order certifying the Class under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiffs as Class representatives and their attorneys as Class counsel to represent Class members;

B.     For an Order finding in favor of Plaintiffs and the Class on all counts asserted herein;

C.     For an Order awarding compensatory, treble, and punitive damages in amounts to be determined by the Judge and/or jury;

D.     For prejudgment interest on all amounts awarded;

E.     For an Order of restitution and all other forms of equitable monetary relief; and

F.     For an Order awarding Plaintiffs and the Class their reasonable attorneys' fees and expenses and costs of suit.

### JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury on all claims triable in this action.

Dated:   July 10, 2014

Edwards Wildman Palmer LLP

By:                            
   Ronie M. Schmelz
   Attorneys for Plaintiff
   Shuxin Li, Haiyuan Zhao,
   Yu Hu, and Hongyan Liu

EDWARDS WILDMAN
PALMER LLP
ATTORNEYS AT LAW
LOS ANGELES

AM 34840718.1

- 68 -

AMENDED CLASS ACTION COMPLAINT
AND DEMAND FOR JURY TRIAL