Suzelle M. Smith, Bar No. 113992
SSmith@howarth-smith.com
Don Howarth, Bar No. 53783
DHowarth@howarth-smith.com
Padraic Glaspy, Bar No. 259563
PGlaspy@howarth-smith.com
Jessica C. Walsh, Bar No. 276543
JWalsh@howarth-smith.com
HOWARTH & SMITH
523 West Sixth Street, Suite 728
Los Angeles, CA 90014
Telephone:  213.955.9400
Facsimile:   213.622.0791

Stephen Tuggy, Bar No. 120416
STuggy@lockelord.com
Ira Greenberg (Admitted pro hac vice)
Ira.Greenberg@lockelord.com
LOCKE LORD LLP
300 S. Grand Avenue, Suite 2600
Los Angeles, CA 90071
Telephone:  213.485.1500
Facsimile:   213.485.1200

Attorneys for Plaintiffs
Shuxin Li and Julia Leung

# UNITED STATES DISTRICT COURT

# FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SHUXIN LI and JULIA LEUNG, <br><br> Plaintiffs, <br><br> v. <br><br> EFT HOLDINGS, INC., a Nevada Corporation, JACK J. QIN, and DOES 1-25, <br><br> Defendants. | Consolidated Cases No.  2:13-cv-08832 <br><br> **SECOND AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL** <br><br> Action File:  November 27, 2013 <br> Trial Date:    October 20, 2015 |

Plaintiffs Shuxin Li and Julia Leung (collectively, "Plaintiffs"), by and through their attorneys, make the following allegations pursuant to the investigation of their counsel and based upon information and belief, except as to allegations specifically pertaining to themselves and their counsel, which are based upon personal knowledge.

**NATURE OF THE ACTION**

1.     This is an action against EFT Holdings, Inc. ("EFT") and its founder Jack J. Qin ("Qin," referred to collectively with EFT as "Defendants") arising out of their distribution, marketing, and sale of nutritional supplements that Defendants advertise as providing a variety of health, anti-aging, and nutritional benefits.  The U.S. Food and Drug Administration ("FDA") previously determined that a number of Defendant's products are adulterated and others are drugs because they are intended for use in the cure, mitigation, treatment, and/or prevention of disease.  In 2009, the FDA sent EFT a Warning Letter advising the company that certain of its dietary supplements, including those purchased by Plaintiffs, were misbranded and illegal drugs and demanded that the company immediately cease selling the products.  EFT ignored the FDA's Warning Letter and continues to market and sell those nutritional supplements today.

2.     Plaintiffs caused some EFT products purchased by Plaintiffs to be tested by a U.S. laboratory.  Those tests revealed that some of the products contained an undisclosed poisonous or deleterious substance, lead, which may be injurious to health.  Other products were similarly mislabeled, either because they did not contain the stated amount of ingredients listed or they contained other ingredients that were not listed on the product label.  Plaintiffs are informed and believe that the tested products, as well as other, as yet untested products, do not have the composition, attributes, characteristics, nutritional value, health qualities, or value as represented by Defendants.  Plaintiffs are further informed and believe that Defendants know there are just trace amounts of active ingredients present in their nutritional supplements and therefore they cannot relieve the symptoms for which Defendants advertise them.

3.     Plaintiffs seek relief in this action for violations of California's Unfair Competition Law ("UCL") (Business and Professions Code §§ 17200 *et seq.*), False

/ / /

1  Advertising Law ("FAL") (Business and Professions Code §§ 17500 *et seq.*), and

2  Fraud.

3  **THE PARTIES**

4      4.    Plaintiff Shuxin Li is a resident of the City of Dalian located in the

5  People's Republic of China.

6      5.    Plaintiff Julia Leung is a resident of Plano, Texas.

7      6.    Defendant EFT is an American based e-Commerce, publicly traded

8  Nevada Corporation with its principal place of business at 17800 Castleton Street,

9  Suite 300, City of Industry, California  91748.  According to its website,

10 www.eftb.us, EFT, through its subsidiaries, engages in the merchandising and sale

11 of EFT-brand products over the Internet.  All EFT products, which include

12 nutritional supplements, anti-aging and skin care products, and cosmetics, are

13 manufactured in the United States and sold to consumers around the world,

14 including in the U.S. and China.  To purchase products, consumers are directed to

15 fax a form to a U.S. fax number and remit the purchase price for products ordered

16 in U.S. Dollars ("USD"), the only currency Defendants accept.  Orders are

17 processed by EFT's offices in the City of Industry, California, and shipped from

18 there to affiliates around the world, including in the U.S. and China.

19     7.    Defendant Qin is a California resident who founded EFT in 1998 and,

20 since its inception, has served as the company's Chief Executive Officer, President,

21 and Chairman of the Board.

22     8.    The true names and capacities of Defendants Does 1 through 25 are

23 unknown to Plaintiffs who therefore sue these Defendants by such fictitious names.

