Suzelle M. Smith, Bar No. 113992
SSmith@howarth-smith.com
Don Howarth, Bar No. 53783
DHowarth@howarth-smith.com
Padraic Glaspy, Bar No. 259563
PGlaspy@howarth-smith.com
Jessica C. Walsh, Bar No. 276543
JWalsh@howarth-smith.com
HOWARTH & SMITH
523 West Sixth Street, Suite 728
Los Angeles, CA 90014
Telephone:   213.955.9400
Facsimile:   213.622.0791

Stephen Tuggy, Bar No. 120416
STuggy@lockelord.com
Ira Greenberg (Admitted pro hac vice)
Ira.Greenberg@lockelord.com
LOCKE LORD LLP
300 S. Grand Avenue, Suite 2600
Los Angeles, CA 90071
Telephone:   213.485.1500
Facsimile:   213.485.1200

Attorneys for Plaintiffs Shuxin
Li, Haiyuan Zhao, Yu Hu, and
Hongyan Liu

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SHUXIN LI, HAIYUAN ZHAO, YU HU, and HONGYAN LIU,<br><br>    Plaintiffs,<br><br>    v.<br><br>EFT HOLDINGS, INC., a Nevada Corporation, BUCKMAN, BUCKMAN & REID, INC., a New Jersey Corporation, GREENSTONE HOLDINGS, INC., a New York Corporation, BROWN DOOR, INC., a Delaware Corporation, PIERSTONE GROUP, LLC, a New York Limited Liability Company, REGAL WALNUT<br><br>CAPTION CONTINUED ON NEXT PAGE | Consolidated Cases No. 2:13-cv-08832<br><br>**SECOND AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL**<br><br>Action Filed:  November 27, 2013<br>Trial Date:     October 20, 2015 |

1  LLC, a California Limited Liability
   Company, and JACK J. QIN, VISMAN
2  CHOW, NORMAN KO, WILLIAM
   SLUSS, PYNG SOON, GEORGE
3  CURRY, JOHN HUEMOELLER II,
   WALLACE GAIKAS, and PETER
4  LAU, individuals,

5          Defendants.

6

7  / / /

8  / / /

9  / / /

10  / / /

11  / / /

12  / / /

13  / / /

14  / / /

15  / / /

16  / / /

17  / / /

18  / / /

19  / / /

20  / / /

21  / / /

22  / / /

23  / / /

24  / / /

25  / / /

26  / / /

27  / / /

28  / / /

Plaintiffs, by their attorneys, make the following allegations pursuant to the investigation of their counsel and based upon information and belief, except as to allegations specifically pertaining to themselves and their counsel, which are based upon personal knowledge.

## NATURE OF THE ACTION

1.     Defendants pilfered millions from Plaintiffs and other similarly situated through an endless chain investment scam—a scheme that succeeded for many years.

2.     Defendants pushed this scam on a vulnerable class of Chinese consumers. Defendants specifically targeted these consumers because of their relative lack of sophistication concerning U.S. laws and because, by operating abroad, Defendants hoped to avoid U.S. scrutiny.

3.     Defendants sold spots in the endless chain through product purchases: the more products purchased, the better the spot.

4.     Defendants further devised a "stock" ownership system through which consumers could unlock rights to purchase "shares" by purchasing extra product. By subsequently manipulating quoted stock prices, Defendants were able to manufacture demand for their shares, which in turn induced consumers to buy more products and commit more money to the endless chain.

5.     Defendants promised participants that they could earn substantial returns through retail product sales, recruiting new participants into the chain, and owning part of the business. In actuality, the products were defective, the chain structure was illegal, and the alleged ownership was illusory.

6.     Consequently, Plaintiffs seek relief in this action under California's Endless Chain Scheme Law (California's Penal Code § 327 and California Civil Code § 1689.2), California's Deception Statute (Civil Code §§ 1709-10 and California Penal Code §§ 487, 12022, 186.11), the common law, and the Racketeer Influenced and Corrupt Organizations Act (18 U.S.C. § 1961 et seq.).

**THE PARTIES**

7.     Plaintiffs Shuxin Li, Haiyuan Zhao, Yu Hu, and Hongyan Liu are citizens of the People's Republic of China.

8.     Defendant EFT Holdings, Inc. ("EFT") is an e-Commerce, publicly traded Nevada corporation with its principal place of business at 17800 Castleton Street, Suite 300, City of Industry, California 91748. According to its website, http://www.eftb.us, EFT, through its subsidiaries, engages in the merchandising and sale of EFT-brand products over the internet. EFT claims to operate through over one million registered "affiliate members" located throughout Hong Kong, the People's Republic of China, Asia, and Europe. EFT claims all its products, which include bio-available nutritional and nutritional spray products, are manufactured in the United States and sold to consumers around the world, including China.

9.     Defendant Jack Qin ("Qin") is a citizen of California who founded EFT in 1998 and, since its inception, has served as the company's Chief Executive Officer, President, and Chairman of the Board.

10.     Defendant Visman Chow ("Chow") is a citizen of California and has been a member of EFT's Board of Directors since at least July 2009.

11.     Defendant Norman Ko ("Ko") is a citizen of California and has been a member of EFT's Board of Directors since at least July 2009.

12.     Defendant William Sluss ("Sluss") is a citizen of California and is EFT's principal financial and accounting officer.

13.     Defendant Pyng Soon ("Soon") is a citizen of California and has been a member of EFT's Board of Directors since at least July 2009.

14.     Defendant George Curry ("Curry" and together with Chow, Ko, Soon, and Sluss, the "EFT Officers and Directors") is a citizen of California and has previously served as a member of EFT's Board of Directors.

15.     Defendant Buckman, Buckman, and Reid, Inc. ("Buckman") is a New Jersey corporation with its principal place of business at 174 Patterson Avenue,

SECOND AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

HOWARTH & SMITH
ATTORNEYS AT LAW
LOS ANGELES

Shrewsbury, NJ 07702. Buckman is a broker/dealer registered with the SEC and with FINRA. It is licensed to do business in the state of California.

16.     Defendant Greenstone Holdings, Inc. ("Greenstone") is a New York corporation with its principal place of business in New York. It does business in California, is closely affiliated with Buckman, and is managed and controlled by Buckman managing directors Wallace Gaikas and Peter Lau.

17.     Defendant Wallace Gaikas ("Gaikas") is a managing director of Buckman and of Greenstone. He also owns and operates Brown Door, Inc. ("Brown Door"), a shell company, with his wife. Gaikas conducts business within the state of California.

18.     Defendant Brown Door is a Delaware corporation with its principal place of business at a residence in New Jersey. It is owned and operated by Gaikas and his wife.

19.     Defendant Peter Lau ("Lau") is a managing director of Buckman and of Greenstone. He also owns and operates Pierstone Group, LLC ("Pierstone"), a shell company. Lau conducts business within the state of California.

20.     Defendant Pierstone is a New York Limited Liability Company with its principal place of business located at 40 Park Avenue, #19B, New York, NY 10016. It is owned and operated by Lau.

21.     Defendant Huemoeller is a Buckman employee and a consultant for Greenstone. He also was the owner and CEO of HumWare Media Corporation, Inc. ("HumWare"), a Nevada shell corporation listed on the Pink Sheets that was used as the vehicle for EFT's reverse merger onto the OTC Bulletin Board. Huemoeller conducts business within the state of California.

22.     Defendant Regal Walnut LLC ("Regal Walnut" and together with Brown Door and Pierstone, the "Shell Companies") is a California Limited Liability Company owned and operated by Qin. It is a shell entity as well as a

/ / /

million-dollar residence located at 1168 Regal Canyon Drive, Walnut, California 91789.

**JURISDICTION AND VENUE**

23.     Defendants EFT, Qin, and the EFT Officers and Directors (Chow, Ko, Sluss, and Curry) are subject to the jurisdiction of this Court. They have engaged in continuous and systematic business in California. EFT accepted payment solely in US dollars for payment in the United States, sold products in the United States, including California, and shipped products from the United States, including California. EFT has its principal place of business in California and EFT, Qin, and the EFT Officers and Directors have committed tortious acts in this State.

24.     Defendant Buckman is subject to the jurisdiction of this Court. It has engaged in continuous and systematic business in California and is registered and licensed with California as an active brokerage firm.

25.     Defendants Huemoeller, Gaikas, and Lau are subject to the jurisdiction of this Court. They have regularly engaged in business in California and were active parties to several of the tortious California transactions and schemes alleged herein.

26.     Defendant Greenstone is subject to the jurisdiction of this Court. It has conducted business in California and was an active party to several of the tortious California transactions and schemes alleged herein.

27.     Defendant Regal Walnut is a California Limited Liability Company that is subject to the jurisdiction of this Court. It has engaged in continuous and systematic business in California. It has its principal place of business in this this State and was an active party to several of the tortious California transactions and schemes alleged herein.

28.     Defendants Brown Door and Pierstone are subject to the jurisdiction of this Court as parties to several of the tortious California transactions and schemes alleged herein.

29.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(2) because the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of a State and citizens or subjects of a foreign state.

30.     Pursuant to 28 U.S.C. § 1391, this Court is the proper venue for this action because a substantial part of the events, omissions, and acts giving rise to the claims occurred in this District. Defendant EFT's principal place of business is located within this District and the endless chain, including the marketing, advertising, and sales plans for EFT products, which are at the core of Defendants' unlawful scheme, were devised in this District.

**FACTS COMMON TO ALL CLAIMS**

**A.     Endless Chain Scheme**

31.     EFT operates a multi-level distribution system which relies on individual affiliates to market, promote, and sell its products. EFT claims to operate through over one million registered affiliate members, many of whom, like Plaintiffs, are located in China. EFT only sells products to affiliates. Anyone can become an affiliate by being sponsored by an existing affiliate and making an initial purchase. EFT affiliates purchase EFT products, including health care, anti-aging, skin care, and natural cosmetics products via the internet.

32.     As in other illegal endless chain schemes, the focus of the EFT Endless Chain Scheme is in promoting the program rather than selling the products. Qin has advertised EFT as "the first step to unlocking a cash explosion that could help make your financial dreams come true. Ordinary people, who have tried everything before to become successful and failed, are now using our breakthrough fast cash system to go from past financial failure toward financial freedom within a very short period of time" by using what is "without a doubt the fastest, easiest, most sure-fire and lucrative way for the average person to create instant financial success." "Jack [Qin] also shows us how to create wealth through

the wonderful world of network marketing by giving us lots of worthwhile tips, hints, and advice which will benefit anyone wanting to succeed in the same field that has generated roughly 6 out of 10 millionaires in the last 15 years." Qin, EFT, and other EFT officers, directors, and employees also posted statements on the EFT website claiming that the EFT system is a "powerful program [that] can help everybody; even people new to the industry make a high income" and that EFT has "one of the highest affiliate payouts in the industry." Part of the EFT sales pitch relies upon the credibility of the U.S. markets, on which EFT trades and from which EFT purports to operate.

33.    To join the "no-risk EFT team," Plaintiffs had to make an initial investment purchase of EFT products in exchange for the right to recruit other affiliates and earn various rewards. The rewards are structured to incentivize recruitment over product sales and are tied to each affiliate's initial investment amount and subsequent recruiting successes.

34.    There are four levels of affiliates, which are determined by the initial investment amounts: (1) Beginning Consumers, who make one purchase order of $450.00 (which includes $400 worth of products + $50 shipping and handling); (2) Standard Consumers, who make one purchase order of $660.00 ($600 worth of products + $60 shipping and handling); (3) Advisory Consumers, who make one purchase order of $990.00 ($900 worth of products + $90 shipping and handling); and (4) Franchised Consumers, who make one purchase order of $3300.00 (which includes $3000 worth of products + $300 shipping and handling).

35.    Recruitment rewards are unrelated to the sales of products to ultimate users but rather are tied to the initial investment amounts of the sponsor and the recruit. For example, EFT's "Instant Bonus" for sponsors is calculated as follows:

Instant Bonus:

    a.  Beginner Consumers: Regardless of the sponsor entry level, they can only receive $50 USD instant bonus.

b.  Standard Consumers: Receive $50 USD instant bonus by sponsor beginner level consumer; Receive $150 USD instant bonus by sponsor standard level consumer; Receive $150 USD instant bonus by sponsor advisory level consumer; Receive $150 USD instant bonus by sponsor franchised level consumer.

c.  Advisory Consumers: Receive $50 USD instant bonus by sponsor beginner level consumer; Receive $150 USD instant bonus by sponsor standard level consumer; Receive $350 USD instant bonus by sponsor advisory level consumer; Receive $350 USD instant bonus by sponsor franchise level consumer.

d.  Franchised Consumers: Receive $50 USD instant bonus by sponsor beginner level consumer; Receive $150 USD instant bonus by sponsor standard level consumer; Receive $350 USD instant bonus by sponsor advisory level consumer; Receive $1350 USD instant bonus by sponsor franchised level consumer.

