1  Suzelle M. Smith, Bar No. 113992
   SSmith@howarth-smith.com
2  Don Howarth, Bar No. 53783
   DHowarth@howarth-smith.com
3  Padraic Glaspy, Bar No. 259563
   PGlaspy@howarth-smith.com
4  Jessica C. Walsh, Bar No. 276543
   JWalsh@howarth-smith.com
5  HOWARTH & SMITH
   523 West Sixth Street, Suite 728
6  Los Angeles, CA 90014
   Telephone:  213.955.9400
7  Facsimile:   213.622.0791

8  Stephen Tuggy, Bar No. 120416
   STuggy@lockelord.com
9  LOCKE LORD LLP
   300 S. Grand Avenue, Suite 2600
10 Los Angeles, CA 90071
   Telephone:  213.485.1500
11 Facsimile:   213.485.1200

12 *Attorneys for Plaintiffs Yunxia Wang, Fengqin Xu, and Qun Xu,*
   *individually and on behalf of all others similarly situated.*
13

14            **UNITED STATES DISTRICT COURT**

15            **CENTRAL DISTRICT OF CALIFORNIA**

16

17 SHUXIN LI, et al.,                    )  **MASTER FILE NO. CV-13-08832-DSF-**
                                         )  **CWx**
18            Plaintiffs,                )
                                         )  Consolidated with:
19     vs.                               )  CASE NOS. 2:15-CV-00727-DSF-CWx
                                         )  CV-13-08835-DSF-CWx
20 EFT HOLDINGS, INC., et al.,           )
                                         )  **CLASS ACTION**
21            Defendants.                )
                                         )
22 YUNXIA WANG, FENGQIN XU,              )  **PLAINTIFFS' SECOND AMENDED**
   and QUN XU, on behalf of              )  **AND CONSOLIDATED COMPLAINT**
23 Themselves and All Others Similarly   )
   Situated,                             )  Action Filed:  January 30, 2015
24                                       )  Trial Date:
              Plaintiffs,                )
25                                       )
       vs.                               )
26                                       )
   EFT HOLDINGS, INC., et al.,           )
27                                       )
              Defendants.                )
28                                       )

1    Come now Plaintiffs Yunxia Wang ("Wang"), Fengqin Xu, and Qun Xu on

2    behalf of themselves individually, and on behalf of all persons similarly situated (the

3    "Class"), who complain as follows:

4                                    **INTRODUCTION**

5    1.    This action arises from Defendants' manufacture, marketing, production,

6    and sale of defective and mislabeled nutritional supplements, ("Products") to

7    Plaintiffs and a class of purchasers who believed Defendants' representations that

8    because these products were manufactured in and shipped from the United States by a

9    United States Company, that they were as represented, safe and legitimate.  In fact,

10   these Products did not contain the claimed ingredients and, in some cases, contained

11   harmful substances, including lead.

12   2.    In addition, Defendants' operation was in fact an illegal endless chain

13   scheme, in which purchasers of the misbranded Products unknowingly paid to

14   become part of the scheme to sell such Products.  Defendants promised Plaintiffs and

15   the Class that they could earn substantial returns not only through retail sales of

16   Product, but through recruiting new participants into the chain, for which they would

17   be paid.  In reality, the Products were mislabeled and dangerous, and the chain

18   structure illegal.

19   3.    Plaintiffs and the Class paid more money for the Products than they

20   could earn from their retail sale, and participants in the scheme only made money by

21   recruiting others to join in the scheme.  The more that an individual paid into the

22   chain, either by purchasing Products or membership in the company, the better his or

23   her position in the chain.

24   4.    Through their sale of defective, mislabeled, and dangerous Products, and

25   their illegal endless chain scheme, Defendants pilfered millions from Plaintiffs and

26   the Class.

27   5.    Consequently, Plaintiffs seek relief in this action for themselves

28   individually and as a class on behalf of all the others who purchased EFT Products

1  under California's endless chain scheme Law (California's Penal Code § 327 and

2  California Civil Code § 1689.2), False Advertising Law ("FAL")(Business and

3  Professions Code §§ 17500 et seq.), California's Unfair Competition Law

4  ("UCL")(Business and professions Code §§ 17200 et seq.), the Common Law, and

5  the Racketeer Influenced and Corrupt Organizations Act ("RICO") (18 U.S.C. § 1961

6  et seq.).

7                                    **THE PARTIES**

8       6.     Plaintiffs Yunxia Wang, Fengqin Xu, and Qun Xu (the "Wang

9  Plaintiffs") are citizens of the People's Republic of China.[1]

10      7.     Defendant Jack Qin ("Qin") is a citizen of California who founded

11 Defendant EFT Holdings, Inc. ("EFT") in 1998 and, since its inception, has served as

12 the company's Chief Executive Officer, President, and Chairman of the Board.

13      8.     Defendant Visman Chow ("Chow") is a citizen of California and has

14 been a member of EFT's Board of Directors since August 5, 2009.

15      9.     Defendant Norman Ko ("Ko") is a citizen of California and has been a

16 member of EFT's Board of Directors since August 5, 2009.

17      10.    Defendant William Sluss ("Sluss") is a citizen of California and is EFT's

18 principal financial and accounting officer since November 4, 2011.

19      11.    Defendant Pyng Soon ("Soon") is a citizen of California and has been a

20 member of EFT's Board of Directors since at least July 2009.  Defendant soon

21 became General Counsel to EFT on January 1, 2009.

22      12.    Defendant George Curry ("Curry" and together with Chow, Ko, Soon,

23 and Sluss, the "EFT Officers and Directors") is a citizen of California and has

24 previously served as a member of EFT's Board of Directors.  Curry has been a

25 member of the board of directors since November 2007.

26 ─────────────────────────────

[1] Pursuant to the Court's order of April 30, 2015, this Complaint consolidates the
27 actions filed by the Wang Plaintiffs, individually and on behalf of all others similarly
situated, and the actions by individual Plaintiffs who have now filed notices of
28 dismissal, without prejudice, of their separate cases in order to support and participate
as putative class members in the Wang Plaintiffs' class action  *See* Dkt. No.190.

2

13.     Defendant EFT Holdings, Inc. ("EFT") is an e-Commerce, publicly traded Nevada corporation with its principal place of business at 17800 Castleton Street, Suite 300, City of Industry, California 91748.  According to its website, http://www.eftb.us, EFT, through its subsidiaries, engages in the merchandising and sale of EFT-brand Products over the internet.  EFT claims to operate through over one million registered "affiliate members" located throughout Hong Kong, the People's Republic of China, Asia, and Europe.  EFT claims all its products, which include bio-available nutritional and nutritional spray products, are manufactured in the United States and sold to consumers around the world, including China.  *See* "Welcome" page of the EFT Corporate website dated April 7, 2015, a true and correct copy of which is attached hereto as Exhibit 1.  *See* also "Information" page of the EFT Corporate website dated November 21, 2011, a true and correct copy of which is attached hereto as Exhibit 2.