24 Plaintiffs are informed and believe that each of Defendants Does 1 through 25 is

25 responsible in some manner for the events herein described and the injuries suffered

26 by Plaintiffs.  Plaintiffs will further amend this Complaint to allege the identities of

27 such Doe Defendants when the same have been ascertained.  Plaintiffs are further

28 informed and believe that each of the Defendants named herein, including Does 1

1   through 25, was the agent, servant, employee, and/or alter ego of the other

2   Defendants and, that in doing the things alleged herein, was acting within the scope

3   to his/her/its actual or apparent authority.

4   **JURISDICTION AND VENUE**

5       9.    Defendants EFT and Qin are subject to the jurisdiction of this Court.

6   They have engaged in continuous and systematic business in California.

7   Defendants have designated agents for service of process in this State, have their

8   principal place of business here, and have committed tortious acts in this State.

9       10.    This Court has original subject matter jurisdiction over this action

10   pursuant to 28 U.S.C. § 1332(a)(2) because the amount in controversy exceeds the

11   sum or value of $75,000, exclusive of interest and costs, and is between citizens of

12   a State and citizens or subjects of a foreign state.

13       11.    Pursuant to 28 U.S.C. § 1391, this Court is the proper venue for this

14   action because a substantial part of the events, omissions, and acts giving rise to the

15   claims herein occurred in this District.  Defendant EFT's principal place of business

16   is located within this District and the marketing, advertising, and sales plans for

17   EFT products, which are at the core of Defendants' unlawful practices, were

18   devised in and originate from this District.

19   **FACTS COMMON TO ALL CLAIMS**

20   A.    **FDA Warns EFT to Stop Selling Dietary Supplements**

21       12.    In August 2009, the FDA issued a Warning Letter to Defendants (the

22   "Warning Letter") advising Defendants that their sale of numerous dietary

23   supplements violated the Federal Food, Drug, and Cosmetic Act (the "Act").  A

24   true and correct copy of the Warning Letter is attached hereto as Exhibit A and

25   incorporated herein by reference.  Among other things, the Warning Letter states:

26           "Your product 2006 Celprotect I is adulterated within the
        meaning of section 402(a)(1) of the [Federal Food, Drug, and

27           Cosmetic] Act [21 U.S.C. § 342(a)(1)] in that it bears or
        contains a poisonous or deleterious substance, lead, which may

28           render it injurious to health. … If a child under the age of seven

is exposed to the lead at the levels present in your product on a routine basis, permanent damage to the central nervous system can occur.  This can result in learning disorders, developmental defects, and other long-term health problems.  In addition, sustained consumption of products containing high lead levels can produce lead poisoning, which has a number of symptoms, including anemia, neurological effects such as ataxia and irritability, constipation, muscular weakness, and chronic nephritis."

"… the FDA has determined that your products 2006 Celprotect 1, 2007 Celprotect II Bullet Points, Colostrum #3008, Colloidal Silver #2003, SuperCal #3105, MSM #3003 + IONICS, Re-Live Again #3004, GlucoBalance #3017, Cardio Support #3019, PerformPlus #3006, and VisionPlus #3012 are promoted for conditions that cause the products to be drugs under section 201(g)(1)(B) of the Act [21 U.S.C. § 321(g)(1)(B)].  The therapeutic claims on your website establish that these products are drugs because they are intended for use in the cure, mitigation, treatment, or prevention of disease.  The marketing of these products with these claims violate the Act.

Examples of claims observed on your website include:

### 2006 Celprotect I

- "Broad spectrum anti-viral (protects and helps eliminate viruses)."
- "Helps diminish painful cold sores."

### 2007 Celprotect II Bullet Points

- "Can eliminate food poisoning within minutes"

### Colostrum #3008

- "Maintain Blood-sugar balance"
- "Fight viral, bacterial & fungus infections"
- "Improve well being of arthritis sufferers"
- "Relieve pain"
- "Fight gum disease"

### Colloidal Silver #2003

- "Research has demonstrated that Colloidal Silver is effective over a broad spectrum of bacterial, fungal and even viral species.  Not only less costly then available antibiotics and anti-viral agents, Colloidal Silver use does not result in mutations of resistant species."
- "Because of known disease-causing organism can live in the presence of even minute traces of the chemical element of metallic [sic] silver,

#2003 is effective against more than 650 different disease causing pathogens including viruses."

- "All fungus, virus, bacterium, streptococcus, staphylococcus, and other pathogenic organisms are killed in three or four minutes; in fact, there is no microbe know [sic] that is not killed by #2003 in six minutes or less…."
- "It would appear highly unlikely that even germ warfare agents could survive an encounter with #2003, since viruses like E Bola and Hanta, or even the dreaded 'flesh-eating bacteria' are, in the end, merely hapless viruses and bacteria."
- "In addition to its anti-microbial properties, 'EFT' silver solution is also a powerful anti-inflammatory agent."