36.   Furthermore, EFT continually pressures affiliates to invest at higher levels and to continue recruiting into the endless chain. For example, in 2010 EFT implemented an endless-chain-within-an-endless-chain scheme exclusively for its $3,000-level affiliates:

Starting from December 2010, the Company introduced reward programs to its Affiliates. For example, upon joining a $3,000 program, each Affiliate must pay $3,000 as a non-refundable deposit. When the Affiliate sponsors one new Affiliate, the Company will reward the first Affiliate with a $1,500 instant sponsor bonus. When the first Affiliate sponsors at least two new Affiliates, and those two new Affiliates each also sponsor two new Affiliates, the first Affiliate will have completed the first cycle of the program. The Company will then reward the first Affiliate with an additional $1,500 bonus and deliver an EFT-phone and an e-pad for the cost of $1.
After the completion of the first cycle, each Affiliate will enter into the matrix of the second cycle. Upon completion of the second cycle, the Company will reward the first Affiliate with $3,000. For each subsequent cycle thereafter within the matrix, each Affiliate will need to sponsor a new Affiliate in each cycle in order to qualify for the reward.

37.   In order to purchase EFT products, consumers are directed to fax a form to a U.S. fax number and directed to remit the purchase price in U.S. dollars, which is the only currency that EFT accepts. Consumer orders are processed by EFT's offices in the City of Industry, California, and products are shipped to consumers from the United States.

/ / /

38.   Included in the products EFT sells are the following dietary supplements:

(A)   "Collodial Silver #2003" which EFT advertises as a "natural shield and antibiotic" whereby "[a]ll fungus, virus, bacterium, streptococcus, staphylococcus, and other pathogenic organisms are killed in three or four minutes" and "in fact, there is no microbe know that is not killed by #2003 in six minutes or less" and "[t]here are also no side effects whatsoever from higher concentrations." "It would appear highly unlikely that even germ warfare agents could survive an encounter with #2003, since viruses like E Bola and Hanta, or even the dreaded 'flesh-eating bacteria' are, in the end, merely hapless viruses and bacteria. To top it off, #2003 is virtually non-toxic, making it safe for both children and adults, as well as pets . . . Nor does one have to worry about the FDA (Food and Drug Administration) fox being put in charge of this home remedy hen house. #2003 is a pre-1938 healing modality, making it exempt from the FDA jurisdiction under the grandfather clause";

(B)   "Super Re-vitl-izer #3002" which EFT advertises as an all-natural nutritional supplement that "[h]elps restore drinking-impaired motor facilities, - in minutes! (which is reflected also in a Breathalyzer test)";

(C)   "PerformPlus #3006 Performance, Endurance, & Libido Support" which EFT markets on its website as "I Can't Believe It's Not Viagra" and professes is "proven to be powerful endurance, performance, and libido enhancing stimulants for thousands of men and women – some for thousands of years. These pharmacologically standardized extracts are all from natural sources and manufactured in full compliance with US FDA regulations";

(D)   "Zeolite Plus #2005" which EFT advertises as an all-natural nutritional supplement that "[c]onverts in-organic metals (toxic) into organic (absorbable) minerals" and "[i]mproves every biochemical process your body requires";

(E)   "Celprotect I #2006" which EFT advertises as a "[b]road spectrum anti-viral" that "[i]mproves every biochemical process your body requires," "[e]nhances cellular memory transfer," and "[d]rives out toxins and heavy metals";

(F)   "Celprotect II #2007" which EFT claims "[c]an eliminate foot poisoning within minutes" and "[h]as the ability to detoxify herbicides, pesticides, and other poisons";

(G)   "MSM + Ionics #3003" which EFT advertises as an all-natural nutritional supplement that "benefits the body overall while relieving and rebuilding connective tissue and joints"; and

/ / /

HOWARTH & SMITH
ATTORNEYS AT LAW
LOS ANGELES

SECOND AMENDED COMPLAINT AND
DEMAND FOR JURY TRIAL

(H)     "Slim'n Easy #3005 Carbohydrate Craving Control (with 5-HTP)" which EFT advertises as "The Appetite Suppressant in a Spray."

39.     EFT's products did not have the composition, attributes, characteristics, nutritional value, health qualities, or value represented. In August 2009, the U.S. Food and Drug Administration ("FDA") issued a Warning Letter to Qin and EFT setting forth numerous violations of the Federal Food, Drug, and Cosmetic Act for several EFT products, including Collodial Silver #2003, Celprotect I #2006, Celprotect II # 2007, MSM + Ionics #3003, and PerformPlus #3006.

40.     As EFT products were generally mislabeled or adulterated, they were difficult to resell at the price paid by affiliates, much less at a profit. Furthermore, according to the FDA's Warning Letter, EFT's "products are all misbranded within the meaning of section 502(f)(1) of the Act [21 U.S.C. § 355(a)] in that the labeling for these drugs fails to bear adequate directions for use." As such, affiliates could not even legally market their inventories of EFT products within the United States unless they relabeled such products to comply with FDA regulations. The complications and expense required for such relabeling makes legal product resale within the United States a practical impossibility, which explains in part the focus on selling abroad.

41.     In addition to being defective, EFT products were overpriced. Because EFT sends such a large percentage of every dollar it receives to reward recruiting into the chain—according to its website, up to 70%—EFT set its product pricing at an inflated level well over what EFT products would sell for in the open marketplace.

42.     In addition to these inflated product prices, EFT charged excessive shipping and handling fees and other service fees so it could increase profit margins without directly inflating product prices even further. From the affiliates' perspectives, however, the effects of these fees were the same, such that the total

out-of-pocket amounts affiliates paid for EFT products further exceeded what EFT products could reasonably sell for in the open marketplace.

43.     Moreover, the shipping and handling charges levied by EFT grossly exceeded EFT's actual shipping and handling costs, thereby further denying affiliates the possibility of being able to resell EFT products for profit. For example, EFT lists its 2013 shipping costs as totaling only $9,000 yet lists its shipping charges to affiliates as totaling $449,000, representing a markup to affiliates of nearly 5,000%.

44.     In addition to inflated product prices and inflated shipping and handling charges, EFT charges an additional service fee of $40 for each order placed. This service charge is separate from EFT's shipping and handling charges and serves to deny affiliates the possibility of being able to resell EFT products for profit.

45.     EFT further defeats any opportunity for affiliates to resell products by flooding the market in a manner, as disclosed in a recent 10K filing, that evidences just how little chance its affiliates have to make any profit by retail sales:  "The Company has been selling some of its overstocked items and items nearing obsolescence at significantly reduced prices to a third party in an ongoing effort to maintain acceptable inventory levels."

46.     Because of the inflated prices, inflated shipping and handling charges, inflated service fees, and market flooding, the prices affiliates pay for EFT products are so high that the profits EFT promises on retail sales are impossible to achieve.

47.     Although it is virtually impossible to resell EFT products for profit, there is still a systemic incentive for existing affiliates to recruit new affiliates into the program, because EFT pays out recruitment rewards regardless of whether affiliates actually sell products at retail to consumers.

/ / /

48.     The promise of lucrative rewards for recruiting others and the relative impossibility of selling EFT products for profit induces EFT affiliates to focus on recruitment at the expense of retail marketing efforts, making it unlikely that meaningful retail sales or meaningful opportunities for retail sales will occur. Any EFT product purchases that do occur are generally incidental to purchases of the right to participate in EFT's recruitment chain, and to the extent affiliates made any profits, such profits came primarily from recruitment, not product sales.

49.     At a minimum, abuses from EFT's endless chain structure include: (1) the preying on and misleading of consumers with false statements about potential earnings and the business opportunities available for affiliates; (2) affiliates focus on recruiting new affiliates rather than on making retail sales of products to end consumers; (3) affiliates load up on products they do not want, need, or can sell just to purchase additional ownership in the company; (4) affiliates are encouraged to make large, unnecessary, and unwanted purchases just to jump up the chain to higher levels or buy more ownership in the company; and (5) affiliates are encouraged to recruit other affiliates in return for extra bonuses and incentives.

50.     EFT, Qin, and the EFT Officers and Directors induce affiliates to join using material false representations, such as that recruits can realistically resell EFT products for profit.

51.     No Defendant has ever disclosed that EFT operates an Endless Chain Scheme or that affiliate investors have virtually no chance to profit by investing in EFT.

52.     Actual and prospective affiliates were promised riches but had no way of knowing what commissions, bonuses, and other incentives other affiliates received or could reasonably expect to receive through investments and participation in the EFT Endless Chain Scheme.

/ / /

/ / /

53.     Grand overstatements regarding affiliates' potential earnings and opportunities are part of a pattern and practice throughout the EFT Endless Chain Scheme.

**B.      EFT's Lack of Safeguards for its Endless Chain Scheme**

54.     In endless chain schemes, all but the earliest investors necessarily lose their investments as the pool of potential recruits eventually and inevitably dries up, breaking the chain. Additionally, those joining endless chain schemes are often pressured to purchase products far in excess of their own potential retail or personal needs and are thus left saddled with piles of inventory that hold little value to them. However, if a purported chain is actually driven by retail end-consumer sales instead of recruitment, then the chain-like structure is less invidious. Consequently, direct marketers can sometimes avoid being labeled an illegal endless chain scheme by actively enforcing sufficient safeguards designed to deter inventory loading and encourage actual retail sales to end consumers. Some such safeguards include the (1) *initial investment rule*, (2) *the 70% rule*, (3) *the buyback rule*, and (4) *the 10 customer rule*.

55.     EFT employs no such safeguards and instead encourages recruiting over and above retail sales.

*(1) The Initial Investment Rule*

56.     *The initial investment rule* considers the existence and degree of initial investment required to participate in an alleged chain scheme. Illegal endless chain schemes tend to require a meaningful payment or initial disbursement by a new participant in exchange for the right to sell products and the right to earn rewards in return for recruiting other participants into the program. These initial investments are largely unrelated to the sale of products to ultimate users. Legitimate direct marketing businesses, on the other hand, charge nothing or virtually nothing for the right to participate, and to the extent they levy charges, such charges are related to the sale of products to ultimate users.

57.    The EFT chain requires an initial investment of $450 to participate in the scheme at the lowest level. This is unrelated to the sale of products to ultimate users. In fact, EFT does not require any sales of products at all to ultimate users.

58.    Further, EFT requires an initial investment well beyond $450 if an affiliate wants to move up the EFT chain to earn full recruitment commissions. EFT's website notes that "[i]t is suggested you come in at [the $3,300] franchised level, so you can compete at all levels; this will help support your duplication, and bring you great residual income." These distinctions in recruitment levels are entirely contingent upon initial investment amounts and completely unrelated to retail product sales to end users.

59.    As further example of recruitment rewards unrelated to the sales of products to the ultimate users but rather tied to initial investment amounts, EFT offers the "Instant Bonus" program described above.

60.    The only way to get products to sell is to become an affiliate by virtue of making a minimum $450 purchase. Further, the distinctions between different investment levels are entirely unrelated to sales to ultimate end users. EFT's rewards are based on recruitment and affiliate purchase orders instead of on retail sales to end consumers.

*(2) The 70% Rule*

61.    *The 70% rule* considers whether participants in a chain earn performance bonuses on the basis of purchases from the distributor or on the basis of retail sales to end users. Where a direct marketer enforces a rule requiring affiliates to prove that they resell at least 70% of the products they purchase to end consumers, then revenues are somewhat more likely to be coming from retail sales and less likely to be coming from recruitment into the chain.

62.    Here, EFT specifically denies requiring its affiliates to make any retail sales whatsoever, much less a minimum of 70%.

/ / /

*(3) The Buy-Back Rule*

63.     *The buy-back rule* considers the extent to which participants in a chain are discouraged from pushing inventory loading on downstream recruits. When a direct marketer requires affiliates to buy back saleable, unsold inventory from their recruits as such recruits leave the chain, new affiliates are less likely to saddle themselves with thousands of dollars' worth of unsaleable products and senior affiliates are less likely to encourage downstream affiliates to engage in inventory loading.

64.     Here, EFT has no buy-back policy whatsoever.

*(4) The 10 Customer Rule*

65.     *The 10 customer rule* considers the extent to which participants in a chain are required to sell to different retail customers. Where a direct marketer enforces a policy that withholds performance bonuses to affiliates unless they prove sales to 10 different retail customers during each month, then revenues are somewhat more likely to be driven by retail sales and less likely to be driven by recruitment into the chain.

66.     Again, EFT does not require affiliates to make any retail sales whatsoever, much less to a minimum of ten different retail customers during each month.