14.     The true names and capacities of Defendants Does 1 through 25 are unknown to Plaintiffs who therefore sue these Defendants by such fictitious names. Plaintiffs are informed and believe that each of Defendants Does 1 through 25 is responsible in some manner for the events herein described and the injuries suffered by Plaintiffs and members of the Class.  Plaintiffs will further amend this Complaint to allege the identities of such Doe Defendants when the same have been ascertained. Plaintiffs are further informed and believe that each of the Defendants named herein, including Does 1 through 25, was the agent, servant, employee, and/or alter ego of the other Defendants and, that in doing the things alleged herein, was acting within the scope to his/her/its actual or apparent authority.

15.     Plaintiffs are informed and believe, and on that basis allege, that each of the individual defendants was aware of, approved, participated in, and/or ratified all acts of EFT as described herein.

16.     Plaintiffs are informed and believe, and thereon allege, that at all times mentioned herein, each of the Defendants, including all DOE Defendants, was the

1  agent, employee, partner, officer, director, shareholder, joint venturer, part of a single

2  enterprise, officer, director, owner, successor, assign, affiliate, subsidiary, alter ego,

3  or other representative of every other Defendant and acting within the course and

4  scope of such agency, employment, and/or other relationship in conducting the

5  actions and activities or representations of each other Defendant and/or generally or

6  specifically approving the failure to take necessary and appropriate actions and

7  activities, and/or subsequently ratified each other Defendants' conduct.  References

8  herein to "Defendants" mean the acts of Defendants acting individually, jointly,

9  and/or severally.

10  **ALTER EGO**

11  17.    At all times mentioned herein, all Defendants were the alter egos of one

12  another and formed a single enterprise.  There is a sufficient unity of interest and

13  ownership among Defendants, and each of them, such that the acts of one are for the

14  benefit of each other and can be imputed to the acts of the others, The separate

15  corporate personalities of Defendants are and were merged, so that one Defendant is

16  and was a mere adjunct of another, or the Defendants formed a single enterprise.  The

17  separate personalities of each individual Defendant do not and never did in reality

18  exist, and there would be an inequitable result if the acts of the entity in question

19  were treated as the acts of one entity alone and not of each of them.

20  **JURISDICTION AND VENUE**

21  18.    This Court has subject matter jurisdiction over this action pursuant to 18

22  U.S.C § 1332(a)(2) because the amount in controversy exceeds the sum or value of

23  $75,000, exclusive of interest and costs, and is between citizens of a State and

24  citizens or subjects of a foreign state.

25  19.    This Court also has subject matter jurisdiction over this action pursuant

26  to 28 U.S.C. § 1332 (d)(2)(B) because there are more than 100 Class members and

27  the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and

28  / / /

1    costs, and is a class action in which at least one Class member is a citizen or subject

2    of a foreign state.

3          20.    Defendants EFT, Qin, and the EFT Officers and Directors are subject to

4    the jurisdiction of this Court.  They have engaged in continuous and systematic

5    business in California.  EFT accepted payment solely in US Dollars for payment of

6    Products and services in the United States, sold products in the United States,

7    including in California, and shipped products from the United States, including

8    California.  EFT has its principal place of business in California and EFT, Qin, and

9    the EFT Officers and Directors have committed tortious acts within this State.

10          21.    Pursuant to 28 U.S.C. § 1391, this Court is the proper venue for this

11    action because a substantial part of the events, omissions, and acts giving rise to

12    claims occurred in this District.  Defendant EFT's principal place of business is

13    located within this District and the endless chain, including the marketing,

14    advertising, and sales plans for the Product, which are at the core of the Defendants

15    unlawful scheme were devised in this District.

16    **CLASS ACTION ALLEGATIONS**

17          22.    Plaintiffs bring this class action pursuant to Federal Rule of Civil

18    Procedure 23(a) and (b)(3) on behalf of all purchasers of EFT Products and/or

19    membership in EFT and/or individuals who paid money to become Affiliates of EFT

20    (the "Class") during the Class Period.  The Class Period begins when EFT began the

21    endless chain scheme (through implementation of its Affiliate Program and selling

22    Product to individuals) and runs through the present.

23          23.    Excluded from the Class are (i) Defendants; (ii) all officers, directors,

24    and partners of any Defendant and of any Defendant's partnerships, subsidiaries, or

25    affiliates, at all relevant times; (iii) members of the immediate family of any of the

26    foregoing excluded parties; (iv) the legal representatives, heirs, successors, and

27    assigns of ay of the foregoing excluded parties; and (v) any entity in which any of

28    the foregoing excluded parties has or had a controlling interest.

HOWARTH & SMITH
ATTORNEYS AT LAW
LOS ANGELES

24.     Members of the Class are so numerous that their individual joinder herein is impracticable.  The precise number of Class members and their identities are unknown to Plaintiffs at this time but will be determined through discovery; Plaintiffs believe that there are thousands of members of the Class.  Class members may be notified of the pendency of this action by mail and/or publication and through the records of Defendants and their agents, as well as third parties.

25.     Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of the state and federal law compiled herein.

26.     Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class actions. Plaintiffs and their counsel will fairly and adequately protect the interests of Class members.

27.     Common questions of law and fact exist as to all Class members and predominate over questions affecting only individual Class members.  Common legal and factual questions include, but are not limited to:

> (A)     Whether EFT constitutes an endless chain under California state law;
>
> (B)     Whether the business practices of Defendants common to the Product and Membership purchasers constitute a violation of the statutory prohibition on endless chains;
>
> (C)     Whether the Products fail to conform to the representations that were published, disseminated, and advertised;
>
> (D)     Whether Defendants engaged in acts of mail and/or wire fraud, money laundering, or knowing interstate transfers of stolen funds, all in direct violation of the RICO statute;
>
> (E)     Whether Class members suffered losses as a result of Defendants' business practices;

HOWARTH & SMITH
ATTORNEYS AT LAW
LOS ANGELES

PLAINTIFFS' SECOND AMENDED AND CONSOLIDATED COMPLAINT

(F)     Whether Defendants were unjustly enriched by their misconduct; and

(G)     Whether, as a result of Defendants' misconduct as alleged herein, Plaintiffs and Class members are entitled to restitution and other monetary relief and, if so, the amount and nature of such relief.

28.     Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct. Plaintiffs have no interests antagonistic to the interests of the other members of the Class.  Plaintiffs and all members of the Class have sustained economic injury arising out of Defendants' violations of common and statutory law as alleged herein.

29.     The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of Plaintiffs and Class members.  Each individual Class member may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendants' liability.  Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case.  In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scales, and comprehensive supervision by a single court on the issue of Defendants' liability.  Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of liability issues.

## FACTS COMMON TO ALL CLAIMS

## A.     The EFT Operation

30.     EFT operates a multi-level distribution system, which relies on individual Affiliates to market, promote, and sell its Products, which are defective and mislabeled health and nutritional supplements.