**SuperCal #3015**

- "Calcium [an ingredient in the product] … help[s] to prevent the risk of degenerative diseases."
- "[Calcium [h]elps achieve an alkaline balance therey [sic], neutralizing acidity level, increase muscle and joint mobility to combat artihrtic conditions, heart disease … helps sports injuries, headaches, high or low blood pressure, high cholesterol, osteoporosis, rheumatoid arthritis, ulcers, . . . psoriasis, ulcerative colitis, gastroenteritis, hiatal hernia and cataracts."
- "Other medical men of wisdom have also discovered that calcium supplements, such as SuperCal Spray, could indeed reverse cancer."
- "The January 14, 1999 issue of the Phoenix Republic wrote in an article entitled 'Calcium Reduces Tumors' that the New England Journal of Medicine reported 'adding calcium can keep you from getting tumors in your large intestine."

**MSM # 3003 + Ionic Minerals**

- "Unlike NSAID's, such as aspirin, ibuprofen, etc., which cause more problems than the symptoms they're designed to relieve*, MSM has no known side effects, no overdose toxicity (it's safer than water!), and it benefits the body overall while relieving and rebuilding connective tissue and joints."
- "Its benefits are legendary: … relief of muscle cramps, mental normalcy, anti-bacterial/inflammatory/parasitic effect … and relief of muscle spasms and joint pain!"

**Re-Live Again #3004**

- "Zinc 'an ingredient in the product]:  [T]his essential mineral has been useful in the treatment of

Howarth & Smith
Attorneys At Law
Los Angeles

SECOND AMENDED COMPLAINT AND
DEMAND FOR JURY TRIAL

dwarfism and retarded growth in children."

**GlucoBalance #3017 (describing ingredients in the product)**

- "Bitter Melon – Researchers have found that Bitter Melon helps improve glucose tolerance and can help lower blood sugar levels."
- "Barley Sprout – Barley extract is another traditional medicine that scientists have found may significantly help normalize blood sugar levels."
- "Gymnema – Helps lower blood sugar levels…"
- "Cinnamon – Scientists have found that Cinnamon extract contains compounds that help maintain healthy blood sugar levels by enhancing insulin activity in body."

**Cardio Support #3019 (describing ingredients in the product)**

- "Vitamin B3 … helps reduce levels of 'bad' LDL cholesterol and triglycerides (fats)."
- "Ginger – inhibits abnormal platelet clumping and helps protect against abnormal blood clots that can clog arteries."
- "Green tea … may help to lower blood pressure and reduce elevated cholesterol."
- "Salvia (Dan Shen) – supports . . . reduced platelet clumping for optimal cardiovascular health."

**PerformPlus #3006**

- "Sarsaparilla Extract (smilax officinalis) [all ingredient in the product]: This herb … helps lower cholesterol …"
- "Ginkgo Biloba [an ingredient in the product]: This extract [is] helpful in cases of erectile dysfunction."
- "Tribulus Terrestris [an ingredient in the product] … In China, it has long been used for impotency in men."
- "Schisandra [an ingredient in the product]: This herb has been used for centuries to improve … staying power in men."
- "perform plus:  'I Can't Believe It's Not Viagra' Is an all-natural, scientifically balanced formula designed by nutritional experts and health care professionals to respond to each and everyone of these varying problems associated with poor sexual function and lack of Libido, and to promote peak performance in both men and women."

**VisionPlus #3012 (describing ingredients in the product)**

- "Vitamin C [and Vitamin E] … can help prevent age-related cloudiness of the lens of the eye caused

by excessive UV light from the sun, and can significantly slow the deterioration of vision."

- "Vitamin A & Beta Carotene:  Results of a case-control" study found a significant inverse association between the consumption of carotenoid rich food and the risk of age-related macular degeneration, the leading cause of irreversible blindness in adults."

- "Lutein is highly concentrated in the macula of the eye, and helps protect the eyes from sun damage and age-related degeneration of the macula.  Lutein supplementation has been shown to improve visual function for subjects with age-related macular degeneration and also for some subjects with Retinitis Pigmentosa (slow retinal degenerations)."

- "Zeaxanthin … These yellow carotenes function in preventing oxidative damage to the macular and obviously play a central role in protecting against the development of macular degeneration.  Increasing the concentration of Lutein and/or Zeaxanthin may offer significant protective effects against the development of macular degeneration."

13.    The FDA also noted that "these products are not generally recognized as safe and effective for the above referenced uses and therefore, the products are 'new drugs' under section 201(p) of the Act [21 U.S.C. § 321(p)].  New drugs may not be legally marketed in the U.S. without prior approval from the FDA as described in section 505(a) of the Act [21 U.S.C. § 355 (a)]. … Your products are all misbranded within the meaning of section 502(f)(1) of the Act in that the labeling for these drugs fails to bear adequate directions for use [21 U.S.C. § 352(f)(1)]."