**C.     "Stock" Inducement Scheme**

67.     Defendants induced additional participation in the endless chain with a Stock Inducement Scheme. Defendants created a program where consumers could obtain the right to purchase supposedly valuable shares by purchasing products. Qin, EFT, and various EFT officers, directors, and employees, along with Greenstone, Buckman, and the Buckman Team (Lau, Giakas, and Huemoeller), then artificially inflated the perceived value of such shares by misrepresenting the value of the EFT enterprise and manipulating the quoted price on the Pink Sheets.

/ / /

This, in turn, induced Plaintiffs and other similarly situated individuals to continue purchasing more products in order to have access to more shares.

68.     Beginning in 2005, Qin held a series of public meetings during which he gave speeches to induce Plaintiffs and others to purchase EFT products and become company affiliates. Some of Qin's speeches were recorded and discs of the speeches were handed out during meetings in China and circulated among Plaintiffs and others. The discs were marketing tools to induce those who did not attend Qin's meetings in person to purchase EFT products and to obtain the opportunity to invest in the company by doing so.

69.     During these meetings, Qin espoused the benefits of EFT's products. He also represented that consumers who purchased the company's products would not only receive the products ordered, they would also receive ownership interests in EFT, or the right to purchase ownership interests in EFT, in the form of stock certificates that Qin represented as "negotiable securities" that could be sold for money. The number and value of shares issued or made available for purchase depended on the consumer level of products purchased.

70.     In 2007, Qin, Curry, EFT, and other EFT officers and directors contacted Greenstone to get EFT's common stock quoted on the OTC Bulletin Board. Pursuant to this contact, Greenstone, under the control of Lau and Gaikas and in cooperation with Buckman, provided the trading vehicle and public shell, HumWare, through which EFT performed a reverse-merger to get listed on the OTC Bulletin Board.

71.     Greenstone, under the control of Lau and Gaikas and in cooperation with Buckman, connected Qin, Curry, EFT, and other EFT officers and directors with Child, Van Wagoner, & Bradshaw, PLLC ("Wagoner"), an accounting firm headquartered in Salt Lake City, Utah. Wagoner was hand-picked by Greenstone, Buckman, and the Buckman Team to assist with creating EFT's financials.. Greenstone, under the control of Lau and Gaikas and in cooperation with

1   Buckman, further created the accounting system EFT used and placed Sharon
2   Tang, a Buckman employee, in place as EFT's CFO. Wagoner has since been
3   reprimanded by the Public Company Accounting Oversight Board for various
4   material auditing deficiencies, including "the failure, on five audits, to perform
5   sufficient procedures related to reverse mergers and other business combinations."
6   Plaintiffs believe one of these audit failures may have involved EFT.

7       72.     Greenstone, under the control of Lau and Gaikas and in cooperation
8   with Buckman, also connected Qin, EFT, Curry, and other EFT officers and
9   directors with Virginia Sourlis ("Sourlis"), an attorney hand-picked to assist with
10  creating EFT's SEC filings, in furtherance of this scheme. Sourlis has since been
11  suspended from appearing before the SEC as a result of her involvement with other
12  stock manipulation matters where Buckman was the placement agent.

13      73.     Greenstone, Buckman, and the Buckman Team also connected Qin,
14  EFT, Curry, and other EFT employees and directors with HumWare, the shell
15  corporation used for EFT's reverse merger onto the OTC Bulletin Board. On
16  November 7, 2007, HumWare changed its name to EFT BioTech Holdings, Inc.,
17  and effected a reverse stock split of 20,000 shares of common stock for 1 share of
18  common stock. Subsequently, on November 18, 2007, EFT did a reverse merger
19  with EFT BioTech Holdings, Inc., pursuant to which EFT acquired 100% of the
20  issued and outstanding shares of EFT BioTech Holdings, Inc. During this time
21  period, Gaikas and Lau, managing directors of Buckman, had voting and
22  dispositive control of Greenstone, and Huemoeller, an employee of Buckman and a
23  consultant to Greenstone, was the CEO and primary owner of HumWare.

24      74.     On or about November 18, 2007, Greenstone received 4,000,000 EFT
25  shares, Brown Door received 1,000,000 shares, Pierstone received 1,000,000
26  shares, and Huemoeller received 350,000 shares of EFT stock. Altogether, these
27  6,350,000 shares were transferred in exchange for $11,430.
28  / / /

75.     Also in November of 2007, Qin, Curry, EFT, and other EFT officers and directors caused 52,099,000 shares of EFT stock to be issued to Dragon Win Management, Ltd. ("Dragon Win"), a shell company located in the British Virgin Islands, for apparently no consideration. The fact that Qin effectively owned and controlled these shares was never disclosed.

76.     Control of Dragon Win was given to Qin's mistress, Jun(e) Qin Liu ("Liu"). Before being given control of Dragon Win and its nearly $200,000,000 worth of stock, Liu had been an administrative assistant for eFastTeam, and she had only earned an $18,000 salary the year before. In actuality, Liu was a figurehead used to disguise the extent of Qin's ownership.

77.     Starting in January of 2008, Buckman administered a purported Regulation S Offering (the "Offering") where 14,890,040 shares were purportedly sold to Plaintiffs and others for $51,149,412, representing a price increase of 211,111% over what was charged to various insiders less than two months prior.

78.     To successfully push this incredible valuation and perpetrate their scheme, various Defendants knowingly and willfully distributed numerous material misrepresentations and concealed numerous material facts.

79.     For example, in January of 2008, Qin, Curry, EFT, and other EFT officers, directors, and employees caused the misrepresentation that EFT had grown into a $782 billion business to appear on the EFT website at http://www.eftb.us. This misrepresentation was broadcast worldwide from a server located in Dallas, Texas, with a server IP address of 50.23.225.63, and remained posted from the beginning and through the duration of the Offering. This assertion was false. No Defendant believed it to be true nor had reasonable grounds for believing it to be true.

80.     Additionally, from 2007 through at least 2010, Qin knowingly and willfully made misrepresentations in speeches, both in person and distributed over the internet through EFT's websites, which claimed EFT would soon be listed for

sale on the New York Stock Exchange and that the shares owned by Plaintiffs and others would soon double in value. For example, in April of 2007, Qin gave a speech in Hong Kong where he claimed that "[w]e can make the value of shares double many times" and that "[t]he worst condition is to make the value [only] double once." On April 15, 2007, in a conference room of a hotel in Tainjin, China, Qin promised that "franchise-level consumers will become millionaires one year later after following our company just because they are franchise-level." On January 28, 2008, Qin maintained that "we will buy a mine in Chinese mainland" "[a]nd the meaning of buying this mine is that the value of our stocks will increase to $40 USD if the value of the mine could be accepted in the international market." On January 9, 2009, Qin gave a speech in Bali where he urged investors to hold onto their shares and maintained that investor recovery through EFT stock "will definitely happen" and "will not go wrong." And in August of 2010, at a conference in Halong Bay, Vietnam, Qin represented that an EFT stock "blowout" would occur the following year, would be listed on the main board of the NYSE in three months, and that "EFTB stock rising up to $60-100 per share is not a dream." All these assertions were false. No Defendant believed them to be true nor had reasonable grounds for believing them to be true.

81.     Further, from 2007 through the present, Qin, EFT, Greenstone, Buckman, the Buckman Team, and other Defendants knowingly and willfully suppressed the material fact that they were manipulating prices and as a consequence the shares held by Plaintiffs would eventually have little to no value. All Defendants were bound to disclose the material fact that they intended to and were in fact operating stock manipulation scheme, yet they suppressed this fact. Instead, Defendants stayed silent while Qin, EFT, and the EFT Team gave information of other facts, such as promises of high investment returns and other facts as mentioned above, which were materially misleading for want of communication of the fact that Defendants were actually operating a stock

manipulation scheme. For example, during his speeches, Qin represented to Plaintiffs and others that the value of their ownership interests in EFT would increase as more consumers purchased products. In 2010, as Defendants were still liquidating their shares and the price of the shares was still falling, Qin told Plaintiffs and others that:

> "The coming years shall be a harvest period for EFTB investors . . . Recently, minority shareholders are quite unsatisfied with the news that Buckman shall charge $40 on June 25 as the account quarter management fee . . . At this time, shareholders need to be calm and patient. Try to observe and think. The sole purpose of investment is to gain high return. Only actions that help us to gain high returns are correct; others are useless . . . Totally we have 20 to 30 thousand shareholders. Let's say each shareholder buys in 5 stocks, then there shall be 100 to 150 thousand purchasing power. That means stock crash can be avoided . . . the 150 thousand stock shall push the stock price up."

82.    Greenstone, Buckman, and the Buckman Team, in conjunction with Qin, EFT, and others, also manipulated reported prices in order to get consumers to buy more products and unlock more investment opportunities. In 2007, EFT's stock traded on the Pink Sheets. The Pink Sheets are known to be vulnerable to price manipulation because of thin trading and reporting requirements. A company that trades at a low volume is vulnerable to price manipulation because, among other things, insiders are able to trade back and forth between each other to create an illusion of rising prices. Typically, trading volume correlates with price fluctuations, as lots of activity typically comes from and/or causes shifts in price. In EFT's case, the price/volume patterns were somewhat different than what one might expect in a freely-trading open market. During the period immediately preceding the private placement, EFT traded on the Pink Sheets for pennies a share, with a relatively high trading volume. During the same time window, and after the largest volume of shares were positioned among insiders for pennies, the

price leading up to the private placement was gradually increased through tiny
trades. The price and volume, seen in tandem, reveal a striking pattern:



The volume, in green, flatlined around the same time that the price, previously flat,
rocketed upwards. In other words, the high prices immediately preceding the
private placement orchestrated by Buckman—which involved restricted shares that
could not themselves be traded to affect the price—appear to have been created on
exceptionally low levels of actual trading volume. Plaintiffs believe this pattern
reflects a plan of price manipulation that was devised by Greenstone, Buckman,
and the Buckman Team and that was executed by insider and undisclosed trades
between Qin, Greenstone, the Buckman Team, the Shell Companies (Brown Door,
Pierstone, and Regal Walnut), and others over whom Qin and the Buckman Team
exercised controlled. Defendants Qin, Greenstone, the Buckman Team, the Shell
Companies, and others all owed Plaintiffs and others a duty to disclose that they
were trading on insider information and operating a stock manipulation scheme,
yet no Defendant made any such disclosure.

83.     In or about April of 2008, Buckman, acting as placement agent for
EFT, created a Private Placement Memorandum which concealed numerous
material facts and misrepresented others. This memorandum was not signed by any
particular individuals at Buckman but rather was issued generically as a written
group statement. However, EFT has claimed that Greenstone, which is operated by
Buckman employees Lau and Giakas, was hired to effectuate the private placement

1   process and was instrumental in coordinating operations on both the EFT and the

2   Buckman side:

> Greenstone met with the Company's officers and directors several times and sat in on many Board meetings to discuss and plan the Company's future, business strategies and financing options.  When the Company and Greenstone agreed that the Company would benefit from conducting a Private Placement Offering of common stock, the Board and Greenstone made the decision to engage Buckman, Buckman & Reid, Inc., a registered broker/dealer, as the placement agent for the Company's January 2008 Regulation S Offering that ended in October 2008.  Greenstone also played a vital role in directing and advising the Board to file a Registration Statement on Form 10 to become a fully-reporting company and to have Buckman, Buckman & Reid, Inc. sponsor the Company to file an application with FINRA to act as a market maker.  Greenstone also assisted the Company and its Board in determining the termination and appointment of certain key executive officers and directors of the Company.

12  Hence, Lau and Gaikas, as Buckman employees and as the managing directors of

13  Greenstone, are factually connected to the Buckman memorandum and likely

14  participated in the authorship of it. This memorandum represented that shares

15  would be offered "exclusively to non-U.S. residents" while actually offering and

16  accepting share purchases from both U.S. residents and non-residents. It

17  represented that the stock was trading on the Pink Sheets at $6.85 per share without

18  disclosing that it, along with Greenstone, the Buckman Team, Qin, the Shell

19  Companies, had manipulated this price and corresponding Pink Sheet quotations

20  through insider back-and-forth trading. It claims that it would only be entitled to a

21  5% commission and 1% expense allowance without disclosing the millions of

22  shares of ownership that had or would be distributed among the Buckman Team

23  and their respective Shell Companies for virtually no consideration. It describes

24  EFT's business without disclosing that EFT actually operates an illegal endless

25  chain system. It falsely stated that EFT "make[s] no claims as to the products

26  curing any medical situation, or preventing any medical ailment," despite its

27  authors' knowledge of the dozens of medical claims littering EFT's product

28  advertisements. It falsely stated that "[t]here are no relationships existing among

1   and between the issuer's officers and directors," despite the known relationship

2   between Qin and his mistress Jun Qin Liu (through whom he exercised concealed

3   control over the majority of EFT's shares). And it otherwise is materially

4   misleading in its presentation of EFT's business and in its lack of adequate

5   disclosures.