/ / /

HOWARTH & SMITH
ATTORNEYS AT LAW
LOS ANGELES

31.     EFT claims to operate through over one million registered Affiliate members ("Affiliates"), also referred to as "consumers", many of whom, like Plaintiffs and other Class members, are located in China.  *See* Exhibit 1; Exhibit 2; "Information" page of EFT Corporate website dated May 5, 2008, a true and correct copy of which is attached hereto as Exhibit 3, and "FAQ" page of EFT Corporate website dated December 26, 2009, a true and correct copy of which is attached hereto as Exhibit 4.

32.     Individuals were recruited to join the EFT scheme as Affiliates by representations made by Defendants about various qualities of their Products, including their contents and listed ingredients, and the ability for Affiliates to make money through the sale of Products to end consumers.

33.     As in other illegal endless chain schemes, however, the focus of the EFT scheme was in promoting the program rather than the actual sale of Products to end consumers.  Affiliates were required to recruit others to pay into the scheme and become Affiliates.  Affiliates received payments from EFT for each new recruit.

34.     To become an Affiliate, Plaintiffs and other Class members had to make an initial investment purchase of EFT products in exchange for the right to recruit other Affiliates and earn various awards.

35.     The rewards are structured to incentivize recruitment over product sales and are tied to each Affiliate's initial investment amount.  There are four levels of affiliates, which are determined by the initial investment amounts:

(1)     Beginning Consumers - $450;

(2)     Standard Consumers - $660;

(3)     Advisory Consumers - $990; and

(4)     Franchised Consumers - $3300.

*See* "Information" page of the EFT Corporate website dated April 7, 2015, a true and correct of which is attached hereto as Exhibit 5.

/ / /

Howarth & Smith
Attorneys At Law
Los Angeles

PLAINTIFFS' SECOND AMENDED AND CONSOLIDATED COMPLAINT

36.     An Affiliate who recruits another person to enter the scheme is called a "sponsor."  Affiliates earn "rewards" that are unrelated to the sales of products to ultimate end-users but rather are tied to the initial investment amounts made by the Affiliate and those made by individuals that the Affiliate "sponsors" (then new recruits into the scheme).

37.     For example, EFT's "Instant Bonus" for sponsors, as described on its website, is calculated as follows:

Instant Bonus:

    a.     Beginner Consumers: Regardless of the sponsor entry level, they can only receive $50 USD instant bonus.

    b.     Standard Consumers: Receive $50 USD instant bonus by sponsor beginner level consumer; Receive $150 USD instant bonus by sponsor standard level consumer; Receive $150 USD instant bonus by sponsor advisory level consumer; Receive $150 USD instant bonus by sponsor franchised level consumer.

    c.     Advisory Consumers: Receive $50 USD instant bonus by sponsor beginner level consumer; Receive $150 USD instant bonus by sponsor standard level consumer; Receive $350 USD instant bonus by sponsor advisory level consumer; Receive $350 USD instant bonus by sponsor franchise level consumer.

    d.     Franchised Consumers: Receive $50 USD instant bonus by sponsor beginner level consumer; Receive $150 USD instant bonus by sponsor standard level consumer; Receive $350 instant bonus by sponsor advisory level consumer; Receive $1350 USD instant bonus by sponsor franchised level consumer.

*See, Id.*

38.     EFT continually pressured Affiliates to invest at higher levels and to continue recruiting into the endless chain.  For example, in 2010 EFT implemented a

HOWARTH & SMITH
ATTORNEYS AT LAW
LOS ANGELES

program exclusively for its $3,000-level "Franchised Consumer" Affiliates.  Starting from December 2010, the Company introduced "reward programs" to its Affiliates.  One such program, for example, required that upon joining the $3,000 program, each Affiliate had to pay $3,000 as a non-refundable deposit.  When the Affiliate sponsored one new Affiliate, the Company gave the first Affiliate a $1,500 instant sponsor bonus.  When the first Affiliate sponsored at least two new Affiliates, and those two new Affiliates each also sponsor two new affiliates (called a "Cycle"), the Company gave the first Affiliate with an additional $1,500 bonus and deliver an EFT-phone and an e-pad for the cost of $1.  Upon completion of two such Cycles, the Company again gave the first Affiliate $3,000.  *See* EFT 10-Q for the quarterly period ended December 31, 2013, a true and correct copy of which is attached hereto as Exhibit 11.

39.   This rewards system encouraged individuals to recruit more and more people into the scheme, and every new recruit into the scheme paid money into the scheme in order to participate.

40.   EFT further induced Affiliates to pay more into the scheme by selling them membership in the company attached to, or "unlocked" by, the purchase of Product by an Affiliate.

41.   Affiliates therefore also paid money into the ongoing endless chain scheme through the purchase of membership in EFT.

42.   This was all done as part of and in furtherance of the overall EFT endless chain scheme, by which individuals at the top of the chain continually made profits through the recruitment of more and more people at the bottom of the chain.

43.   In order to enter the EFT endless chain scheme, recruits were directed to fax a form to a U.S. fax number and directed to remit the purchase price in U.S. dollars, which is the only currency that EFT would accept.  EFT's offices in California then processed orders, and Products were shipped from California.  *See* Exhibit 2.

HOWARTH & SMITH
ATTORNEYS AT LAW
LOS ANGELES

PLAINTIFFS' SECOND AMENDED AND CONSOLIDATED COMPLAINT

44.     Defendants associated together to operate the endless chain scheme as the "EFT Enterprise."

45.      Income that EFT received from the endless chain scheme was reinvested back into EFT Enterprise to grow and market itself such that it was able to induce Plaintiffs and Class members to invest millions of dollars of their own money through their purchasing of EFT Products and memberships, all of which were packaged and shipped at inflated charges.  The EFT Enterprise touted statistics concerning membership and investment numbers in order to induce Plaintiffs and Class members to buy EFT Products and memberships or recruit others to buy EFT Products.  By doing so, Defendants induce Plaintiffs and Class members to pay into the EFT Enterprise.

**B.     Lack of Safeguards**

46.     In endless chain schemes, all but the earliest investors necessarily lose their investments as the pool of potential recruits eventually and inevitably dries up, breaking the chain.

47.     Additionally, those joining endless chain schemes are often pressured to purchase products far in excess of their own potential retail or personal needs and are thus left saddled with piles of inventory that hold little value.

48.     Legitimate businesses that might otherwise appear to be like an illegal endless chain scheme actively enforce safeguards designed to deter inventory loading and encourage actual retail sales to end consumers, including: (1) *the initial investment rule*, (2) *the 70% rule*, (3) *the buyback rule*, and (4) *the 10-customer rule*.