14.    The FDA instructed EFT to take prompt action to correct the violations noted in the Warning Letter, and immediately cease distribution of the products listed in the letter as well as other products marketed and sold in violation of the Act.

**B.    Defendants Continue to Sell Unlawful Products**

15.    Notwithstanding the FDA's directives, EFT continues to market and sell its products in violation of the Act, including the products identified in the

/ / /

1    Warning Letter which are still sold with many of the offending therapeutic claims

2    that prompted the FDA to issue the Warning Letter.

3         16.    EFT products are unlawful because they are misbranded due to

4    violations of the Sherman Food, Drug, and Cosmetic Laws, California Health and

5    Safety Code §§109875 *et seq.*, which adopts, incorporates, and is, in all relevant

6    aspects, identical to the federal Food, Drug & Cosmetic Act, 21 U.S.C. §§ 301 *et*

7    *seq.* ("FDCA"), and the regulations adopted pursuant to that act.

8         17.    Under California law, it is unlawful to manufacture, sell, deliver, hold,

9    or offer for sale any food, drug, device, or cosmetic that is falsely advertised or

10   misbranded.  Cal. Health & Safety Code §§ 110390 *et seq.*

11        18.    Defendants continue to falsely advertise and sell the following

12   products which were the subject of the Warning Letter:  #2003 – "Colloidal Silver",

13   #2006 – "CelProtect I", #2007 – "CelProtect II Bullet Points", #3003 – "MSM +

14   IONICS", #3004 – "Re-Live Again", #3006 – "PerformPlus", #3008 – "Colostrum

15   Spray", #3012 – "Vision Plus", #3017 – "GlucoBalance", and #3019 – "Cardio

16   Support".

17        19.    The following products, all of which are currently sold by Defendants,

18   are also misbranded:

19        (A)    #2001 – "Super Hydro-Oxy" which EFT purports "works by
                 separating and releasing the oxygen and the hydrogen elements
20               in your water.  This makes both of these elements available in
                 greater amounts in your bloodstream, which helps your body
21               assimilate more nutrients at the cellular level. … Bfcause [sic] it
                 contains fluid rich in magnesium and causes oxygen to be
22               released into the bloodstream, damaged tissue can be safely and
                 effectively rebuilt and dead cells can be removed away."
23
         (B)    #2004 – "Rooibos Tea" which, EFT touts on its website,
24               "contains much stronger anti oxidation action and is capable of
                 preventing fat to change into lipid peroxide."
25
         (C)    #2005 – "Zeolite Plus" whose benefits and advantages
26               Defendants tout as "Helps restore essential minerals," "Helps
                 eliminate harmful metals and poisonous chemicals," "Improves
27               every biochemical process your body requires," and "Regulates
                 the immune system keeping it in balance."
28

                                          - 9 -        SECOND AMENDED COMPLAINT AND
                                                       DEMAND FOR JURY TRIAL

(D)   #2008 – "VinegarPill" which, according to the EFT website, "contain pectin and Acidic Acid, which attaches to cholesterol and carries it out of the body thus decreasing the risk of heart disease" and "Helps to prevent diabetes," "Purification of the blood," and "Help with the prevention of Gout."

(E)   #3002 – "Super Re-viti-izer" which "helps restore drinking-impaired motor facilities – in minutes!"

(F)   #3005 – "Slim 'n Easy Carbohydrate Craving Control (with 5-HTP)" which EFT advertises as "The Appetite Suppressant in a Spray."

(G)   #3009 – "Spray-EEZE Nutrients to assist the Immune System during Cold & Allergy Season" which EFT advertises as "a Dietary Supplement with Vitamin C."

(H)   #3011 – ""MemoryPlusb" which "includes specially selected nutrients to overcome the natural processes associated with aging and enhance cognitive ability."

(I)   #3016 – "Deer Antler Velvet Plus" which purportedly "strengthens the immune system by promoting a healthy white blood cell count" and "is an adaptogen and contains Growth Factors to aid the body against the aging process."

(J)   #3018 – "Liver Support" which "contains nutrients designed to cleanse the liver and rebuild damaged tissue."

(K)   #3020 – "ReishiPlus" which EFT purports "may help lower blood pressure and decrease elevated cholesterol and triglyceride levels.  It may help prevent blood platelets from sticking together, which helps maintain healthy coronary circulation.  Reishi's also provides powerful support for your immune system."

(L)   #4006 – "Gold Cream" which gives "long lasting relief of pain associated with arthritis, stiff and swollen joints, sprains, muscle spasms, bursitis and tendonitis."

(M)   #4007 – "Breast Cream" which contains "activators to maintain female hormonal balance" and purports to "affect hormonal protection and functions in the body," "stimulates the development of breast tissue and helps improve the cup size by lengthening and branching the ducts that connect to the nipple," "increases the fatty tissue and ligaments around the breast, which provides support and shape," and "helps maintain the collagen and stimulates development of new cells in skin."