6          84.    The Stock Inducement Plan was never about giving actual shares of

7   stock to consumers but rather was a contrivance to increase participation in the

8   endless chain and maximize the extraction of funds from Chinese consumers.

9   Consequently, Qin, Buckman, and the Buckman Team coordinated the

10  management of ghost accounts for supposed investors; investors were told that

11  they had purchased stock that they were not allowed to sell for two years, and this

12  stock was supposedly placed in holding accounts at Buckman which were subject

13  to undisclosed quarterly holding fees. Buckman, along with the Buckman Team,

14  had a duty to disclose these holding fees, but either failed to do so or only did so

15  while purposefully concealing such fees through the use of small print in a

16  language foreign to those of the "investors." Indeed, many investors did not in fact

17  actually receive any real stock certificates. Further, by the time investors expected

18  to be able to sell, the once-inflated value of shares had deflated to nearly nothing,

19  and Buckman claimed to have liquidated such shares to cover its previously-

20  undisclosed management fees.

21         85.    Qin continued giving speeches into at least 2010, during which, in

22  addition to touting EFT products and extolling their benefits, he solicited

23  investments in EFT through the sale of company shares which he promised would

24  at least double in value as long as investors held onto their shares until the

25  company was able to go through with its expected listing on the New York Stock

26  Exchange. This listing never occurred, nor did Qin believe or ever have reasonable

27  grounds for believing it would occur.

28  / / /

86.     The effect of Defendants' misrepresentations and omissions was increased demand for the "shares" of EFT. This drove Plaintiffs and others to purchase more products in the endless chain scheme.

**D.      Plaintiffs Become Shareholders and the Equitable Tolling of their Claims**

87.     Plaintiff Li attended five public meetings with Qin and listened to recordings of some of his later speeches. Li also reviewed written EFT marketing materials. In reliance on Qin's misrepresentations about the value and quality of EFT's products and investment opportunities in the company, and after reviewing the written materials, Li purchased approximately $32,000 worth of EFT products, for which he received what he was told were over 30,000 shares in the company.

88.     Plaintiff Zhao attended three public meetings with Qin and listened to recordings of some of his later speeches. Zhao also reviewed written EFT marketing materials. In reliance on Qin's misrepresentations about the value and quality of EFT's products and investment opportunities in the company, and after reviewing the written materials, Zhao purchased approximately $46,530 worth of EFT products, for which he received the right to purchase and did in fact purchase what he was told were 13,000 shares in the company for an additional $49,400.

89.     Plaintiff Hu attended five public meetings with Qin and listened to recordings of some of his later speeches. Hu also reviewed written EFT marketing materials. In reliance on Qin's misrepresentations about the value and quality of EFT's products and investment opportunities in the company, and after reviewing the written materials, Hu and her family purchased approximately $25,080 worth of EFT products, for which she received the right to purchase and did in fact purchase what she was told were 15,000 shares in the company for an additional $57,000.

90.     Plaintiff Liu attended one public meeting with Qin and listened to recordings of some of his later speeches. Liu also reviewed written EFT marketing

materials. In reliance on Qin's misrepresentations about the value and quality of EFT's products and investment opportunities in the company, and after reviewing the written materials, Liu purchased approximately $29,700 worth of EFT products, for which she received the right to purchase and did in fact purchase what she was told were 3,300 shares in the company for an additional $12,540.

91.   Plaintiffs purchased their shares in EFT for $3.80 per share. The value of Plaintiffs' shares in EFT eventually dropped to less than a penny. At various times after purchasing their initial shares in EFT, and before the value of shares dropped to below one cent, Plaintiff Li and others approached Defendant Qin to discuss EFT's stock price, product quality, EFT's team leadership structure, and other issues relating to the EFT and the declining value of its shares. During these meetings, Qin repeatedly assured Mr. Li and others, both in public and private meetings, that EFT's products were good and that the value of the Company's shares would increase as long as long as Mr. Li and others maintained their holdings and recruited more individuals to purchase EFT product and invest in the Company. Throughout their discussions, Qin continued to promote EFT and its products and assured Plaintiffs and others that their investments were safe and would pay off.

92.   Qin and EFT repeatedly and willfully made knowingly false claims for the purpose of inducing Plaintiffs and others to forebear from trying to sell their supposed investments in EFT. Generally, Qin would purposefully make a false claim for the future, the future would come and prove the falsity of the claim, and then Qin would cover with a false excuse while simultaneously making another false claim for the future.

93.   For example, in April of 2007, Qin made and publicized online a speech where he spoke of getting EFT stock "listed" and claimed "We can make the value of shares double many times. The worst condition is to make the value [just] double once." But instead of doubling in value, EFT stock dropped in value.

1   To explain this turn of events, Qin gave a speech on June 28, 2008, where he made
2   up a false and fantastical story about a single short-seller being responsible for
3   bringing down the value of EFT stock, and stated "In the future, you do not need to
4   pay too much attention to the fluctuation of price . . . [y]ou could concern about the
5   price and do not need to worry. Nothing will happen to EFT who can buy
6   [business] with NT 19.9 billion dollar . . . The increase of up and down is healthy.
7   You never see the price to go straight up . . . the big generation of EFT will come."
8   But instead of the "big generation of EFT" coming, the value of EFT stock
9   continued to drop. To explain this turn of events, Qin gave a speech in Bali on
10  January 9, 2009, where he made up false and fantastical financial projections while
11  blaming the financial markets at large, maintaining that "According to our original
12  plan, if no financial crisis, the price of our stocks should be $8 to $10 and the end
13  of last year. But the premise was no financial crisis. According to our original plan
14  and development condition, the price of our stock will be doubled at the end of
15  2009. And there will be doubled once or twice at the end of 2010. This is the
16  original anticipation. But the condition now has changed. And you should be
17  patient." Qin also maintained that "According to our original plan, our stocks
18  would be listed in 19 November 2007 and would be listed in the main board in
19  April or May or June or July 2008 . . . In September, many people were still
20  expecting to knock the bell in the U.S. and I promised to take 200 people to knock
21  the bell. I think we were so lucky no to go there . . . EFT is so lucky because our
22  stocks are not listed in the main board. . . but in the beginning or the second half of
23  this year, a favorable turn may appear. There will be a chance before the turn . . .
24  I hope shareholders or consumers who had lost great amount of money in Chinese
25  stock market could recover in EFT stock market. I sincerely hope that will happen
26  and I know this will definitely happen." But the value of EFT declined instead of
27  doubling by the end of 2010, EFT stock was never listed in the main board as
28  promised, and the "definite" recovery coming to shareholders never actually came.

1    To explain this turn of events, Qin gave a 2010 speech where he blamed third

2    parties, claiming that "due to our investment in ocean shipping, we were cheated

3    by Renhe Jiao, a partner from Taiwan. So, we're litigating. After the lawsuit is

4    won, the stock will go up." But, again, the value of EFT stock went down, not up.

5    To explain this turn of events, Qin gave a 2011 speech where he claimed that "the

6    shipyard will compensate us with more money than the purchase cost of the ship,

7    and the later the compensation, the more the money will be given, and the stock

8    'blowout' will occur." But, as usual, the shipyard never compensated EFT, much

9    less for more than the purchase cost of the ship, and no stock "blowout" ever

10   occurred.

11       94.    After years of repeated misrepresentations that the value of Plaintiffs'

12   investment in EFT was secure and would be realized once the company was listed

13   on the main stock board, Plaintiffs began to suspect that the assurances of Qin,

14   EFT, and others were false and misleading. Thus, in 2012, Plaintiffs set out to

15   locate other similarly situated Chinese consumers who had attended meetings with

16   Qin, purchased EFT products, and become company shareholders. Through their

17   efforts, Plaintiffs determined that there are tens of thousands of Chinese consumers

18   – both rich and poor – who, based on Qin's speeches about the benefits of EFT's

19   products and promises of riches, invested tens of millions of dollars in EFT by

20   becoming company affiliates.

21       95.    After discovering that they were not alone and that the fraudulent

22   Endless Chain Scheme and Stock Inducement Scheme had ensnarled so many

23   unsuspecting Chinese consumers, Plaintiffs engaged counsel, first in China and

24   later the U.S., to explore their legal options. It was only after engaging counsel in

25   2012 that Plaintiffs first learned of the endless chain, false promises, and misuse of

26   the money they had invested in EFT. This was also the first time that Plaintiffs

27   learned that the products they purchased were mislabeled and that some of the

28   products contained unlisted ingredients and others did not contain the full amount

of ingredients listed on product labels. Further, it was not until May 21, 2013, that Plaintiffs discovered that some of their stockholder certificates were counterfeit and of the mass involuntary share liquidations perpetrated by Buckman.

### COUNT I

**(ENDLESS CHAIN SCHEME; California Penal Code § 327 and California Civil Code § 1689.2.)**

**Against All Defendants**

96.   Plaintiffs repeat, reallege, and incorporate by reference the allegations contained in the paragraphs above as if fully set forth herein.

97.   California Penal Code § 327 renders endless chain schemes illegal. Section 1689.2 of the California Civil Code provides:

> A participant in an endless chain scheme, as defined in Section 327 of the Penal Code, may rescind the contract upon which the scheme is based, and may recover all consideration paid pursuant to the scheme, less any amounts paid or consideration provided to the participant pursuant to the scheme.

98.   Qin, EFT, and the EFT Officers and Directors operated an endless chain scheme. Greenstone, Buckman, the Buckman Team, and the Shell Companies assisted Qin, EFT, and the EFT Officers and Directors with increasing demand for the endless chain scheme and thereby increasing participation therein.

99.   Plaintiffs have suffered injuries in fact and have lost money or property because of the business acts, omissions, and practices of Qin, EFT, the EFT Officers and Directors, Greenstone, Buckman, the Buckman Team, and the Shell Companies.

100.   Plaintiffs are entitled to recover all consideration paid under the scheme, less any amounts paid or consideration provided to the participants under the scheme.

101.   As violations of California Penal Code §327 are punishable by imprisonment for over one year, violations of California Penal Code §327 can provide the basis for a RICO predicate act of racketeering.

102.   As Defendants' violations of California Penal Code §327 constitute a pattern of felonious fraud and grand theft causing injury in excess of $3,200,000, such acts and omissions are punishable by imprisonment for over one year under California Penal Code §§ 487, 12022, and 186.1, and thus can provide the basis for a RICO predicate act of racketeering.

## COUNT II

### (DECEPTION and COMMON LAW FRAUD: California Civil Code §§ 1709- 1710; California Penal Code §§ 487, 12022, 186.11)

### Against Defendants Qin and EFT

103.   Plaintiffs repeat, reallege, and incorporate by reference the allegations contained in the paragraphs above as if fully set forth herein.

104.   California Civil Code § 1709 provides:

> One who willfully deceives another with intent to induce him to alter his position to his injury or risk, is liable for any damage which he thereby suffers.

105.   California Civil Code § 1710 provides:

> A deceit, within the meaning of the last section, is either:
>
> 1. The suggestion, as a fact, of that which is not true, by one who does not believe it to be true;
>
> 2. The assertion, as a fact, of that which is not true, by one who has no reasonable ground for believing it to be true;
>
> 3. The suppression of a fact, by one who is bound to disclose it, or who gives information of other facts which are likely to mislead for want of communication of that fact; or,
>
> 4. A promise, made without any intention of performing it.

106.   Qin   and   EFT   knowingly   and   willfully   made   numerous misrepresentations and suppressions of material fact to Plaintiffs and others. For example:

> (A)   In January of 2008, Qin, Curry, and other EFT officers and directors knowingly and willfully caused the misrepresentation that EFT had grown into a $782 billion business to appear on the EFT website. This assertion or

suggestion of fact was not true. No Defendant believed it to be true nor had reasonable grounds for believing it to be true.

(B)   From 2007 and continuing through at least 2010, Qin knowingly and willfully made misrepresentations in speeches, made both in person and also distributed over the internet, which claimed EFT would soon be listed for sale on the New York Stock Exchange and that the shares owned by Plaintiffs and others would soon double in value. For example, in April of 2007, Qin claimed that "[w]e can make the value of shares double many times" and that "[t]he worst condition is to make the value [only] double once." On April 15, 2007, in a conference room of a hotel in Tainjin, China, Qin promised that "franchise-level consumers will become millionaires one year later after following our company just because they are franchise-level." On January 28, 2008, Qin maintained that "we will buy a mine in Chinese mainland" "[a]nd the meaning of buying this mine is that the value of our stocks will increase to $40 USD if the value of the mine could be accepted in the international market." On January 9, 2009, Qin gave a speech in Bali where he urged investors to hold onto their shares and maintained that investor recovery through EFT stock "will definitely happen" and "will not go wrong." And in August of 2010, at a conference in Halong Bay, Vietnam, Qin represented that an EFT stock "blowout" would occur the following year, would be listed on the main board of the NYSE in three months, and that "EFTB stock rising up to $60-100 per share is not a dream." All of these assertions or suggestions of fact were not true. No Defendant believed them to be true nor had reasonable grounds for believing them to be true.