49.     EFT employs no such safeguards and instead encourages recruiting over and above retail sales.

50.     *(1) The initial investment rule* considers the existence and degree of initial investment required to participate in an alleged chain scheme.  Illegal endless chain schemes tend to require a meaningful payment or initial disbursement by a new participant in exchange for the right to sell products and the right to earn rewards in

1    return for recruiting other participants into the program.  These initial investments are
2    largely unrelated to the sale of products to ultimate users.  Legitimate direct
3    marketing businesses, on the other hand, charge nothing or virtually nothing for the
4    right to participate, and to the extent they levy charges, such charges are related to the
5    sale of products to ultimate end-users.

6    51.    The EFT chain requires an initial investment (ranging from $300 to more
7    than $600 at various times) to participate in the scheme at the lowest level.  This is
8    unrelated to the sale of products to ultimate end-users.  In fact, EFT does not require
9    any sales of products at all to ultimate end-users.  Further, EFT requires an initial
10   investment well beyond $450 if an Affiliate wants to move up the EFT chain, as
11   described above.

12   52.    As further example of recruitment rewards unrelated to the sales of
13   products to the ultimate users but rather tied to initial investment amounts, EFT offers
14   the "Instant Bonus" program described above.

15   53.    The only way to get products to sell is to become an affiliate by virtue of
16   making a minimum purchase ranging from $300 to more than $600.  Further, the
17   distinctions between different investment levels are entirely unrelated to sales to
18   ultimate end users.  EFT's rewards are based on recruitment and Affiliate purchase
19   orders instead of on retail sales to end-users.

20   54.    *(2) The 70% rule* considers whether participants in a chain earn
21   performance bonuses on the basis of purchases from the distributor or on the basis of
22   retail sales to end users.  Where a direct marketer enforces a rule requiring Affiliates
23   to prove that they resell at least 70% of the products they purchase to end-user
24   consumers, then revenues are somewhat more likely to be coming from retail sales
25   and less likely to be coming from recruitment into the chain.

26   55.    Here, EFT did not require its Affiliates to make any retail sales
27   whatsoever, much less a minimum of 70%.

28   / / /

56.    *(3) The buy-back rule* considers the extent to which participants in a chain are discouraged from pushing inventory loading on downstream recruits.  When a direct marketer requires affiliates to buy back saleable, unsold inventory from their recruits as such recruits leave the chain, new affiliates are less likely to saddle themselves with thousands of dollars' worth of non-sellable products and senior affiliates are less likely to encourage downstream affiliates to engage in inventory loading.

57.    Here, EFT has no buy-back policy whatsoever.

58.    *(4) The 10-Customer Rule* considers the extent to which participants in a chain are required to sell to different retail customers.  Where a direct marketer enforces a policy that withholds performance bonuses to affiliates unless they prove sales to 10 different retail customers during each month, then revenues are more likely to be driven by retail sales and less likely to be driven by recruitment into the chain.

59.    Again, EFT does not require Affiliates to make any retail sales whatsoever, much less to a minimum of ten different retail customers during each month.

## C.    Defendants Recruit Plaintiffs and the Class Using Material Misrepresentations

60.    In order to recruit Plaintiffs and the members of the Class into purchasing EFT Products and joining their scheme Qin and EFT knowingly and willfully made misrepresentations and omissions of material fact to Plaintiffs and the Class, as alleged herein.  No Defendant believed the false representations described herein to be true nor had reasonable grounds for believing them to be true.

61.    Defendants asserted on the labels of their Products that their Products were composed of certain ingredients in certain amounts that the Products did not actually contain.  Of a sampling of four products tested independently by Plaintiffs, all four were mislabeled:

HOWARTH & SMITH
ATTORNEYS AT LAW
LOS ANGELES

(A)   Perform Plus #3006 – The test revealed only 14% of the stated amount of Vitamin B12, 41% of the stated amount of Folic Acid, and 3.2% Alcohol Content, which was not referenced on the label.

(B)   MSM #3003 – The test revealed 105.8% the amount of methylsulfonymethane referenced on the label, and 816 mcg/ML of calcium, which was not referenced on the label

(C)   Slim 'n Easy #3005 – The rest revealed 139.8% of the stated amount of Niacin and 164 mcg/mL of Chromium, which was not referenced on the label.

(D)   Spray-EEZE #3009: The test revealed only 41.5% of the stated amount of Vitamin A and 63.8% of the amount of stated Vitamin C.

*See* Consumer Product Testing Co. results dated August 21, 2013, true and correct copies of which are attached here to as Exhibit 6.

62.    These representations were false and Defendants knew them to be false. These representations were made with the intent that Plaintiffs and the members of the Class would rely on those representations in paying money for those Products and in joining the EFT endless chain.

63.    Additionally, in August 2009, the U.S. Food and Drug Administration ("FDA") issued a Warning Letter ("FDA Warning Letter") to Qin and EFT setting forth numerous violations of the Federal Food, Drug, and Cosmetic Act for several EFT Products, including Collodial Silver #2003, Celprotect I #2006, Celprotect II # 2007, MSM + Ionics #3003, and PerformPlus #3006.  A true and correct copy of this letter is attached hereto as Exhibit 7.

64.    The FDA Warning Letter revealed that at least one of EFT's products, Colloidal Silver #2003, contained "a poisonous or deleterious substance, lead" that was not indicated on the label, and was in violation of US law:

1    Your product 2006 Celprotect I is adulterated within the meaning

2    of section 402(a)(1) of the Act [21 U.S.C. § 342(a)(1)] in that it

3    bears or contains a poisonous or deleterious substance, lead, which

4    may render it injurious to health. The FDA laboratory found 5.2

5    ug of lead (pb)/gram in the product. Under the maximum

6    recommended conditions of use (4 capsules per day), the total

7    possible lead consumption from this product is 12 ug Pb/day.

8    Lead is a poisonous or deleterious substance in this product

9    because it is present in an amount that contributes to an

10   unacceptable dietary exposure for children under the age of seven.

11   If a child under the age of seven is exposed to lead at the levels

12   present in your product on a routine basis, permanent damage to

13   the central nervous system can occur. This can result in learning

14   disorders, developmental defects, and other long-term health

15   problems. In addition, sustained consumption of products

16   containing high lead levels can produce lead poisoning, which has

17   a number of symptoms including anemia, neurological effects

18   such as ataxia and irritability, constipation, muscular weakness,

19   and chronic nephritis.

20   *Id.*, at 1.

21       65.    Despite being warned by the FDA that 2006 Celprotect I was in

22   violation of US law, and contained a poisonous substance, Defendants knowingly

23   continued to manufacture Celprotect I and encourage Affiliates to purchase that

24   Product and join or pay into the EFT endless chain.

25       66.    Defendants knew that their Product contained lead and was mislabeled

26   and nonetheless sold such Product to Plaintiffs and members of the Class.

27   / / /

28   / / /

67.     Defendants did not reveal this material fact, but rather concealed it, in order to induce Plaintiff and members of the Class to purchase Products and pay into the EFT endless chain scheme.