True and correct copies of descriptions for EFT products that are the subject of the Warning Letter and listed above, and which were available on the EFT website as

/ / /

1  of the filing of the original complaint in this action, are attached hereto as Exhibit B
2  and incorporated herein by reference.

3       20.    In addition to the products listed above, EFT also sell a product, #3013
4  – "REM Sleep & Relaxation Enhancer," which was purported to "contain[]
5  nutrients to help the body regulate the sleep-wake cycle, to promote 'REM' sleep
6  and general relaxation."  This product, which Plaintiffs, is no longer among the
7  Nutrition Products on EFT's website, but is listed as currently available for order on
8  the EFT Order Application Form, a true and correct copy of which is attached
9  hereto as Exhibit C.

10      21.    Defendants' products are misbranded and/or do not have the
11 composition, attributes, characteristics, nutritional value, health qualities, or value
12 represented.

13 **C.    Defendants Continue to Falsely Advertise EFT Products**

14      22.    Defendants manufacture, distribute, advertise, and sell "MSM #3003,"
15 an "All Natural" "Intra-Oral Spray" containing methylsulfonymethane ("MSM").
16 Among other things, Defendants represent that MSM "benefits the body overall
17 while relieving and rebuilding connective tissue and joints" and that "[i]ts benefits
18 are legendary:  improved general body health, relief of muscle cramps, mental
19 normalcy, anti-bacterial/inflammatory/parasitic effect, increased blood supply, and
20 relief of muscle spasms and joint pain!"

21      23.    A chemical analysis performed on MSM #3003 reveals that the
22 product contains greater amounts of MSM than represented, as well as lead, which
23 is not disclosed by Defendants.

24      24.    There is no competent and reliable scientific evidence that MSM – let
25 alone through oral administration – helps improve joint comfort.  Clinical cause and
26 effect studies have found no causative link between MSM supplementation and
27 joint renewal or rejuvenation.  Defendants did not and do not have competent and
28 reliable scientific evidence that any of the ingredients in MSM #3003 taken alone is

effective at helping relieve joint pain or rebuild connective tissue and joints. Defendants' claims about the benefits of using MSM #3003 are false and misleading and likely to and do deceive the reasonable consumer.

25.    Defendants also manufacture, distribute, advertise, and sell "Deer Antler Velvet Plus #3016," a spray which they claim "enhances athletic performance by reducing recovery time" and "contains a high concentration of Insulin-Like Growth Factor (IGF-1) and Epidermal Growth Factor … [which] have a positive effect on the growth and maintenance of the bones, cartilage, and skin."

26.    IGF-1 is a peptide hormone, or protein, that has a function and structure similar to insulin.  It is a member of a family of proteins that are involved in mediating growth and development.  Contrary to Defendants' claims, IGF-1 can only be injected to have any effect and, even then, it's only known effects are to increase total protein and DNA content in tissues, not to provide the benefits advertised and represented by Defendants.

27.    Defendants knew or should have known that the IGF-1, as it exists in Deer Antler Velvet Plus #3016 and through the delivery of a spray mechanism, does not provide any of the benefits as represented by Defendants.  In fact, the studies finding that IGF-1 *may* have beneficial properties involved nonhuman test subjects or different delivery and concluded that further research was required to establish the effectiveness of Antler Velvet in humans.

28.    For example, a study by Gilbey, et al., entitled *Health benefits of deer and elk velvet antler supplements:  a systematic review of randomized controlled studies*, 125(1367):80-6 NZ Med. J. (Dec. 14, 2012), found that there were no beneficial effects of deer or elk antler velvet supplements.  The study identified seven randomized controlled studies ("RCTs") that examined the effectiveness of velvet antler for rheumatoid arthritis (two RCTs), osteoarthritis (one RCT), sexual function (one RCT), and sporting performance enhancement (three RCTs).  The study found that the two RCTs that reported some positive effects of deer and elk

velvet antler supplements were not convincing, and the remaining five RCTs found that velvet antler supplements had no effect.  The study also concluded that "[c]laims made for velvet antler supplements do not appear to be based upon rigorous research from human trials, although for osteoarthritis the findings may have some promise."

29.    Defendants know that their products, including MSM #3003 and Deer Antler Velvet Plus #3016, do not produce the benefits and cannot relieve the symptoms for which they are advertised.  Defendants also know that their products are mislabeled in that they either contain more or less of the active ingredients listed and/or fail to disclose the presence of harmful ingredients, including lead.