(C) From 2007 and continuing through the present, Qin, EFT, Greenstone, Buckman, the Buckman Team, and the Shell Companies, as well as the EFT Officers and Directors from at least 2009 to the present, knowingly and willfully suppressed the material fact that they were operating an endless chain scheme and a stock inducement scheme, and that as a consequence of these schemes the shares and products held by Plaintiffs would eventually have little to no value. Qin, EFT, the EFT Officers and Directors, Greenstone, Buckman, the Buckman Team, and the Shell Companies were bound to disclose the material fact that they intended to and were in fact operating such schemes, yet they suppressed this fact. Instead, Qin, EFT, the EFT Officers and Directors, Greenstone, Buckman, the Buckman Team, and the Shell Companies gave information of other facts, such as promises of high investment returns, false statements in private placement memorandums, false assurances of legality and regulatory compliance, and other facts as mentioned above, which were materially misleading for want of communication of the fact that they were actually operating an endless chain scheme and a stock inducement scheme.

107.   Plaintiffs purchased shares in EFT at $3.80 per share. Subsequently, Plaintiffs' shares dropped in value, eventually becoming worth less than a penny.

At various times after purchasing their initial shares in EFT, and before the value of shares dropped to below one cent, Plaintiff Li and others approached Defendant Qin to discuss EFT's stock price, product quality, EFT's team leadership structure, and other issues relating to the Company and the declining value of its shares. During these meetings, Qin repeatedly issued and used the aforementioned misrepresentations and suppressions of material facts to assure Mr. Li and others, both in public and private meetings, that EFT's products were good and that the value of the Company's shares would increase as long as Mr. Li and others maintained their shares and recruited more individuals to purchase EFT product and invest in the Company. Throughout their discussions, Qin continued to promote EFT and its products and assured Plaintiffs and others that their investments were safe and would pay off. For example, in a speech on June 28, 2008, Qin made up a false story about a single short-seller being responsible for bringing down the value of EFT stock, and then stated that "In the future, you do not need to pay too much attention to the fluctuation of price . . . [y]ou could concern about the price and do not need to worry. Nothing will happen to EFT who can buy [business] with NT 19.9 billion dollar . . . The increase of up and down is healthy. You never see the price to go straight up . . . the big generation of EFT will come." At no time did any Defendant disclose that they were operating an endless chain scheme or stock inducement scheme.

108.   Such misrepresentations and suppressions were made willfully and knowingly, with the purpose and intent of inducing Plaintiffs to forebear from selling their shares until after the execution of the various schemes.

109.   Had Qin and EFT made truthful disclosures instead of the aforementioned misrepresentations and suppressions of material fact, Plaintiffs would have sold their shares. But for the deceptive acts and omissions, Plaintiffs would not have held their shares through the duration of the various schemes.

110.   Plaintiffs justifiably relied the misrepresentations and concealments of

1   Qin and EFT, and were in fact induced to retain their shares until after such shares
2   were worthless.

3        111.   Plaintiffs have suffered injuries in fact and have lost money or
4   property because of the deceptive acts of Qin and EFT.

5        112.   Plaintiffs are entitled to recover all losses suffered as a result of the
6   deceptive acts of Qin, EFT, the EFT Officers and Directors, Greenstone, Buckman,
7   the Buckman Team, and the Shell Companies.

8        113.   The various deceptive acts and omissions constitute a pattern of
9   felonious fraud and grand theft causing injury in excess of $3,200,000. Under
10  California Penal Code §§ 487, 12022, 186.1, such acts and omissions are
11  punishable by imprisonment for over one year and thus can provide the basis for a
12  RICO predicate act of racketeering.

**COUNT III**

**(RICO 18 U.S.C. § 1962(c))**

**Against All Defendants**

16       114.   Plaintiffs repeat, reallege, and incorporate by reference the allegations
17  contained in the paragraphs above as if fully set forth herein.

18       115.   EFT, Qin, the EFT Officers and Directors, Buckman, the Buckman
19  Team, the Shell Companies, and others known and unknown make up the "EFT
20  Enterprise," an association of entities and individuals associated in fact to operate
21  multiple illegal schemes, including but not limited to the Endless Chain Scheme
22  and Stock Inducement Scheme. EFT, Qin, the EFT Officers and Directors,
23  Buckman, the Buckman Team, the Shell Companies are engaged in activities
24  affecting federal interstate and foreign commerce and are entities capable of
25  holding a legal or beneficial interest in property. EFT, Qin, the EFT Officers and
26  Directors, Buckman, the Buckman Team, the Shell Companies, and other
27  participants in the EFT Enterprise are all "persons" as that term is defined by 18
28  U.S.C. §1961(3).

116. Except for Chow, Soon, Sluss, and Ko, Defendants have been members of the EFT Enterprise since at least 2007 and continuing until the present. Chow, Soon, and Ko joined the EFT Enterprise by at least 2009 and Sluss joined the EFT Enterprise in 2010. Qin, the EFT Officers and Directors, Buckman, the Buckman Team, the Shell Companies, and others are separate entities from the EFT Enterprise and play separate and distinct roles in the operation of the EFT Enterprise. Among others, participants in the EFT Enterprise include:

(A)  Qin is the founder, architect, and main beneficiary of the current EFT Endless Chain Scheme as well as various prior endless chain schemes. Through interstate wire and mails, he coordinates the EFT Enterprise, a worldwide scheme. Qin is also affiliated with numerous shell companies and individuals, through which he coordinates and operates his schemes.

(B)  EFT is the official front business structured to run the EFT Endless Chain Scheme and to be used as a vehicle in various other schemes. It is the most recent iteration of a long succession of front businesses used to run endless chains and other scams operated by Qin and others, such as eFastTeam, eFastTeam2000, and ef2t. EFT is affiliated with numerous shell companies and individuals that reap fraudulent profits by using it in various schemes.

(C)  Jun(e) Qin Liu ("Liu") was Qin's mistress and an administrative assistant at eFastTeam, one of the predecessor versions of EFT. After earning a salary of $18,000 in 2007, Liu was appointed to EFT's Board of Directors in 2008 and given control over 52,099,000 shares of EFT stock (representing over 68% of issued and outstanding common stock, or more than $192,000,000 at the OTC valuation of $3.70 per share). She gained control over this stock when Qin placed her in control of the British Virgin Islands shell company Dragon Win. In fact, Qin was the beneficiary and person with control over Dragon Win.

(D)  Dragon Win is a shell corporation located in the British Virgin Islands that at its inception was created to be *de jure* managed by Liu, Qin's mistress, and *de facto* controlled by Qin himself, through Liu. Dragon Win's purpose was to facilitate the various schemes of Qin and Defendants. EFT, under the control of Qin and with the assistance of Liu and other accomplices, ultimately funneled 52,099,000 shares of EFT into Dragon Win, at a total market value of over $192,000,000. Dragon Win currently owns approximately 1,600,000 shares, having successfully unloaded the rest.

(E)  Buckman is a broker/dealer incorporated in New Jersey. It, in conjunction with various affiliated companies owned and

operated by Buckman managers and employees, knowingly provided the financial expertise and business vehicles needed for the EFT Enterprise's schemes to operate. It, along with its managing director Lau and his company Greenstone, drafted the deceptive private placement memorandum associated with the 2008 private placement of EFT shares. Buckman is registered with the SEC and with FINRA, and has 13 FINRA public disclosure events. Nine of these relate to final, formal proceedings initiated by regulatory authorities for violations of investment-related rules or regulations. Four of these are FINRA arbitration awards involving securities and commodities disputes between public customers and Buckman. Buckman served as EFT's placement agent for its Regulation S Offering and market maker of EFT's common stock on the OTC Bulletin Board. Various owners and employees of Buckman also operated the entities which enabled EFT's reverse-merger onto the OTC Bulletin Board. While providing these services, Buckman and its owners, managing directors, and employees funneled millions of EFT shares into various shell corporations and facilitated the price manipulation in the EFT Stock Inducement Scheme.

(F)  Huemoeller is an employee of Buckman, the ex-CEO and President of HumWare, and a consultant to Greenstone. Huemoeller is registered with FINRA and has two disclosure events for arbitrations where he was ordered to pay approximately $199,000 in damages to his customers. In November of 2007, and before the execution of the EFT Enterprise's Stock Inducement Scheme, Huemoeller received 350,000 shares of EFT stock for virtually no consideration.

(G)  HumWare was the shell corporation used as the reverse-merger vehicle for getting EFT listed on the OTC Bulletin Board. HumWare was owned and operated by Buckman employee and Greenstone consultant Huemoeller. HumWare's value to the EFT Enterprise was that it was trading on the Pink Sheets as a typical penny stock. As such, it could be used as a reverse-merger vehicle to bypass many of the extensive regulatory hurdles for listing normally imposed by the SEC and quickly get EFT listed for public trading. On November 7, 2007, HumWare changed its name to EFT BioTech Holdings, Inc., and effected a reverse stock split of 20,000 shares of common stock for 1 share of common stock.

(H)  Lau is a managing director and 5-10% owner of Buckman, a co-founder/president of Greenstone, director or owner of Pierstone, and a director CTX.

(I)  Gaikas is a managing director and 5-10% owner of Buckman, a co-founder/director of Greenstone, and a director or owner of Brown Door.

(J)  Greenstone is a shell corporation founded and by Lau and Gaikas. Lau and Gaikas have voting and dispositive control of Greenstone. Greenstone, Buckman, Heumoeller, Lau, and

Gaikas served as the financial advisors to get EFT listed on for public trading on the OTC Bulletin Board. In November of 2007, and before the execution of EFT's Stock Inducement Scheme, Greenstone received 4,000,000 shares of EFT stock for virtually no consideration.

(K)  Pierstone is a shell corporation located in New York that is directed or controlled by Lau. In November of 2007, and before the execution of the Share Inducement Scheme, it received 1,000,000 shares of EFT stock for virtually no consideration.

(L)  Brown Door is a shell corporation located in Farmingdale, New Jersey, that is directed or controlled by Gaikas. In November of 2007, and before the execution of the Share Inducement Scheme, it received 1,000,000 shares of EFT stock for virtually no consideration.

(M)  Sourlis is the attorney hand-picked by Buckman to assist with EFT's SEC filings in furtherance of the EFT Enterprise's schemes. Sourlis was also used to facilitate Greenstone's listing on the OTC Markets. Sourlis has since been suspended from appearing in front of the SEC as a result of her involvement with another stock manipulation matter where Buckman was the placement agent.

(N)  Wagoner is an accounting firm headquartered in Salt Lake City, Utah. It was hand-picked by Buckman to assist with creating EFT's audited financials for EFT's reverse-merger onto the stock market, in furtherance of the EFT Enterprise's various schemes. Wagoner has since been reprimanded by the Public Company Accounting Oversight Board for various material auditing deficiencies, including "the failure, on five audits, to perform sufficient procedures related to reverse mergers and other business combinations."

(O)  Wendy is Qin's sister. Wendy is also a director of EFT International, which pays her a salary of $300,000 per year. Wendy is also the owner or director of Assets Limited, JFL, Regal Walnut, and  the 6,500 square foot Hong Kong Office located at 8 Arglye Street, Suite 3706, Kowloon, Hong Kong SAR. Directly and indirectly, Wendy has received millions of dollars from her participation in the various EFT Enterprise schemes.

(P)  Assets Limited is a shell corporation located in the British Virgin Islands that is owned by Wendy and affiliated with EFT. Since at least 2007, EFT has paid Assets Limited millions of dollars in royalties for the right to use the "EFT" name.

(Q)  JFL is a shell corporation located in the British Virgin Islands that is owned by Wendy and affiliated with EFT. It receives hundreds of thousands of dollars from EFT annually for consulting services that Wendy apparently provides outside of her regular duties as director of EFT International.

(R)  The Hong Kong Office is a 6,500 square foot facility owned by Wendy and leased to EFT for hundreds of thousands of dollars per year.

(S)  Regal Walnut is a California limited liability company owned by Wendy in conjunction with her brother Qin. Walnut is a shell corporation as well as a million-dollar residence located at 1168 Regal Canyon Drive, Walnut, California 91789. In November of 2007, before the execution of EFT's Stock Inducement Scheme, Walnut received 1,000,000 shares of EFT stock for virtually no consideration.

(T)  Excalibur is a marine shipping and transportation company located in Taiwan. It is operated by Soon, an EFT Director.

(U)  Meifu is a construction company that on belief is operated by affiliates of Qin, the EFT Directors, Buckman, or the Buckman Team.