68.     As alleged herein above, Defendants engaged in the sale of misbranded and unsafe products.  The sale of misbranded and unsafe products is unethical, oppressive, and unscrupulous.

69.     As alleged herein above, Qin, EFT, and the EFT Officers and Directors have and continue to dupe consumers into purchasing products that fail to accurately disclose the ingredients in the products, and, in some instances, contain undisclosed poisonous and harmful ingredients as demonstrated by independent testing and testing performed by the FDA.

70.     In fact, the products were mislabeled under the FDA, meaning it would be a violation of US federal regulations to resell them as sold by EFT.  Furthermore, some EFT Products were found to contain lead, a toxic substance.  These deficiencies, of which all Defendants were aware and failed to disclose to Plaintiffs and Class Members, made the products worthless, dangerous, illegal, and unsellable.

71.     EFT, Qin, the EFT Officers and Directors, and various Does continue to falsely advertise and sell products which were the subject of the FDA Warning Letter, including:  #2003 – "Colloidal Silver", #2006 – "CelProtect I", #2007 – "CelProtect II Bullet Points", #3003 – "MSM + IONICS", #3004 – "Re-Live Again", #3006 – "PerformPlus", #3008 – "Colostrum Spray", #3012 – "Vision Plus", #3017 – "GlucoBalance", and #3019 – "Cardio Support".  *See Id.,* at 2-4.

72.     Qin, Curry, and other EFT Officers and Directors knowingly and willfully misrepresented that by 2007 EFT had grown into a $782 billion business as represented on the EFT website in 2008.  *See* "About Company" page on the EFT Corporate website, dated April 30, 2008, a true and correct copy of which is attached hereto as Exhibit 8.  *See* "About Company" page of the EFT Corporate website dated

February 29, 2008, a true and correct copy of which is attached hereto as Exhibit 9. This representation was false and Defendants knew it was false or had not reason to believe such representation was true.

73.     From 2007 and continuing through the present, Qin and EFT as well as the EFT Officers and Directors, knowingly and willfully omitted the material fact that they were operating an endless chain scheme, and that as a consequence of that scheme the products and affiliate status held by Plaintiffs had little to no value.

74.     Defendants knowingly misrepresented the nature of the EFT scheme and intentionally concealed the fact that it was operated as an illegal endless chain scheme.  In fact, the EFT endless chain scheme was set up in a way that Affiliates, including all the named Plaintiffs herein and each of the members of the Class, could not make any profit from the retail sale of the Products and they could only make money from the recruitment of others into the scheme.  *See* "Affiliate Prog" page of the EFT Corporate website dated March 23, 2008, a true and correct copy of which is attached hereto as Exhibit 10.

75.     Defendants and various Does induced additional participation in the EFT endless chain by Plaintiffs and members of the Class by offering Affiliates who purchased products the right to invest in EFT by buying membership in the company.

76.     Defendants asserted that because their Products were of a certain quality and value that their membership was valuable.  In fact, the money that Plaintiffs and the Class paid for membership in the company was more money that was being paid into the endless chain scheme.  Through their misrepresentations regarding the quality of the Products and the nature of the endless chain scheme they were operating, Defendants were able to take even more money from Plaintiffs in the form of membership sales, which money became another part of the endless chain scheme.

**D.     Plaintiffs' Reliance and Damages**

77.     Plaintiffs and Class members justifiably relied on the misrepresentations and omissions made by Qin and EFT, alleged herein above.

78.     Plaintiffs justifiably relied on the labels of EFT's Products to be an accurate list and portrayal of the ingredients inside of the Products and chose to purchase those Products and to pay EFT to obtain Affiliate status based upon those representations.  Plaintiffs read the labels and relied on the labels to disclose the actual content of the EFT Products.

79.     Plaintiffs relied on the facts that EFT was a legitimate business and not an endless chain scheme and that EFT Products would have value both for personal use and resale, and so chose to purchase EFT Products and to pay EFT to obtain Affiliate status.  *See* Exhibit 10.

80.     In reliance on Defendants' misrepresentations, as alleged herein above, Plaintiffs and members of the Class, paid money into the endless chain scheme in the form of money paid to become an affiliate of EFT, money paid to purchase EFT Products, money paid to purchase EFT memberships.

81.     Plaintiffs and Class members have suffered injuries in fact and have lost money or property because of the acts of Defendants, as alleged herein above.

82.     Plaintiffs and members of the Class lost the money that they paid into the scheme.  The Products were misbranded, mislabeled, and in some cases contained harmful substances and were therefore worthless.  Plaintiffs were unable to sell such Products and the money that they paid into the endless chain scheme in the form of company membership was also completely lost because the membership was worthless.

83.     In reliance on Qin's misrepresentations about the value and quality of EFT's products and the nature of the EFT operation, and after reviewing the written materials, including the website, Qun Xu paid approximately $49,830 to EFT for $5,750 worth of EFT products, for which she received the right to invest and did invest $44,080 for $11,600 membership shares of the company.  After her purchase, Plaintiff Qun Xu discovered that her EFT Products were actually worthless and that the membership had no value, despite Defendants' representations to the contrary.

18

84.     In reliance on Qin's misrepresentations about the value and quality of EFT's Products and nature of the EFT operation, and after reviewing the written materials, including the website, Plaintiff Wang and her immediate family paid approximately $14,080 EFT for $9,520 worth of EFT Product, for which she received the right to invest and did invest $4,560 for $1,200 membership shares of the company.  After her purchase, Plaintiff Wang discovered that her EFT Products were actually worthless and that the membership had no value, despite Defendants' representations to the contrary.

85.     In reliance on Qin's misrepresentations about the value and quality of EFT's Products and the nature of the EFT company, and after reviewing the written materials, including the website, Plaintiff Fengqin Xu paid approximately $4,618 to EFT for $3,250 worth of EFT Product, for which she received the right to invest, and did invest $1,368 for 360 membership shares of the company.  After her purchase, Plaintiff Fengqin Xu discovered that her EFT Products were actually worthless and that the membership had no value, despite Defendants' representations to the contrary.

86.     After years of repeated misrepresentations about the value and legitimacy of EFT Products and statements that EFT was a legitimate company, Plaintiffs began to suspect that the assurances of Qin, EFT, and others were false and misleading.

87.     Thus, in 2012 Plaintiffs set out to locate other similarly situated Chinese consumers who had attended meetings with Qin, and paid money into EFT.

88.     Through their efforts, Plaintiffs determined that there are tens of thousands of Chinese consumers—both rich and poor—who, based on Qin's speeches about the quality of EFT's products and the nature of the EFT endless chain scheme, paid tens of millions of dollars in EFT by becoming company Affiliates.