30.    Further, Qin has knowingly made a number of false statements regarding the safety and efficacy of EFT products. On or about April of 2007, Qin gave a speech where he touted the "miracles made by the products of EFT" and how he receives "many calls" that are "all about saving life with our products." Similarly, on or about August of 2009, Qin gave a speech where he claimed "[i]f we do not use EFT products, we will surely all be infected [by the pig flu]" and that products "2001 and 2003," or "Magic Water and Silver," combined with products "2006 and 2007," will "turn hepatitis from positive to negative." "[S]ome people will have Hepatitis B turn from positive to negative; in fact in China, we have had many people who have achieved this, turning positive to negative. This attribute is also helpful to prevent pig flu. If we have children playing outside, if we do not want them to get pig flu, you need this product . . . . 2001, 2003, 2006 and 2007, you have to use, use it every day." Further, on or about May 20, 2010, Qin signed and filed a Form 10-12G with the S.E.C. that echoed many of the false product claims from the EFT website, such as that "Deer Antler Velvet Plus" will "promote white blood cell count" and "help the body handle stress and promote recovery from the effects of injury and fatigue." This filing also claimed that EFT's products

/ / /

1  had not been tested by the FDA, despite the FDA's warning letter to the contrary

2  from nearly a year before.

3      31.    Plaintiffs have been, and will continue to be, deceived and misled by

4  Defendants' deceptive representations touting the effectiveness and safety of their

5  products, including MSM #3003 and Deer Antler Velvet Plus #3016.

6      32.    Defendants' sale of misbranded and falsely advertised nutritional

7  supplements form the core of a fraudulent pyramid scheme pursuant to which

8  Plaintiffs and tens of thousands of other Chinese and American consumers paid

9  Defendants tens of millions of dollars in U.S. currency for EFT products in

10 exchange for the right to acquire an ownership interest in EFT.  Qin promised

11 Plaintiffs that the value of their ownership interests, which they could only acquire

12 if they purchased EFT's products, would increase substantially over time as

13 company sales increased.  A key, but unspoken, part of Defendants' scheme was

14 that in order for Plaintiffs to realize the promised lucrative rewards from their EFT

15 investments, they had to recruit others to purchase EFT products and ownership

16 interests in the company.

17     33.    Defendants' entire business model was based on the recruitment of

18 unsuspecting consumers who were promised the highest quality products and an

19 ownership interest in a vibrant, growing, and legitimate company if they purchased

20 EFT products, rather than on actual sales of EFT products to consumers.

21     34.    Beginning in 2003, Defendant Qin held a series of public meetings

22 during which he gave speeches to induce Plaintiffs to purchase EFT products.

23 Some of Qin's speeches were recorded and discs of the speeches were handed out

24 during subsequent meetings in China and circulated among Plaintiffs and others.

25 The discs were used as marketing tools to educate those who did not attend Qin's

26 meetings in person about EFT, its products, and how to invest in the company.

27     35.    During these meetings, Qin espoused the benefits and safety of EFT

28 products.  He also represented that consumers who purchased the company's

1  products would not only receive the medical benefits of the products ordered, they

2  would also reap financial rewards and the right to purchase ownership interests in

3  EFT.

4      36.    During his speeches, Qin represented to Plaintiffs and others that the

5  value of their ownership interests in EFT would increase as more consumers

6  purchased products.  In true pyramid fashion, however, Qin had to insure that, in

7  addition to bringing money into the pyramid through the sale of EFT products,

8  Plaintiffs and others did not try to take money out of the company by selling their

9  shares or otherwise liquidating the rewards they earned through sponsoring new

10 product purchases.  Thus, during his speeches, Qin told Plaintiffs not to redeem

11 their rewards or sell their shares in EFT until the company conducted an initial

12 public offering (the promised "IPO").  By holding onto their shares until after the

13 IPO, Qin assured Plaintiffs and others that the value of their shares in the company

14 would increase substantially.

15     37.    Qin continued giving speeches into at least 2010, during which, in

16 addition to touting EFT products and extolling their benefits, he solicited

17 investments in EFT through the sale of company shares which he promised would

18 at least double in value as long as investors held onto their shares until the company

19 was able to go through with its promised IPO.  As of the date of this Second

20 Amended Complaint, Defendants continue to sell and extoll the virtues of EFT

21 products and solicit investment in the company.

22 **D.    Plaintiffs Purchase of Defendants' Products**

23     38.    Plaintiff Li attended five (5) public meetings with Qin and listened to

24 recordings of some of his speeches.  Li also reviewed written EFT marketing

25 materials, including materials on the EFT website describing the ingredients in and

26 benefits of Defendants' products.  In reliance on Qin's representations about the

27 value, quality, and safety of EFT products and investment opportunities in the

28 company, and after reviewing the written materials, Li purchased over Thirty

Thousand Dollars ($30,000) worth of the following EFT products:  #2001, #2002, #2003, #2004, #2005, #2006, #2007, #2008, #3001, #3002, #3003, #3004, #3005, #3006, #3007, #3008, #3009, #3011, #3012, #3013, #3015, #3016, #3017, #3018, #3019, #3020, #4006, #4007, and #4008.  Li last purchased EFT products in March 2011.  Li would not have purchased any EFT products if he had known that they do not provide the advertised benefits or that the product descriptions do not accurately reflect the ingredients contained in the products.