(V)  CTX is a technology company operated by Curry and directed by Lau.

(W)  Soon, Curry, Chow, Ko, and Sluss are current or former EFT officers and directors.

117.   Defendants are all employed by or associated with the EFT Enterprise.

118.   Qin, EFT, the EFT Officers and Directors, Buckman, the Buckman Team, and others, both known and unknown, all agreed to and did conduct and participate in the conduct of the EFT Enterprise's affairs through a pattern of racketeering activity and for the unlawful purpose of intentionally defrauding Plaintiffs and others. Specifically, Defendants willfully and intentionally violated and continue to violate numerous State and Federal laws with the goal of obtaining money, directly and indirectly, through a pattern of racketeering activities composed of numerous indictable offenses, including but not limited to violations of the mail and wire fraud statutes 18 U.S.C. §§ 1341 and 1343, the National Stolen Property Acts, 18 U.S.C. §§ 2314 and 2315, the Money Laundering Acts 18 U.S.C. §§ 1956 and 1957, and California Penal Code §§ 327, 487, 12022, and 186.1.

/ / /

119.   From at least 2007 and continuing until the present, and with respect to Chow, Soon, Ko, and Sluss from at least 2010 until the present, within the Central District of California and elsewhere, EFT, Qin, the EFT Officers and Directors, Buckman, the Buckman Team, the Shell Companies, and others, in association with each other, did knowingly, willfully, and unlawfully conduct and participate, directly and indirectly, in the conduct of the affairs of the EFT Enterprise through a pattern of racketeering activity.

120.   From at least 2007 and continuing until the present, and with respect to Chow, Soon, Ko, and Sluss from at least 2010 until the present, EFT, Qin, the EFT Officers and Directors, Buckman, the Buckman Team, the Shell Companies, and others, in association with each other, executed a per se scheme to defraud through a pattern of racketeering made up of distinct and indictable acts of mail and wire fraud under 18 U.S.C. §§ 1341 and 1343 transfers of stolen property in violation of the National Stolen Property Acts, 18 U.S.C. §§ 2314 and 2315, and money laundering in violation of the Money Laundering Acts, 18 U.S.C. §§ 1956 and 1957.

121.   The EFT Enterprise engaged in and affected interstate and foreign trade. The EFT Enterprise transacts business through the instrumentalities of interstate commerce such as telephones, facsimile machines, the internet, email, and the United States mail and interstate commercial carrier to communicate in furtherance of the activities of the EFT Enterprise. The EFT Enterprise advertises, markets, and sells products and services throughout the world, and manufactures and ships products specifically from the United States. The operation of the EFT Enterprise has continued over several years, including activities in every state, and has affected and damaged, and continues to affect and damage, commercial activity.

122.   To further the goals of the EFT Enterprise, which include (1) earning money through fraudulent means; (2) enticing individuals to become EFT

affiliates; (3) enticing individuals to purchase products from EFT; (4) enticing individuals to recruit others to become EFT affiliates and profit from those recruits' purchases of EFT products; (5) selling adulterated and mislabeled products through the channels of interstate commerce; and (6) reaping large profits for themselves based on fraud and false representations, EFT, Qin, the EFT Officers and Directors, Buckman, the Buckman Team, the Shell Companies, and others known and unknown engaged in various forms of illegal activity, including but not limited to mail fraud, wire fraud, money laundering, conspiracy, the transfer and receipt stolen property, the sale of adulterated and mislabeled goods in violation of FDA regulations and California law, and operation of an endless chain scheme.

123.   The pattern of racketeering activity alleged is distinct from the EFT Enterprise. Each act of racketeering activity is distinct from the EFT Enterprise in that each is a separate offense committed by an entity or individual while the EFT Enterprise is an association of entities and individuals. The EFT Enterprise has an ongoing structure and organization supported by personnel and associates with continuing functions or duties.

124.   The racketeering acts set out in this Amended Complaint, and others, all had the same pattern and similar purpose of defrauding Plaintiffs and others for the benefit of the EFT Enterprise and its members. Each racketeering act was related, had a similar purpose, involved the same or similar participants and methods of commission and had similar results affecting Plaintiffs and others. The racketeering acts of mail fraud, wire fraud, transfers of stolen property, and money laundering were also related to each other in that they were part of the EFT Enterprise's goal to reap illicit and unlawful profits while fraudulently inducing Plaintiffs and others to join the Endless Chain Scheme, purchase products, and recruit others to join the schemes.

/ / /

125.   The wrongful conduct of EFT, Qin, the EFT Officers and Directors, Buckman, the Buckman Team, the Shell Companies, and others has been and remains part of the EFT Enterprise's ongoing way of doing business and constitutes a continuing threat to the property of Plaintiffs and others. Without the repeated acts of mail fraud, wire fraud, transfers of stolen property, and money laundering, the EFT Enterprise's fraudulent scheme would not have succeeded.

126.   In connection with promoting and executing their illegal schemes, members of the EFT Enterprise knowingly and recklessly placed and caused to be placed in the United States mail or by interstate commercial carrier, or took or received from the same, matters or things to be sent to or delivered by the United States mail or by interstate commercial carrier comprising, among other things product, invoices, letters, promotional materials, brochures, products, and wire transfers to Plaintiffs and others and received communications between and among themselves through the United States mail, in the United States. It was reasonably foreseeable that these mailings or receipts would take place in furtherance of the fraudulent schemes.

127.   In connection with promoting and executing their illegal schemes, members of the EFT Enterprise engaged in wire fraud, in violation of 18 U.S.C. § 1343 by, among other things, knowingly and recklessly transmitting or causing to be transmitted with wire communications, in interstate and foreign trade, materials promoting the illegal EFT chain on internet web sites, radio, satellite radio, television, email, facsimile, telephone, and text messages, including promotional materials, registration information, product information, and invoices. Qin, EFT, the EFT Officers and Directors, and others maintain websites on the internet where EFT affiliates can and do buy products and are given inducements to continue working as affiliates within the EFT chain. EFT maintains various websites hosting promotional videos featuring Qin and others promoting the unlawful scheme and other marketing materials promoting the illegal scheme. EFT sent and received

these interstate wire communications to and from all fifty states and the District of Columbia.

128.   Each Defendant has promoted the EFT chain and EFT Enterprise. Each use of the mail or wire by Defendants done in furtherance of the EFT endless chain was an act of racketeering.

129.   The pattern of racketeering activity through which the affairs of the EFT Enterprise were conducted and in which Defendants participated consisted of at least the following:

**Predicate Acts of Mail or Wire Fraud**

130.   Criminal mail or wire fraud involves a scheme based on an intent to defraud and the use of the mails or wires to further that scheme. A scheme to defraud encompasses acts of artifice or deceit which are intended to deprive an owner of his property or money. The elements of mail and wire fraud are (1) a plan or scheme to defraud, (2) intent to defraud, (3) reasonable foreseeability that the mail or wires will be used, and (4) actual use of the mails or wires to further the scheme.

131.   As described in detail in the preceding allegations of this Amended Complaint, Defendants' Endless Chain Scheme involved numerous acts of artifice or deceit which were intended to deprive Plaintiffs and others of their property or money.

132.   As described in detail in the preceding allegations of this Amended Complaint, Defendants, through the EFT Enterprise, perpetrated the Endless Chain Scheme with the intent to defraud Plaintiffs and others.

133.   It was reasonably foreseeable that the mails or wires would be used to further the Endless Chain Scheme. All of EFT's products were shipped by mail from within the United States. The shipment of products was a necessary component of the Endless Chain Scheme, as without product shipments the chain would not function. Qin, EFT, and the EFT Officers and Directors allowed for EFT

product orders to be placed by mail and accepted such orders when received. Where product orders were not placed by mail, orders were accepted by fax or email and accepted payment by wire. The accepting of EFT product orders was necessary for the execution of the endless chain scheme. EFT, Qin, the EFT Officers and Directors, Buckman, the Buckman Team, and the Shell Companies encouraged checks to be sent by mail or wire and accepted and received the same by mail and wire. Accepting checks and wired funds was necessary for the Endless Chain Scheme, since without money the Defendants could not run their schemes or make profits. Qin, EFT, and the EFT Officers and Directors sent materials promoting the Endless Chain Scheme by mail. EFT, Qin, the EFT Officers and Directors, Buckman, the Buckman Team, and the Shell Companies sent and received (and fully expected to send and receive) checks by mail and funds by wire which were used in furtherance of the Endless Chain Scheme. And as this Amended Complaint has previously alleged in specific detail, Qin, EFT, the EFT Officers and Directors, Buckman, and the Buckman Team sent electronic transmissions of promotional and often false and fraudulent information over the internet or through the mails, in furtherance of the Endless Chain Scheme.

134. From at least early 2007, and with respect to Chow, Soon, Sluss, and Ko from at least 2010, in California and elsewhere, Qin, the EFT Officers and Directors, Greenstone, Buckman, the Buckman Team, the Shell Companies, and others known and unknown, willfully and knowingly did combine, conspire, and agree together and with each other to commit mail and wire fraud.

135. It was a part and object of the conspiracy between them that Qin, the EFT Officers and Directors, Greenstone, Buckman, the Buckman Team, the Shell Companies, and others known and unknown, would and did use the mails and wires to further the Endless Chain Scheme as previously described in specific detail in this Amended Complaint. Qin, the EFT Officers and Directors, Greenstone, Buckman, the Buckman Team, the Shell Companies, and others

1    known and unknown, with the intent and purpose of furthering the Endless Chain

2    Scheme, did send and receive products, communications, and funds to and from

3    places within the U.S. by use of the mails and wires, thereby committing numerous

4    indictable offenses in violation of 18 U.S.C. §§ 1341 and 1343, each punishable by

5    imprisonment in excess of one year and constituting RICO predicate acts of

6    racketeering under 18 U.S.C. § 1962 et seq.

7         136.   Examples of the mails and wires being used to further the Endless

8    Chain Scheme include, but are not limited to, the following:

9         (A)  This Amended Complaint previously alleged specific
     details concerning investments and product purchases made by
10    the named Plaintiffs. As previously alleged in specific detail,
     each such investment and product purchase was induced by the
11    various fraudulent actions of one or more of the Defendants.
     Each such investment and product purchase required the use of
12    the mails or use of the wires, and each such use was foreseeable,
     intended, and solicited by one or more of the Defendants. Each
13    product order, fax, or investment order was send via mail or
     wire to EFT's California office, and each such sending,
14    delivering, and acceptance of forms, funds, and securities
     furthered one or more of Defendants' fraudulent schemes.
15

16    (B)  This Amended Complaint previously alleged specific
     details for numerous speeches given by Qin in furtherance of
17    Defendants' schemes. The speeches Qin gave on April 21, 2007,
     June 28, 2008, and January 9, 2009, were all recorded on DVDs.
18    Such DVDs were distributed through the mails as well as posted
     electronically on the EFT website at http://www.eftb.us.
19    Transmissions from this website are sent worldwide from a
     server located in Dallas, Texas, with a server IP address of
20    50.23.225.63. Each and every mailing of one of these DVDs
     was done in furtherance of Defendants' aforementioned schemes
21    and constitutes a predicate act of mail fraud. Each and every
     posting of a speech online was done in furtherance of
22    Defendants' aforementioned schemes. Each and every download
     of a speech from the http://www.eftb.us website has the
23    foreseeable potential effect of furthering Defendants'
     aforementioned schemes.

24    (C)  This Amended Complaint previously alleged specific
     details for numerous false product claims given in furtherance of
25    Defendants' schemes. These product claims were posted
     electronically on the EFT website http://www.eftb.us. in January
26    of 2008 and remain on the website to this day. Transmissions
     from this website are sent worldwide from a server located in
27    Dallas, Texas, with a server IP address of 50.23.225.63. Each
     and every posting of a false product claim online was done in
28    furtherance of Defendants' aforementioned schemes and

constitutes a predicate act of wire fraud. Each and every download of a false product claim has the foreseeable potential effect of furthering Defendants' aforementioned schemes and constitutes a predicate act of wire fraud.

(D)  This Amended Complaint previously alleged specific details concerning numerous EFT products that were falsely labeled and adulterated. Each and every order of such products from EFT is shipped through the mails. Each one of these mailings is sent in furtherance of Defendants' schemes. As such, each and every one of the tens of thousands of falsely labeled and adulterated EFT products shipped by Defendants constitutes a predicate act of mail fraud.

(E)  This Amended Complaint previously alleged specific details for numerous false business claims that were posted electronically on the EFT website at http://www.eftb.us. These false claims were given in furtherance of Defendants' schemes. Transmissions from http://www.eftb.us broadcast worldwide from a server located in Dallas, Texas, with a server IP address of 50.23.225.63. Each and every posting of false business claims online was done in furtherance of Defendants' aforementioned schemes and constitutes a predicate act of wire fraud. Each and every download of a false business claim has the foreseeable potential effect of furthering Defendants' aforementioned schemes and constitutes a predicate act of wire fraud.