89.     After discovering that they were not alone and that the fraudulent endless chain scheme had ensnarled so many unsuspecting Chinese consumers,

HOWARTH & SMITH
ATTORNEYS AT LAW
LOS ANGELES

1    Plaintiffs engaged counsel, first in China and later the U.S., to explore their legal
2    options.

3        90.    It was only after engaging counsel in 2012 that Plaintiffs first learned of
4    the endless chain, false promises, and misuse of the money they had invested in EFT.
5    This was also the first time that Plaintiffs learned that the Products they purchased
6    were mislabeled and that some of the Products contained unlisted ingredients, such as
7    lead, and others did not contain the full amount of ingredients listed on product
8    labels.

9        91.    As a direct and proximate result of Defendants' actions, Plaintiffs and
10   the Class were harmed in an amount to be proven at trial, but on information and
11   belief is in the order of $100,000,000.

12                          **FIRST CAUSE OF ACTION**

13   **(Endless Chain Scheme: Violation of California Penal Code § 327 and California**
14                          **Civil Code § 1689.2)**

15                          **Against All Defendants**

16       92.    Plaintiffs hereby incorporate by reference each and every allegation
17   contained in Paragraphs 1 through 91, inclusive, as though fully set forth herein.

18       93.    Plaintiffs bring this claim on behalf of themselves and all Class
19   members.

20       94.    California Penal Code § 327 renders endless chain schemes illegal and
21   California Civil Code § 1689.2 provides civil relief for all participants in such
22   schemes.

23       95.    Defendants Qin, EFT, and the EFT Officers and Directors willfully
24   contrived, prepared, set up, and operated the EFT Product endless chain scheme.

25       96.    Defendants pay Affiliates recruitment rewards as compensation
26   unrelated to the sales of products to ultimate users but rather, tied to the initial
27   investment amounts of the sponsor affiliate and the recruit.

28   / / /

97.   Plaintiffs and Class members have suffered injuries in fact and have lost money or property because of the business acts, omissions, and practices of Defendants, as alleged herein above.

98.   Plaintiffs and the Class are entitled to recover all consideration paid under the scheme, less any amounts paid or consideration provided to the participants under the scheme.

99.   As Defendants' violations of California Penal Code §327 constitute a pattern of felonious fraud and grand theft causing injury to the Class in an amount to be proven at trial, but on information and belief, is on the order of $100,000,000. Such acts and omissions are punishable by imprisonment for over one year under California Penal Code §§ 487, and 186.1.

100.   As a direct and proximate result of Defendants' actions, Plaintiffs and the Class were harmed in an amount to be proven at trial.

## SECOND CAUSE OF ACTION

### (Deception and Common Law Fraud: California Civil Code §§ 1709-1710; California Penal Code §§ 487, 186.11)

### Against Qin and EFT

101.   Plaintiffs hereby incorporate by reference each and every allegation contained in Paragraphs 1 through 100, inclusive, as though fully set forth herein.

102.   Plaintiffs bring this claim on behalf of themselves and all Class members.

103.   As alleged herein above, Qin and EFT knowingly and willfully made numerous misrepresentations and omissions of material fact to Plaintiffs and the Class.

104.   As alleged herein above, Defendants represented that the EFT Products contained certain amounts of certain ingredients.

105.   As alleged herein above, the EFT Products did not contain the represented ingredients.  In fact, some contained harmful substances including lead.

106.   Defendants knew that their representations were false at the time they made them.

107.   Defendants intended to deceive Plaintiffs and the Class in an effort to manipulate Plaintiffs and the Class to pay more into the EFT scheme.

108.   Plaintiffs were justified in their reliance on Defendants' representations.

109.   As alleged herein above, Plaintiffs and Class members have suffered injury in fact and have lost money or property as a result.

110.   As a direct and proximate result of Defendants' actions, Plaintiffs were harmed in an amount to be proven at trial.

111.   Additionally, Plaintiffs are entitled to punitive damages on this claim pursuant to California law.

**THIRD CAUSE OF ACTION**

**(False Advertising: Business and Professions Code §§ 17500 et. seq.)**

**Against All Defendants**

112.   Plaintiffs hereby incorporate by reference each and every allegation contained in Paragraphs 1 through 111, inclusive, as though fully set forth herein.

113.   Plaintiffs bring this claim on behalf of themselves and all members of the Class.

114.   As alleged herein above, Defendants intended to dispose of personal property, the EFT Products.

115.   As alleged herein above, Defendants publicly disseminated advertising, which contained statements that were untrue or misleading.

116.   Defendants knew, or in the exercise of reasonable care should have known, that the statements described herein above were untrue or misleading.

117.   The statements described by herein above concerned the EFT Products.

118.   As alleged herein above, Defendants publicly disseminated advertising with the intent not to sell the EFT Products at the prices stated or as advertised. The products were defective and did not possess the value advertised.

PLAINTIFFS' SECOND AMENDED AND CONSOLIDATED COMPLAINT

119.   Plaintiffs and Class members have suffered injury in fact and have lost money or property as a result of such unfair competition.

120.   As a direct and proximate result of Defendants' actions, Plaintiffs were harmed in an amount to be proven at trial.

## FOURTH CAUSE OF ACTION

**(Unfair Competition: Business and Professions Code §§ 17200 et. seq.)**

**Against All Defendants**

121.   Plaintiffs hereby incorporate by reference each and every allegation contained in Paragraphs 1 through 120, inclusive, as though fully set forth herein.

122.   As alleged herein above, Defendants knowingly sold misbranded and unsafe products.

123.   The sale of misbranded and unsafe products violates California and Federal law statutory and common law and thus constitutes an unlawful business practice under the UCL.[2]

124.   Under the UCL, an Under the UCL, an "unlawful" business practice includes a practice that violates any law - state or federal, statutory or court-made - regardless of whether the underlying law independently carries a private right of action.  Defendants' sale of misbranded and unsafe products violates California and Federal statutory and common law, including, but not limited to, the following:

(A)   21 U.S.C. §§ 331, 343;

(B)   Cal. Civ. Code § 1709;

(C)   Cal. Health & Safety Code§§ 110390, 110395, 110398, 110400, 111445,

(D)   FAL; and

(E)   Cal. Penal Code § 383.

/ / /

---

[2] A violation of the FAL is necessarily a violation of the UCL.  *See Kasky v. Nike, Inc.*, 27 Cal. 4th 939, 950–951 (2002).

23

HOWARTH & SMITH
ATTORNEYS AT LAW
LOS ANGELES

125.   As alleged herein above, the business practices of Defendants are fraudulent in that they have deceived and continue to deceive the public by misrepresenting their products.

126.   As alleged herein above, the advertisements of Defendants are unfair, deceptive, untrue, or misleading.

127.   Plaintiffs and members of the Class have suffered injury and out-of-pocket losses as a result of the unlawful, unfair, fraudulent, or deceptive business practices of Defendants because, as alleged herein above: (a) Plaintiffs and members of the Classes were induced to purchase products that they would not have otherwise purchased if they knew that they were mislabeled, did not have the composition, and/or, nutritional value promised, and (b) Plaintiffs and members of the Classes were induced to pay substantially more for the products than they would have paid based on the misrepresentations and omissions of Defendants.