39.     Plaintiff Leung listened to recordings of Qin's speeches and read the marketing and other materials about EFT products on the company's website.  In reliance on representations about the value, quality, and safety of EFT products and investment opportunities in the company, and after viewing recordings of Qin's speeches and reading written materials about the company and its products, Leung purchased over Ten Thousand Dollars ($10,000) worth of the following EFT products:  #2003, #2005, #2006, #2007, #2008, #3003, #3005, #3006, #3008, #3009, #3013, #3016, #3017, #3018, #3019, #4006, and #4007.    Leung last purchased EFT products in or about November 2011.  Leung would not have purchased any EFT products if she had known that they do not provide the advertised benefits or that the product descriptions do not accurately reflect the ingredients contained in the products.

F.    **The Equitable Tolling of Plaintiffs' Claims**

40.     When Plaintiffs purchased their EFT products and shares in the company, the shares were valued at Three Dollars and Eighty Cents ($3.80).  The value of Plaintiffs' shares in EFT eventually dropped to less than a penny.  At various times after purchasing their initial shares in EFT, and before the value of shares dropped to below one cent, Plaintiff Li and others approached Qin to discuss EFT's stock price, product quality, EFT's team leadership structure, and other issues relating to the company and the declining value of its shares.  During these meetings, Qin repeatedly assured Li and others, both in public and private meetings,

that EFT products were of the highest quality and that the value of the company's shares would increase as long as Li and others recruited more individuals to purchase EFT products and invest in the company.  Throughout their discussions, Qin continued to promote EFT and its products and assure Plaintiffs and otherss that their investments were safe and would pay-off.

41.     Defendants failed to disclose and intentionally omitted material information about EFT and its operations from Plaintiffs.  Among other things, Defendants failed to disclose that the FDA had issued the Warning Letter and instructed the company to cease selling many of its nutritional supplements and other products.  Defendants also did not disclose to Plaintiffs that money invested by consumers in EFT (an on-line e-commerce company) was used to purchase interests in transportation companies and real estate holdings that were unrelated to the stated business operations of the company.  These investments, moreover, were made without the approval of EFT's Board of Directors, prompting two directors to resign from the Board.  Many of Defendants' investments resulted in litigation, thus further jeopardizing the value of Plaintiffs' investments in EFT.  Nor did Defendants disclose to Plaintiffs that the company was engaged in illegal endless chain scheme.

42.     After years of Defendants' repeated representations that the value of Plaintiffs' investments in EFT were secure and would be realized once the company held its IPO, Plaintiffs began to suspect that Defendants' assurances were false and misleading.  Thus, in 2012, Plaintiffs set out to locate other similarly situated consumers who had attended meetings with Qin, purchased EFT products, and become company shareholders.  Through their efforts, Plaintiffs determined that there are tens of thousands of Chinese consumers, including Chinese Americans— both rich and poor—who, based on Qin's speeches about the benefits of EFT products and promises of riches, invested tens of millions of dollars in EFT by becoming company "consumers" and "shareholders."

43.     After discovering that they were not alone and that Defendants' fraudulent scheme had ensnarled so many unsuspecting consumers, Plaintiffs engaged counsel, first in China and later the U.S., to explore their legal options.  It was only after engaging counsel in 2013 that Plaintiffs learned about the Warning Letter, that the FDA had instructed Defendants to cease selling their products, that the products Plaintiffs purchased were misbranded, and that some of the products contained unlisted and harmful ingredients, did not contain the full amount of ingredients listed on product labels, or contained just trace amounts of active ingredients so that the products do not relieve the symptoms for which they are advertised.

## COUNT I

### (For Violation of the Unfair Competition Law, Bus. & Prof. Code §§ 17200 *et seq.*)

### Against All Defendants

44.     Plaintiffs repeat and reallege the allegations contained in the above paragraphs as if fully set forth herein.

45.     Defendants have engaged and are engaging in unlawful, unfair, and fraudulent business practices and unfair, deceptive, false, and misleading advertising within the meaning of the UCL, Cal. Bus. & Prof. Code §§ 17200 *et seq.*  The acts or practices alleged herein constitute a pattern of behavior, pursued as a wrongful business practice, which has victimized and continues to victimize tens of thousands of consumers.

46.     Under the UCL, an "unlawful" business practice includes a practice that violates any law—state or federal, statutory or court-made—regardless of whether the underlying law independently carries a private right of action. Defendants' sale of misbranded and unsafe products violates California and Federal law statutory and common law and thus constitutes an unlawful business practice under the UCL.