137.    Because of the material misrepresentations made by Defendants through the wires or delivered through the mails, Plaintiffs and others became EFT affiliates and maintained their positions as EFT affiliates and continued to order EFT products and recruit others to do the same, as alleged in specific detail throughout this Amended Complaint. In reality, and as previously detailed, Plaintiffs and others had no real hope of profiting by participating in the Endless Chain Scheme, and were consequently defrauded out of their money by Defendants' material misrepresentations.

138.    Qin, EFT, and various others known and unknown distributed these material misrepresentations by interstate wire transmissions over the internet from web servers based in the U.S., especially the server broadcasting from Dallas, Texas, from the IP address of 50.23.225.63, using various website addresses including, but not limited to, http://www.eftb.us, http://www.eftb.net, http://eftbeftb.com, http://eftbt.com, http://2by2.eftb.us, http://ezgt.eftb.net,

http://eftk.us, http://www.efasteam.com, http://www.efasteam2000.com, http://www.ef2t.com, and http://ddp.eftb.us. These transmissions were done with the purpose and intent of recruiting affiliates such as Plaintiffs and others into the EFT Enterprise's illegal schemes. As a result, Plaintiffs and others became EFT affiliates, maintained their positions as EFT affiliates, initiated or increased investments in EFT securities, and continued to order EFT products and recruit others to do the same. Each product order that Plaintiffs and others placed necessitated the use of bank wires and the shipment of products through the U.S. Postal Service. Each investment in EFT securities that Plaintiffs and others made necessitated the use of bank wires or the mails. These orders and shipments were necessary for carrying out the Endless Chain Scheme and were among the direct, intended consequences of Defendants' purposeful and material misrepresentations.

139.   All of these claims were purposeful material misrepresentations made to induce Plaintiffs and others to send funds into the EFT Enterprise, and Plaintiffs and others did so because of such material misrepresentations. Qin, EFT, and others posted misrepresentations to EFT's website with the purpose and intent of promoting the EFT Enterprise's illegal scheme, and participation in the scheme required use of bank wires and use of the U.S. Postal Service.

140.   In engaging in the aforementioned wire and mail fraud, Qin, the EFT Officers and Directors, Greenstone, Buckman, the Buckman Team, the Shell Companies, and others known and unknown, knew that Plaintiffs and others would reasonably rely on the various representations and omissions which would cause the Plaintiffs and others to pay funds into the endless chain as well as purchase the mislabeled and adulterated products.

141.   Qin, the EFT Officers and Directors, Greenstone, Buckman, the Buckman Team, the Shell Companies, and others known and unknown, knew that the misrepresentations and omissions described above in promoting and executing

/ / /

Howarth & Smith
Attorneys At Law
Los Angeles

1  the fraudulent scheme were material because they caused Plaintiffs and others to

2  join and participate in the illegal scheme.

3       142.   Had Plaintiffs known that Qin, the EFT Officers and Directors,

4  Greenstone, Buckman, the Buckman Team, the Shell Companies, and others

5  known and unknown, were promoting illegal schemes, Plaintiffs would not have

6  participated in the endless chain, paid any money to any of the Defendants, placed

7  any orders for any EFT products, or otherwise engaged in transactions with

8  Defendants.

9       143.   Each and every payment made by Plaintiffs pursuant to the Endless

10  Chain Scheme, whether made through the mails or through the wires, proximately

11  caused injury to Plaintiffs.

12       144.   Qin, the EFT Officers and Directors, Greenstone, Buckman, the

13  Buckman Team, the Shell Companies, and others known and unknown, committed

14  thousands of predicate acts of mail and wire fraud which were a proximate cause

15  of the injuries that Plaintiffs suffered. Because of this pattern of unlawful conduct,

16  Plaintiffs and others have collectively suffered injuries in excess of $5,000,000.

17  **Predicate Acts of Transferring Stolen Property**

18       145.   Violations of the National Stolen Property Act occur when one

19  transports, transmits, transfers, or receives in interstate commerce any goods,

20  wares, merchandise, securities, or money worth more than $5,000 while knowing

21  that such were stolen, converted, or taken by fraud.

22       146.   From at least early 2007, and with respect to Chow, Soon, Sluss, and

23  Ko from at least 2010, in California and elsewhere, Qin, EFT, the EFT Officers

24  and Directors, Greenstone, Buckman, the Buckman Team, the Shell Companies,

25  Wendy, and others known and unknown, willfully and knowingly did combine,

26  conspire, and agree together and with each other to transport, transmit, transfer,

27  and receive in interstate commerce money worth more than $5,000 with full

28  / / /

knowledge that such money was stolen or taken by fraud, in furtherance of the Endless Chain Scheme.

147.   It was a part and object of the conspiracy between them that Qin, the EFT Officers and Directors, Greenstone, Buckman, the Buckman Team, the Shell Companies, Wendy, and others known and unknown, would and did transport, transmit, transfer, and receive monetary instruments, and funds from places in the U.S. to and through places within and outside the U.S., with the intent to promote the carrying on of the fraudulent Endless Chain Scheme, by knowingly transporting, transmitting, transferring, and receiving money procured by the fraud and worth more than $5,000, thereby committing numerous indictable offenses in violation of 18 U.S.C. §§ 2314 and 2315, each punishable by imprisonment in excess of one year and constituting RICO predicate acts of racketeering under 18 U.S.C. § 1962 *et seq.*

148.   Qin, EFT, the EFT Officers and Directors, Greenstone, Buckman, the Buckman Team, the Shell Companies, Wendy, and others known and unknown conspired in various ways to further the Endless Chain Scheme by manipulation of revenue.  This was generally accomplished through variations of the same four methods: (1) exorbitant insider consulting payments; (2) exorbitant insider rental or royalty payments; (3) insider "loans" that were never collected; and (4) insider "investments" that met with disaster right before beginning to pay a return. These insider transactions were carried out to further the Endless Chain Scheme.

149.   For example, as detailed below, millions of dollars have been transferred from EFT to Wendy Qin ("Wendy") and affiliated entities. Wendy is Qin's sister, a director of EFT International Ltd. ("EFT International"), and an owner or director of EFT Assets Limited ("Assets Limited"), JFL Capital Limited ("JFL"), Regal Walnut, and a 6,500 square foot office space located at 8 Arglye Street, Suite 3706, Kowloon, Hong Kong SAR ("Hong Kong Office"). All of these

/ / /

entities have received millions of dollars in cash and/or stocks in exchange for little to no value in return.

150.   Assets Limited is a shell corporation located in the British Virgin Islands that is owned by Wendy and affiliated with EFT. Per EFT's SEC filings, sometime in 2009 EFT started paying Assets Limited millions of dollars each year for the rights to use Asset Limited's "Washington EFT" logo. But EFT itself had already been using the Washington EFT logo since at least 2003; Asset Limited was thus licensing EFT the right to use its own logo. In reality, Asset Limited was only formed and the Washington EFT logo was only trademarked for the purpose of funneling capital out of EFT. Asset Limited did not register a trademark for the Washington EFT logo until September 22, 2009, more than five years after EFT started using the logo but only a few months after the Offering left EFT with money to burn off the books. And Asset Limited "abandoned" the Washington EFT logo as of December 03, 2012, yet still receives massive royalty payments from EFT.

151.   Between June 25, 2009, and January 15, 2014, Asset Limited received the following $8,233,266 in royalty checks for licensing to EFT its own logo:

| Approximate Check Mailing Date: | Paid To: | Amount $USD: |
|---|---|---|
| 06/25/2009 | Cash | $ 2,313,137.00 |
| 07/10/2009 | Cash | 600,000.00 |
| 12/15/2009 | EFT Assets Ltd | 600,000.00 |
| 03/12/2010 | EFT Assets Ltd | 600,000.00 |
| 05/25/2010 | | 749,134.00 |
| 01/19/2011 | EFT Assets Ltd | 502,566.00 |
| 02/28/2011 | | 529,996.00 |
| 03/30/2011 | EFT Assets Ltd | 275,491.00 |
| 10/10/2012 | EFT Assets Ltd | 1,243,378.00 |
| 02/05/2013 | EFT Assets Ltd | 77,739.00 |
| 03/16/2013 | EFT Assets Ltd | 293,372.00 |
| 03/27/2013 | EFT Assets Ltd | 31,786.00 |
| 09/10/2013 | EFT Assets Ltd | 74,794.00 |
| 12/15/2013 | EFT Assets Ltd | 32,045.00 |
| | | $ 8,233,266.00 |

152.   Similarly, JFL is a shell corporation located in the British Virgin Islands that is owned by Wendy and affiliated with EFT. It receives hundreds of

1  thousands of dollars from EFT annually for consulting services that Wendy

2  apparently provides outside of her regular duties as director of EFT International

3  (for which she already receives $300,000 annually). From October of 2010 through

4  March of 2014, EFT has paid $1,350,000 to JFL for the consulting services Wendy

5  provided to EFT. Again, Wendy is already an EFT employee that receives a

6  $300,000 annual salary for her services.

7      153.   Wendy also purportedly owns a 6,500 square foot Hong Kong Office

8  which she leases to EFT. Per EFT's SEC disclosures, EFT pays Wendy

9  approximately $375,000 per year for this space (e.g., "During the years ended

10 March 31, 2011, 2010, and 2009 we paid the lessor $377,892, $379,355 and

11 $362,271 in rental"). In reality, EFT pays Wendy almost twice as much. For

12 example, in 2010 alone, EFT paid Wendy $4,800,000 in Hong Kong Dollars

13 ("HKD"):

14

| Date: | Check #: | Amount $HKD: |
|---|---|---|
| 1/29/2010 | 917335 | $ 400,000.00 |
| 2/19/2010 | 917344 | $ 400,000.00 |
| 3/11/2010 | 917354 | $ 400,000.00 |
| 4/13/2010 | 917368 | $ 400,000.00 |
| 5/25/2010 | 917383 | $ 400,000.00 |
| 6/21/2010 | 917396 | $ 400,000.00 |
| 7/19/2010 | 417977 | $ 400,000.00 |
| 8/23/2010 | 417992 | $ 400,000.00 |
| 9/23/2010 | 418012 | $ 400,000.00 |
| 10/8/2010 | 418029 | $ 400,000.00 |
| 11/24/2010 | 008452 | $ 400,000.00 |
| 12/17/2010 | 008466 | $ 400,000.00 |
|  |  | $ 4,800,000.00 |

22      154.   Since the exchange rate between United States Dollars ("USD") and

23 HKD has, since May 2005, been set by law to fluctuate within the range of

24 USD$1:HK$7.75–7.85, this $4,800,000 HKD per year represents at least

25 $611,464.97 USD.

26      155.   In October 2008, EFT purchased a 49% interest in Excalibur

27 International Marine Corporation ("Excalibur") for an aggregate purchase price of

28 $19,193,000. EFT also subsequently loaned Excalibur over $10,000,000.

Allegedly, these loans enabled Excalibur to buy a ship called Ocean LaLa, but the Ocean LaLa was allegedly destroyed by misuse shortly after its purchase, rendering this asset relatively worthless. Further, apparently this ship and EFT's cash were Excalibur's main assets, which calls into question the initial ~$40,000,000 valuation for the company before it even had the ship. Additionally, the CEO of Excalibur is Soon, one of the EFT Officers and Directors. Plaintiffs believe Excalibur is further owned and operated by other inside parties and that its true purpose is just to be another vehicle for furthering the Endless Chain Scheme by misrepresenting to Plaintiffs the true value of their shares in EFT.

156.    In July of 2010, EFT lent $5,000,000 to CTX Virtual Technologies, Inc. ("CTX"). This loan was unsecured and was convertible to CTX stock at the election of CTX. As is usual with large EFT loans, this one was never collected. On March 12, 2011, CTX elected to convert the full $5,000,000 into CTX stock. EFT has since written off the entire value of this stock, ultimately removing another $5,000,000 from the EFT books. Additionally, the CEO of CTX is Curry, a former EFT director, and one of the directors of CTX is Lau, part-owner of Greenstone and a managing director of Buckman. Plaintiffs believe CTX is owned or otherwise operated by inside parties and that the true purpose of this effectively defaulted loan to CTX was to gift or otherwise siphon millions more off of EFT's books.

157.    On May 2, 2011, Qin entered EFT into an agreement with Meifu Development Co., Ltd. ("Meifu") to construct a building in Taiwan for approximately $235,000,000. As of December 31, 2013, payment of approximately $20,800,000 has been made. EFT now alleges that Meifu has not complied with the conditions of the agreement, and so the building project is on hold. In reality, Plaintiffs believe Meifu is owned or operated by inside parties and that the true purpose of these purportedly failed arrangements are just another vehicle for

/ / /

1  furthering the Endless Chain Scheme by misrepresenting to Plaintiffs the true value

2  of their shares in EFT.