128.   Pursuant to California Business and Professions Code § 17203, Plaintiffs and members of the Class are therefore entitled to: (A) an Order requiring Defendants to cease the acts of unfair competition alleged herein; (B) full restitution of all monies paid to Defendants as a result of their deceptive practices; (C) interest at the highest rate allowed by law; and (D) the payment of Plaintiffs' attorneys fees and costs pursuant to, *inter alia*, California Code of Civil Procedure § 1021.5.

## FIFTH CAUSE OF ACTION
### (RICO 18 U.S.C. § 1962 (a)(c)(d))
### Against All Defendants

129.   Plaintiffs hereby incorporate by reference each and every allegation contained in Paragraphs 1 through 128 inclusive, as though fully set forth herein.

130.   Defendants, and others unknown make up the "EFT Enterprise," an association of entities and individuals associated in fact to operate the endless chain scheme.

131.   EFT, Qin, and the EFT Officers and engaged in activities affecting

1  federal interstate and foreign commerce and are entities capable of holding a legal or

2  beneficial interest in property.  EFT, Qin, and the EFT Officers and Directors and

3  other participants in the EFT Enterprise are all "persons" as that term is defined by 18

4  U.S.C. §1961(3).

5      132.   As alleged herein above, the EFT Enterprise advertises, markets, and

6  sells products and services throughout the world, specifically including China, and

7  manufactures and ships products specifically from the United States.  The operation

8  of the EFT Enterprise has continued over several years and has affected and

9  damaged, and continues to affect and damage, commercial activity.

10      133.   Qin, the EFT Officers and Directors, and others are separate entities

11  from the EFT Enterprise and play separate and distinct roles in the operation of the

12  EFT Enterprise.

13      134.   Qin, EFT, the EFT Officers and Directors, and others, both known and

14  unknown, all agreed to and did conduct and participate in the conduct of the EFT

15  Enterprise's affairs.

16      135.   All Defendants participated through a pattern of racketeering activity

17  and for the unlawful purpose of intentionally defrauding Plaintiffs and Class

18  members as alleged herein above.  Specifically, all Defendants willfully and

19  intentionally violated and continue to violate numerous State and Federal laws with

20  the goal of obtaining money, directly and indirectly, through a pattern of racketeering

21  activities composed of numerous indictable offenses, including but not limited to

22  violations of the California Penal Code §§ 327 (Endless Chain), 487 (Grand

23  Larceny), and 186.1 ("California Control of Profits of Organized Crime Act")

24      136.   Criminal mail or wire fraud involves a scheme based on intent to

25  defraud and the use of the mails or wires to further that scheme.  A scheme to

26  defraud encompasses acts of artifice or deceit, which are intended to deprive an

27  owner of his property or money.  The elements of mail and wire fraud are: (1) a plan

28  or scheme to defraud, (2) intent to defraud, (3) reasonable foreseeability that the mail

25

1    or wires will be used, and (4) actual use of the mails or wires to further the scheme.

2    Defendants' endless Chain Scheme involved numerous acts of artifice or deceit

3    which were intended to deprive Plaintiffs and others of their property or money.

4        137.   Defendants, through the EFT Enterprise, perpetrated the endless chain

5    scheme with the intent to defraud Plaintiffs and others.

6        138.   It was reasonably foreseeable that the mails or wires would be used to

7    further the endless Chain Scheme.  All of EFT's products were shipped by mail from

8    within the United States.  The shipment of products was a necessary component of

9    the endless Chain Scheme, as without product shipments the chain would not

10   function.  Where product orders were not placed by mail, orders were accepted by fax

11   or email and accepted payment by wire.  The accepting of EFT product orders was

12   necessary for the execution of the endless chain scheme. EFT, Qin, the EFT Officers

13   and Directors, encouraged checks to be sent by mail or wire and accepted and

14   received the same by mail and wire.  Accepting checks and wired funds was

15   necessary for the endless Chain Scheme, since without money the Defendants could

16   not run their schemes or make profits.

17       139.   From at least 2007 (the actual date will be determined through discovery

18   of Defendants' records) Defendants willfully and knowingly did combine, conspire,

19   and agree together and with each other to commit mail and wire fraud.

20       140.   It was a part and object of the conspiracy between them Defendants,

21   would and did use the mails and wires to further the endless chain scheme.

22       141.   Defendants did send and receive products, communications, and funds to

23   and from places within the U.S. by use of the mails and wires, thereby committing

24   numerous indictable offenses in violation of 18 U.S.C. §§ 1341 and 1343, each

25   punishable by imprisonment in excess of one year and constituting RICO predicate

26   acts of racketeering under 18 U.S.C. § 1962 et seq.

27       142.   Numerous EFT products that were falsely labeled and adulterated. Each

28   and every order of such products from EFT is shipped through the mails.  Each one

26

1   of these mailings is sent in furtherance of Defendants' schemes.  As such, each and

2   every one of the tens of thousands of falsely labeled and adulterated EFT products

3   shipped by Defendants constitutes a predicate act of mail fraud.

4        143.   Because of the material misrepresentations made by Defendants through

5   the wires or delivered through the mails, Plaintiffs and others became EFT affiliates

6   and maintained their positions as EFT affiliates and continued to order EFT products

7   and recruit others to do the same, as alleged in specific detail throughout this

8   Complaint.  In reality, and as previously detailed, Plaintiffs and Class members had

9   no real hope of profiting by participating in the endless chain scheme, and were

10   consequently defrauded out of their money by Defendants' material

11   misrepresentations.

12        144.   Qin, EFT, and various others known and unknown distributed these

13   material misrepresentations by interstate wire transmissions over the internet from

14   web servers based in the U.S., especially the server broadcasting from Dallas, Texas,

15   from the IP address of 50.23.225.63, using various website addresses including, but

16   not limited to, http://www.eftb.us, http://www.eftb.net, http://eftbeftb.com,

17   http://eftbt.com, http://2by2.eftb.us, http://ezgt.eftb.net, http://eftk.us,

18   http://www.efasteam.com, http://www.efasteam2000.com, http://www.ef2t.com, and

19   http://ddp.eftb.us.

20        145.   These transmissions were done with the purpose and intent of recruiting

21   affiliates such as Plaintiffs and Class members into the EFT Enterprise's illegal

22   schemes.  As a result, Plaintiffs and Class members became EFT affiliates,

23   maintained their positions as EFT affiliates, initiated or increased investments in EFT

24   securities, and continued to order EFT products and recruit others to do the same.