47.     Under the UCL, an "unfair" business practice includes a practice that offends an established public policy, or that is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers.  Defendants' sale of misbranded and unsafe products is unethical, oppressive, and unscrupulous in that Defendants are duping consumers into purchasing products that are falsely advertised to provide benefits which they do not provide, fail to accurately disclose the ingredients in the products, and, in some instances, contain undisclosed poisonous and harmful ingredients.

48.     Under the UCL, a "fraudulent" business practice is likely to deceive the public.  Defendants' business practices are fraudulent in that they have deceived and continue to deceive the public by misrepresenting their products.

49.     Plaintiffs suffered injury and out-of-pocket losses as a result of Defendants' unlawful, unfair, fraudulent, and/or deceptive business practices because:  (A)  Plaintiffs were induced to purchase products that they would not have otherwise purchased if they knew that they were mislabeled, did not have the composition, attributes, characteristics, nutritional value, health qualities, safety, and/or value promised; and (B) Plaintiffs were induced to pay substantially more for the products than they would have paid based on Defendants' misrepresentations and omissions respecting the value and safety of the products.

50.     Pursuant to California Business and Professions Code § 17203, Plaintiffs are therefore entitled to:  (A) an Order requiring Defendants to cease the acts of unfair competition alleged herein; (B) full restitution of all monies paid to Defendants as a result of their deceptive practices; (C) interest at the highest rate allowed by law; and (D) the payment of Plaintiffs' attorneys fees and costs pursuant to, *inter alia*, California Code of Civil Procedure § 1021.5.

/ / /

/ / /

/ / /

## COUNT II

### (For Violation of the False Advertising Law,
### Bus. & Prof. Code §§ 17500 *et seq.*)

### Against All Defendants

51.     Plaintiffs repeat and reallege the allegations contained in the above paragraphs as if fully set forth herein.

52.     Defendants' business acts, false advertisements, and materially misleading omissions constitute unfair trade practices and false advertising in violation of the FAL.

53.     Defendants have engaged in and continue to engage in false, unfair, and misleading business practices, consisting of false advertising and materially misleading omissions likely to deceive the public and include, but are not limited to, Defendants' failure to disclose to consumers that EFT products do not have the composition, attributes, characteristics, nutritional value, health qualities, safety, and/or value promised.

54.     Defendants knew or should have known, through exercise of reasonable care, that their statements were untrue and misleading.

55.     Defendants' actions in violation of the FAL were false and misleading such that the general public was and is likely to be deceived.

56.     As a direct and proximate result of these acts, consumers have been and are being harmed.  Plaintiffs bring this action pursuant to California Business & Professions Code § 17535 for injunctive relief to enjoin the practices described herein and to require Defendants to issue corrective disclosures to consumers.

## COUNT III

### (For Fraud)

### Against Defendants Qin and EFT

57.     Plaintiffs repeat and reallege the allegations contained in the above paragraphs as if fully set forth herein.

HOWARTH & SMITH
ATTORNEYS AT LAW
LOS ANGELES

SECOND AMENDED COMPLAINT AND
DEMAND FOR JURY TRIAL

58.     The representations of Qin and EFT as alleged herein respecting their products were knowingly false when made to Plaintiffs.

59.     Qin and EFT made the knowingly false statements respecting their products with the intent to deceive Plaintiffs and in order to induce reliance on such statements so that Plaintiffs would purchase EFT products.

60.     Plaintiffs justifiably relied on the representations of Qin and EFT and, as a result of their reliance, suffered damage in an amount to be proven at trial.

WHEREFORE, Plaintiffs seek judgment against Defendants as follows:

A.     For an Order declaring that Defendants' conduct violates the statutes referenced herein;

B.     For an Order finding in favor of Plaintiffs on all counts asserted herein;

C.     For an Order awarding compensatory, treble, and punitive damages in amounts to be determined by the Judge and/or jury;

D.     For prejudgment interest on all amounts awarded;

E.     For an Order of restitution and all other forms of equitable monetary relief, including all equitable remedies available pursuant to California Civil Code § 1780;

F.     For injunctive relief as pleaded or as the Court may deem proper; and

G.     For an Order awarding Plaintiffs their reasonable attorneys' fees, expenses, and costs of suit.


Dated:     January 30, 2015          HOWARTH & SMITH


By: /s/ Suzelle M. Smith
Suzelle M. Smith
Attorney for Plaintiffs Shuxin Li and
Julia Leung

SECOND AMENDED COMPLAINT AND
DEMAND FOR JURY TRIAL

HOWARTH & SMITH
ATTORNEYS AT LAW
LOS ANGELES

1

**DEMAND FOR TRIAL BY JURY**

2

      Plaintiffs hereby demand a trial by jury on all claims so triable in this action.

3

4

Dated:    January 30, 2015           HOWARTH & SMITH

5

6

                            By: /s/ Suzelle M. Smith

7

                            Suzelle M. Smith
                            Attorney for Plaintiffs Shuxin Li and

8

                            Julia Leung

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28