3      158.   On July 25, 2008, EFT loaned $1,567,000 to Yeuh-Chi Liu ("Yeuh-

4  Chi"). At the time, Yeuh-Chi was a vendor to EFT. Plaintiffs believe Yeuh-Chi

5  may be otherwise affiliated with Qin or one of the EFT Officers and Directors. As

6  is usual with large EFT loans, this one was never collected. This loan was written

7  off on December 31, 2010, and no effort has been expended to enforce the loan or

8  collect on any collateral. Rather, Yeuh-Chi has since been made a director of

9  Excalibur. In reality, Plaintiffs believe the true purpose of the defaulted loan to

10 Yeuh-Chi was to gift or otherwise further the Endless Chain Scheme by

11 misrepresenting to Plaintiffs the true value of their shares in EFT.

12     159.   In 2009, EFT engaged a general contractor to construct a water

13 manufacturing plant at a cost of approximately $755,000. EFT had planned to

14 begin selling water during 2012. As usual, however, things went awry right before

15 this investment was to start paying off. EFT alleges it began and then ceased

16 production because of defective construction, and that production will not be

17 resumed until a dispute with the contractor has resolved. Plaintiffs believe this loss

18 is just another means to further the Endless Chain Scheme by misrepresenting to

19 Plaintiffs the true value of their shares in EFT.

20     160.   Violations include, but are not limited to, the following acts in

21 furtherance of the Endless Chain Scheme:

22         (A)  This Amended Complaint previously alleged specific
           details for 27 checks that went to Wendy Qin, EFT Assets
23         Limited, and/or JFL Capital. Each of these checks was
           individually in excess of $5,000; collectively, they add up to
24         millions. Wendy was an active and knowing participant in the
           various fraudulent schemes that were largely being orchestrated
25         by her brother Qin, and she was in fact a major beneficiary of
           such schemes. She participated in these schemes with the
26         purpose and intent of receiving money taken by fraud. As such,
           she accepted each of the 27 aforementioned checks fully
27         knowing that they constituted money taken by fraud. Each such
           acceptance constitutes a predicate act of transferring stolen
28         property in violation of the National Stolen Property Act.

(B)  This Amended Complaint previously alleged specific details for numerous transactions engaged in by Defendants. Each of these transactions were in excess of $5,000; collectively, they add up to tens of millions. The participants in these transactions were active and knowing participants in the various fraudulent schemes which provided the funds to be used in the transactions, and indeed participated in the transactions for the purposes of receiving money taken by fraud. As such, each transfer of money and each acceptance of money listed above was done with knowledge that the money was originally taken by fraud and thus constitutes a predicate act of transferring stolen property in violation of the National Stolen Property Act.

161.   But for Defendants' violations of the National Stolen Property Act, Defendants would not have been able to perpetrate or maintain the Endless Chain Scheme, which proximately caused harm to Plaintiffs and others.

162.   As a proximate and foreseeable result of the Endless Chain Scheme enabled by violations of the National Stolen Property Act, Plaintiffs and others have collectively suffered injuries in excess of $5,000,000.

## Predicate Acts of Money Laundering

163.   Money laundering occurs when one, while knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of such unlawful activity, where such is done with the intent to promote the carrying on of the unlawful activity or with the knowledge that the transaction is designed to conceal or disguise the nature, location, source, ownership, or control of the proceeds of such unlawful activity or to avoid a transaction reporting requirement under State or Federal law.

164.   From at least early 2007, and with respect to Chow, Soon, Sluss, and Ko from at least 2010, in California and elsewhere, Qin, the EFT Officers and Directors, Greenstone, Buckman, the Buckman Team, the Shell Companies, Wendy, and others known and unknown, willfully and knowingly did combine, conspire, and agree together and with each other to commit money laundering in furtherance of the Endless Chain Scheme.

165.   It was a part and object of the conspiracy between them that Qin, the EFT Officers and Directors, Greenstone, Buckman, the Buckman Team, the Shell Companies, Wendy, and others known and unknown, would and did transport, transmit, transfer, and receive monetary instruments and funds from places in the U.S. to and through places within and outside the U.S. These monetary instruments and funds represented the proceeds of Defendants' unlawful and fraudulent Endless Chain Scheme, and were transported, transmitted, transferred, and received to and through places within and outside the U.S. with the intent and purpose of promoting the carrying on of Defendants' fraudulent Endless Chain Scheme, and with the further intent and purpose of concealing the source, ownership, control, and location of such monetary instruments and funds, and also with the further intent and purpose of evading Federal and State reporting requirements. Therefore, Qin, the EFT Officers and Directors, Greenstone, Buckman, the Buckman Team, the Shell Companies, Wendy, and others known and unknown, committed numerous indictable offenses in violation of 18 U.S.C. §§ 1956 and 1957, each punishable by imprisonment in excess of one year and constituting RICO predicate acts of racketeering under 18 U.S.C. § 1962 et seq.

166.   Such violations include, but are not limited to, the following acts in furtherance of the Endless Chain Scheme:

(A)  This Amended Complaint previously alleged specific details for 27 checks that went to Wendy Qin, EFT Assets Limited, and/or JFL Capital. Each of these fund transfers and receipts were made in furtherance of the Endless Chain Scheme and in an effort to distribute proceeds acquired through this scheme. These fund transfers and receipts were made with the purpose and intent of transmitting and receiving money taken by fraud. Additionally, to the extent such payments were made to shell companies in the British Virgin Islands, such were made in an attempt to avoid Federal and State taxes as well as Federal and State reporting requirements. As such, each transmission and each receipt of these 27 aforementioned checks constitutes a predicate act of money laundering.

(B)  This Amended Complaint previously alleged specific details for numerous other insider transactions. Each of these fund transfers and receipts were made in furtherance of the

Endless Chain Scheme and in an effort to distribute proceeds acquired through this scheme. The participants in these transactions were active and knowing participants in the fraudulent schemes which provided the funds to be used in the transactions, and indeed participated in the transactions for the purposes of receiving money taken by fraud. Additionally, to the extent such payments were made to foreign entities, such were made in an attempt to avoid Federal and State taxes as well as Federal and State reporting requirements. As such, each transfer of money and each receipt of money listed in detail above constitutes a predicate act of money laundering.

167. But for these and other money laundering acts, Qin, the EFT Officers and Directors, Greenstone, Buckman, the Buckman Team, the Shell Companies, Wendy, and others known and unknown, would not have been able to perpetrate or maintain the Endless Chain Scheme which proximately caused harm to Plaintiffs and others.

168. Qin, EFT, the EFT Officers and Directors, Greenstone, Buckman, the Buckman Team, the Shell Companies, Wendy, and others known and unknown, had obligations under U.S. law to disclose the true nature of the aforementioned acts of money laundering, yet failed to do so.

169. Qin, EFT, the EFT Officers and Directors, Greenstone, Buckman, the Buckman Team, the Shell Companies, Wendy, and others known and unknown, knew that Plaintiffs and others would reasonably rely on the legitimacy of their transactions and would be deceived by their concealment of the true nature of their transactions. Plaintiffs and others did in fact rely on the legitimacy of their transactions and were deceived by their concealment of the true nature thereof.

170. As a proximate and foreseeable result of this money laundering, Plaintiffs and others have collectively suffered injuries in excess of $5,000,000.

171. Under 18 U.S.C. § 1964(c), Plaintiffs are entitled to treble their damages, plus interest, costs, and attorney's fees.

/ / /

/ / /

/ / /

## COUNT IV

### (RICO 18 U.S.C. § 1962(a))

### Against All Defendants

172.    Plaintiffs repeat, reallege, and incorporate by reference the allegations contained in the paragraphs above as if fully set forth herein.

173.    The EFT Enterprise is an enterprise engaged in and whose activities affect interstate commerce.

174.    Defendants used and invested income that was derived from a pattern of racketeering activity in an interstate enterprise. Specifically, revenue gained from the pattern of racketeering activity as specifically alleged previously in this Amended Complaint, and constituting a significant portion of the total income of EFT, Qin, the EFT Officers and Directors, Greenstone, Buckman, the Buckman Team, the Shell Companies, and others, was reinvested in the operations of the EFT Enterprise for the following purposes: (a) to expand the operations of the EFT Enterprise and provide additional false and misleading advertising and promotional materials aimed at recruiting new affiliates into the Endless Chain Scheme; (b) to facilitate the execution of the Endless Chain Scheme; and (c) to convince current affiliates to recruit new affiliates, to purchase EFT products, and to invest in EFT.

175.    As a direct and proximate result of Defendants' racketeering activities and violations of 18 U.S.C. § 1962(a), Plaintiffs have been injured in their business and property. Specifically, the reinvestment of the racketeering income into the EFT Enterprise enabled the EFT Enterprise to grow and market itself such that it was able to induce Plaintiffs and others to invest millions of dollars of their own money through their purchasing of EFT products and promotional materials, all of which were packaged and shipped at inflated charges. The EFT Enterprise touted statistics concerning membership and investment numbers in order to induce Plaintiffs and others to buy EFT products or recruit others to buy EFT products. But for the EFT Enterprise's reinvestment into the EFT chain scheme, the EFT

HOWARTH & SMITH
ATTORNEYS AT LAW
LOS ANGELES

Enterprise would not have been able quote membership and investment rates to induce Plaintiffs and others to invest in the EFT Enterprise.

176.   As a direct and proximate result of Defendants' racketeering activities and violations of 18 U.S.C. § 1962(a), Plaintiffs have been injured in their business and property. Specifically, the reinvestment of the racketeering income into the EFT Enterprise enabled the EFT Enterprise to grow and market itself such that it was able to induce Plaintiffs and others to invest millions of dollars of their own money through their purchasing of EFT products and promotional materials, all of which were packaged and shipped at inflated charges. The EFT Enterprise touted statistics concerning membership and investment numbers in order to induce further investments from new and existing consumers. But for the EFT Enterprise's reinvestment into the EFT Enterprise's schemes and into expanded ownership of EFT itself, the EFT Enterprise would not have been able quote membership and investment rates to induce Plaintiffs and others into buying EFT products, investing in EFT securities, or recruiting others to buy EFT products and invest in EFT securities.

177.   Under 18 U.S.C. § 1964(c), Plaintiffs are entitled to treble their damages, plus interest, costs and attorney's fees.

## **COUNT V**

### **(RICO 18 U.S.C. § 1962(d))**

### **Against All Defendants**

178.   Plaintiffs repeat, reallege, and incorporate by reference the allegations contained in the paragraphs above as if fully set forth herein.

179.   As set forth above in specific detail, Defendants agreed and conspired to violate 18 U.S.C. § 1962(a) (b) and (c). For example, Defendants and other participants in the EFT Enterprise coordinated amongst each other to conduct or participate in the conduct of the affairs of the EFT Enterprise and run the EFT Enterprise's Endless Chain Scheme; to acquire funds through the EFT Enterprise's

Endless Chain Scheme; to reinvest these funds into ownership of EFT stock and various other entities; and to reinvest these funds into maintaining, growing, operating, and marketing EFT and the EFT Enterprise.

180.   As a direct and proximate result of Defendants' violation of 18 U.S.C. § 1962(d), Plaintiffs and others were injured by Defendants' unlawful conduct. The funds used to buy EFT products and used to invest in EFT constitute property of Plaintiffs and others under 18 U.S.C. § 1964(c).

181.   Under 18 U.S.C. § 1964(c), Plaintiffs are entitled to treble their damages, plus interest, costs and attorney's fees.

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, seek judgment against Defendants as follows:

A.     For an Order finding in favor of Plaintiffs on all counts asserted herein;

B.     For an Order awarding compensatory, treble, and punitive damages in amounts to be determined by the Judge or jury;

C.     For prejudgment interest on all amounts awarded;

D.     For an Order of restitution, rescission, and all other forms of equitable monetary relief; and

E.     For an Order awarding Plaintiffs their reasonable attorneys' fees and expenses and costs of suit.

Dated:  January 30, 2015                         HOWARTH & SMITH


By: /s/ Suzelle M. Smith
Suzelle M. Smith
Attorney for Plaintiff
Shuxin Li, Haiyuan Zhao,
Yu Hu, and Hongyan Liu

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**<u>JURY TRIAL DEMANDED</u>**

Plaintiffs hereby demand a trial by jury on all claims triable in this action.

Dated:  January 30, 2015                    HOWARTH & SMITH


By: /s/ Suzelle M. Smith
Suzelle M. Smith
Attorney for Plaintiff
Shuxin Li, Haiyuan Zhao,
Yu Hu, and Hongyan Liu