25   Each product order that Plaintiffs and Class members placed necessitated the use of

26   bank wires and the shipment of products through the U.S. Postal Service.  Each

27   investment in EFT securities that Plaintiffs and Class members made necessitated the

28   use of bank wires or the mails.  These orders and shipments were necessary for

HOWARTH & SMITH
ATTORNEYS AT LAW
LOS ANGELES

PLAINTIFFS' SECOND AMENDED AND CONSOLIDATED COMPLAINT

1    carrying out the endless chain scheme and were among the direct, intended
2    consequences of Defendants' purposeful and material misrepresentations.

3    146.    All of these claims were purposeful material misrepresentations made to
4    induce Plaintiffs and Class members to send funds into the EFT Enterprise, and
5    Plaintiffs and Class members did so because of such material misrepresentations.
6    Qin, EFT, and others posted misrepresentations to EFT's website with the purpose
7    and intent of promoting the EFT Enterprise's illegal scheme, and participation in the
8    scheme required use of bank wires and use of the U.S. Postal Service.

9    147.    In engaging in the aforementioned wire and mail fraud, Qin, EFT, the
10   EFT Officers and Directors, and others known and unknown, knew that Plaintiffs and
11   others would reasonably rely on the various representations and omissions which
12   would cause the Plaintiffs and Class members to pay funds into the endless chain as
13   well as purchase the mislabeled and adulterated Products.

14   148.    Qin and the EFT Officers and Directors, knew that the
15   misrepresentations and omissions described above in promoting and executing the
16   fraudulent scheme were material because they caused Plaintiffs and Class members to
17   join and participate in the illegal scheme.

18   149.    Had Plaintiffs known that Qin and, the EFT Officers and Directors, and
19   others known and unknown, were promoting illegal schemes, Plaintiffs would not
20   have participated in the endless chain, paid any money to any of the Defendants,
21   placed any orders for any EFT products, or otherwise engaged in transactions with
22   Defendants.

23   150.    Each and every payment made by Plaintiffs pursuant to the endless chain
24   scheme, whether made through the mails or through the wires, proximately caused
25   injury to Plaintiffs.

26   151.    Qin, the EFT Officers and Directors, and others known and unknown,
27   committed thousands of predicate acts of mail and wire fraud which were a proximate
28   cause of the injuries that Plaintiffs suffered. Because of this pattern of unlawful

PLAINTIFFS' SECOND AMENDED AND CONSOLIDATED COMPLAINT

1    conduct Plaintiffs and Class members have collectively suffered injuries in an amount

2    to be proven at trial.

3        152.   As alleged herein above, the EFT Enterprise advertises, markets, and

4    sells products and services throughout the world, specifically including China, and

5    manufactures and ships products specifically from the United States.  The operation

6    of the EFT Enterprise has continued over several years and has affected and

7    damaged, and continues to affect and damage, commercial activity.

8        153.   Qin, the EFT Officers and Directors, and others are separate entities and

9    play separate and distinct roles in the operation of the EFT Enterprise.

10       154.   Defendants used and invested income that was derived from a pattern of

11   racketeering activity in an interstate enterprise.  Revenue gained from the pattern of

12   racketeering activity as specifically alleged previously in this Complaint, and

13   constituting a significant portion of the total income of EFT, Qin, the EFT Officers

14   and Directors, and others, was reinvested in the operations of the EFT Enterprise for

15   the following purposes: (a) to expand the operations of the EFT Enterprise and

16   provide additional false and misleading advertising and promotional materials aimed

17   at recruiting new affiliates into the endless chain scheme; (b) to facilitate the

18   execution of the endless chain scheme; and (c) to convince current affiliates to recruit

19   new affiliates, to purchase EFT products, and to pay into EFT.

20       155.   As a direct and proximate result of Defendants' racketeering activities

21   and violations of 18 U.S.C. § 1962(a), Plaintiffs have been injured in their business

22   and property.

23       156.   Specifically, the reinvestment of the racketeering income into the EFT

24   Enterprise enabled the EFT Enterprise to grow and market itself such that it was able

25   to induce Plaintiffs and Class members to invest millions of dollars of their own

26   money through their purchasing of EFT products and promotional materials, all of

27   which were packaged and shipped at inflated charges.  The EFT Enterprise touted

28   statistics concerning membership and investment numbers in order to induce

HOWARTH & SMITH
ATTORNEYS AT LAW
LOS ANGELES

Plaintiffs and Class members to buy EFT products or recruit others to buy EFT products. But for the EFT Enterprise's reinvestment into the EFT chain scheme, the EFT Enterprise would not have been able quote membership and investment rates to induce Plaintiffs and Class members to pay into the EFT Enterprise.

157. As set forth above in specific detail, Defendants agreed and conspired to violate 18 U.S.C. § 1962(a) (b) and (c). For example, Defendants and other participants in the EFT Enterprise coordinated amongst each other to conduct or participate in the conduct of the affairs of the EFT Enterprise and run the EFT Enterprise's endless chain scheme; to acquire funds through the EFT Enterprise's endless chain scheme and to reinvest these funds into maintaining, growing, operating, and marketing EFT and the EFT Enterprise.

158. As a direct and proximate result of Defendants' violation of 18 U.S.C. § 1962(d), Plaintiffs and Class members were injured by Defendants' unlawful conduct in an amount to be proven at trial. The funds used to buy EFT products and used to invest in EFT constitute property of Plaintiffs and Class members under 18 U.S.C. § 1964(c).

159. Under 18 U.S.C. § 1964(c), Plaintiffs are entitled to treble their damages, plus interest, costs and attorney's fees.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually, and on behalf of all others similarly situated, pray for judgment against Defendants as follows:

1. For an Order certifying the Class under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiffs as Class representatives and their attorneys as Class counsel to represent Class members;

2. For an Order finding in favor of Plaintiffs and the Class on all counts asserted herein;

3. For an Order awarding compensatory, treble, and punitive damages in amounts to be determined by the Judge or Jury;

HOWARTH & SMITH
ATTORNEYS AT LAW
LOS ANGELES

4. For prejudgment interest on all amounts awarded;

5. For an Order of restitution, rescission, and all other forms of equitable monetary relief, including relief from unjust enrichment, and

6. For an Order awarding Plaintiffs their reasonable attorneys' fees and expenses and costs of suit.

Dated:   May 11, 2015                         HOWARTH & SMITH

                                              By:   /s/ Suzelle M. Smith
                                                    Suzelle M. Smith

                                              Attorneys for Plaintiffs Yunxia Wang, Fengqin Xu, and Qun Xu, individually and on behalf of all others similarly situated.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury on all claims triable in this action.

Dated:   May 11, 2015                         HOWARTH & SMITH

                                              By:   /s/ Suzelle M. Smith
                                                    Suzelle M. Smith

                                              Attorneys for Plaintiffs Yunxia Wang, Fengqin Xu, and Qun Xu, individually and on behalf of all others similarly situated.

HOWARTH & SMITH
ATTORNEYS AT LAW
LOS ANGELES

PLAINTIFFS' SECOND AMENDED AND CONSOLIDATED COMPLAINT